# EXHIBIT N

IN THE HIGH COURT OF JUSTICE                                    2008 Folio
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

    (1)    **ED&F MAN COMMODITY ADVISERS LIMITED**
    (2)    **ED&F MAN SUGAR INC**

    **Claimants**

-and-

    (1)    **FLUXO-CANE OVERSEAS LIMITED**
    (2)    **S/A FLUXO-COMERCIO E ASSESSORIA**
           **INTERNACIONAL**

    **Defendants**

---

## PARTICULARS OF CLAIM

---

### The Customer Agreement

1. At all material times the First Claimant ("MCA") carried on business as futures and options brokers.

2. On 1st February 2005 MCA entered into an agreement ("the Customer Agreement") [Tab 1] with Cane International Corp. Ltd, a company incorporated in the British Virgin Islands ("CIC"). MCA will rely upon the Customer Agreement for its full terms and effect at trial.

3. Paragraph 14. of the Customer Agreement provides:

"You [CIC] will pay to us [MCA] on demand:

    14.1    in relation to all Customer Contracts (other than for the purchase by you of a non margined option, the premium for which is payable in full immediately upon purchase) such sums of money by way of deposit or initial margin or margin or maintenance as we require and will supplement that payment from time to time on demand:

    14.2    such sums of money as we may require at any time in or towards clearance of any debit balance on any of your accounts with us:

14.3 on a full indemnity basis, any costs, claims, liabilities, expenses fines, penalties or losses from time to time suffered by us by reason of any breach of the Customer Agreement or as a result of entering into any Customer Contract matching contract with an intermediate broker or settlement agent (as the case may be) or matching exchange traded contract, or any failure by you duly to perform a Customer Contract fully in accordance with its terms or of us taking steps pursuant to Clause 17 to 19 below.

14.4 Failure to provide margin

If you fail to provide margin when required to do so we (or any applicable exchange, clearing house or counterparty) may close out your positions and exercise the rights described in Clause 17.

We will additionally have the right to close out your positions in any other circumstances provided by this Agreement."

4. Paragraph 16.1 of the Customer Agreement provides:

"You are warned that, if at any time:

16.1.1. you have not provided any deposit, margin or other payment due in respect of any Customer Contract by close of business on the Business Day next following the demand, or you have failed to comply with a request made by us; or

...

then we may without prejudicing any other rights we might have, take any one or more of the steps out (sic) in Clauses 17 to 19."

5. Paragraph 20 of the Customer Agreement provides:

"20.1 Default Interest

If you default in paying any amount when due, interest will be payable by you to us on demand as follows:

20.1.1 Accrual

Interest will accrue on such sum until you do pay it (before as well as after judgement).

LDNLIT 1900200.1

2

20.1.2 Rate of Interest

Such interest will be calculated at such rate as may be set out in any relevant special terms or other additional documents or, where not so set out, at the rate of 3% per annum above our cost of funding such default as certified by us. If such rate cannot be ascertained for any reason or is insufficient to compensate us for our loss or expense, as determined solely by us, such interest will be calculated at the rate per annum conclusively determined by us to be equal to loss of interest suffered by us or, as applicable, the cost to us at prevailing market rates of funding the amount of such default from such sources and for such periods as we may at our discretion and from time to time decide."

6. Schedule 1 to the Customer Agreement states:

"(e) "Customer Contract" shall mean any specific transaction entered into or dealing from time to time between us and you."

7. The Customer Agreement is governed by English law and contains a submission to the Courts of England.

**The Guarantee**

8. MCA was only prepared to enter into the Customer Agreement upon a guarantee being provided in respect of CIC's liabilities under the Customer Agreement.

9. Accordingly, on 1st February 2005 MCA and the Second Defendant ("Fluxo-Comercio") entered into a guarantee agreement ("the Guarantee") [Tab 2]. In consideration of MCA giving credit to CIC, Fluxo-Comercio guaranteed all payments due from CIC to MCA. MCA will rely upon the full terms and effect of the Guarantee at trial.

10. Paragraph 1.1 of the Guarantee provides:

"Payment to you [MCA] on demand of all money:

(a) that is now or shall at any time or times hereafter be due or owing to you from or payable to you by the Principal [CIC] under or in respect of any dealing, transaction or engagement whatsoever, either solely or jointly with any other person, firm or company and whether as principal or guarantor,

LDNLIT 1900200.1

3

  (b) that you may from time to time become liable to pay in respect of any dealing, transaction or engagement on account of or for the benefit or accommodation of the Principal, either solely or jointly as stated above,

together with all interest, costs, commissions, fines, penalties and other charges and expenses that you may in the course of your business charge against the Principal and all legal and other costs, charges and expenses that you may incur in enforcing or obtaining payment of any such money from the Principal, or attempting to do so."

11. Paragraph 8 of the Guarantee provides:

"Money not recoverable on footing of guarantee

As a separate and independent stipulation it is agreed by us that any money payable by the Principal that may not be recoverable from us on the footing of a guarantee whether by reason of any legal limitation on, disability or incapacity of the Principal or by virtue of any statutory or other provision rendering the liability of the Principal void or by reason of any other fact or circumstance, and whether known to you or us or not, shall nevertheless be recoverable from us as sole or principal debtor in respect of it and shall be paid by us on demand."

12. MCA will say that notwithstanding that the instrument signed was called a "guarantee" the effect of clause 6 was to make Fluxo-Comercio jointly liable with CIC under the Customer Agreement as a principal co-obligor. Further the instrument operated as an indemnity whereby Fluxo-Comercio agreed to hold MCA harmless from any circumstances that would operate so as to cause CIC's liability under the Customer Agreement to cease.

13. The Guarantee is governed by English law and contains a submission to the Courts of England.

**Credit Facility**

14. On 21st December 2005 MCA entered into a Credit Facility Agreement with CIC with a credit limit of US$7 million ("the 2005 Credit Facility") [Tab 3]. MCA will rely upon the full terms and effect of the 2005 Credit Facility at trial.

15. On 2nd October 2006 MCA entered into a Credit Facility Agreement with CIC with a credit limit of US$10 million ("the 2006 Credit Facility") [Tab 4].

MCA will rely upon the full terms and effect of the 2006 Credit Facility at trial.

16. Both credit facilities expressly referred to and relied upon the Guarantee.

### The merger of CIC with Fluxo Overseas

17. On 29th October 2006 CIC merged with Fluxo Overseas Ltd ("Fluxo Overseas"), a company incorporated in the British Virgin Islands. Pursuant to the merger the surviving company was Fluxo Overseas and its name was changed to Fluxo-Cane Overseas Ltd ("FCO").

18. On 11th December 2006 Flavia Turci of Turci Advocados, lawyers appointed by and acting for CIC and FCO and Fluxo Comercio, sent an email to MCA which stated [Tab 5]:

"It is a merge of a parent company (Fluxo Overseas) with it's (sic) subsidiary (Cane). As you will see in the plan of merge, and in accordance with BVI laws, upon the merger, the separate corporate existence of Cane shall cease and Fluxo Overseas shall: (i) become owner, without other transfer, of all the rights and property of Cane; and (i) (sic) become subject to all liabilities, claims, debts, obligations and penalties of Cane. So, all the existing contracts of Cane will remain in full force. That's why, in our opinion, there's no need, or at least no hurry, to execute new contracts..."

19. The plan of merger, stated [Tab 6]:

"5. Upon merger, the separate corporate existence of Cane shall cease and Fluxo-Cane shall: (i) become owner, without other transfer, of all the rights and property of the Constituent Companies; and (ii) become subject to all liabilities and penalties of the Constituent Companies.

6. As a result of the above, any contracts and arrangement entered into by the Constituent Companies shall continue to be fully binding to Fluxo-Cane, without any amendment or transfer."

20. On 5th April 2007 FCO gave notice to MCA of the aforesaid merger and sent the plan of merger, articles of merger, consent resolution, certification of incorporation and certificate of merger [Tab 7].

LDNLIT 1900200.1

5

**Liabilities of CIC/FCO**

21. Pursuant to the Customer Agreement MCA have carried out transactions on behalf of CIC and/or FCO.

22. Pursuant to the 2005 Credit Facility and the 2006 Credit Facility MCA gave credit to CIC and/or FCO.

23. On 17th January 2008 MCA demanded payment of US$9,468,847.79 in margin payments due under the Customer Agreement [Tab 8].

24. On 18th January 2008 MCA demanded payment of US$29,783,602.29 in margin payments under the Customer Agreement [Tab 9].

25. On 18th January 2008 MCA gave notice to FCO that by reason of the failure to pay sums due under the Customer Agreement MCA would liquidate FCO accounts. Schedules of margin payments due to MCA were attached (Tab 10].

26. On 4th February 2008 MCA demanded payment by FCO of the sum due pursuant to the Customer Agreement of US$41,961,982.07 [Tab 11].

27. On 5th February 2008 MCA demanded payment by Fluxo-Comercio of US$41,961,982.07 pursuant to the Guarantee and in particular as co-obligor under the Customer Agreement and/or pursuant to the indemnity provisions of the Guarantee [Tab 12].

28. On 5th February 2008 MCA demanded payment by FCO of US$39,409,623.27 due pursuant to the Customer Agreement [Tab 13].

29. On 5th February 2008 MCA demanded payment by Fluxo-Comercio of US$39,409,623.27 pursuant to the Guarantee [Tab 14].

30. Wrongfully and in breach of the Customer Agreement FCO and Fluxo-Comercio (as co-obligor) has failed to make payment in respect of any of sums demanded as set out in paragraphs 23, 24, 26, 27, 28 and 29 above.

31. Wrongfully and in breach of the Guarantee Fluxo-Comercio (as indemnifier) has failed to make payment in respect of any of the sums demanded as set out in paragraphs 27 and 29 above.

### The Assignment to ED&F Man Sugar Inc

32. On 7th January 2008 the Second Claimant ("MSI") entered into a sugar purchase agreement with FCO ("the Sugar Purchase Agreement") [Tab 15].

33. On 28th January 2008 FCO demanded payment by MSI of US$6,013,149.93 pursuant to the Sugar Purchase Agreement [Tab 16].

34. On 4th February 2008 MCA assigned to MSI US$6,013,149.93 ("the Initial Assigned Debt") of the US$41,961,982.07 owed by FCO ("the Assignment"). MCA and MSI will rely upon the full terms and effect of the Assignment at trial [Tab 17]. MCA reserve the right to assign future debts to MSI in the same manner as the Initial Assigned Debt (together "the Assigned Debts").

35. The Assignment was governed by English law and included a submission to the courts of England.

36. On 4th February 2008 MSI gave notice to FCO that it set off the Initial Assigned Debt against the sum due under the Sugar Purchase Agreement [Tab 18].

37. On 7th February 2008 Middleton Potts, solicitors acting for FCO and Fluxo-Comerico gave notice that their clients disputed the validity of the Assignment [Tab 19].

### MCA's Claim against FCO

38. MCA claims against FCO, pursuant to the Customer Agreement:

    a. The sums demanded in paragraphs 23, 24, 26, and 28 above, currently totalling. US$24,474,161.20 or such sum due at trial in respect of liabilities under the Customer Agreement.

    b. Interest upon unpaid sums. Alternatively, interest pursuant to section 35A of the Supreme Court Act 1981 at such rate and for such period as the Court thinks fit.

    c. The charges and legal costs of recovering sums due from FCO.

39. The assignment being an assignment of part of the sums owing from FCO to MCA is operable as an equitable assignment only. In the premises the legal right to claim the debt due from FCO to MCA remains with MCA.

40. The following interest is claimed by MCA from FCO:

   a. Interest payable by FCO to MCA under the Customer Agreement.

   b. Such further interest which accrues before judgment.

41. For the avoidance of doubt MCA will give credit for the Assigned Debts insofar as FCO accepts MSI's set off, alternatively the set off is sanctioned by a competent court, against the sum due under the Sugar Purchase Agreement, alternatively insofar as FCO tenders sums assigned to MSI.

### MCA's Claim against Fluxo-Comercio

42. MCA claims against Fluxo-Comercio, pursuant to the Guarantee and in particular the principal debtor obligation set out in paragraph 8 of the Guarantee:

   a. The sums demanded in paragraphs 27 and 29 above, currently totalling. US$24,474,161.20 or such sum due at trial in respect of liabilities under the Customer Agreement.

   b. Interest upon unpaid sums as set out in paragraph 40 above and accruing.

   c. The charges and legal costs of recovering sums due from FCO.

### MSI's Claim against FCO

43. The Second Claimant seeks a declaration that the Assignment is valid as a matter of English law.

AND the First Claimant Claims against the First Defendant:

(1) The debt of US$24,474,161.20 or such sum that the Court finds due under the Customer Agreement.

(2) Interest at the rate of the Customer Agreement, alternatively interest pursuant to section 35A of the Supreme Court Act 1981 at such rate and for such period as the Court thinks fit.

(3) An indemnity in respect of all charges and costs incurred in recovering funds owed by the First Defendant.

LDNLIT 1900200.1

8

AND the First Claimant claims against the Second Defendant:

(1) Pursuant to the Guarantee the sum of US$24,474,161.20 and interest as aforesaid or such sum that the Court finds due under the Customer Agreement.

(2) An indemnity in respect of all charges and costs incurred in recovering funds owed by the First Defendant.

AND the Second Claimant claims against the First Defendant:

(1) A declaration that the Assignment is valid as a matter of English law.

PAUL DOWNES

PETER DE VERNEUIL SMITH

**THE CLAIMANTS BELIEVES THE FACTS STATED IN THE PARTICULARS OF CLAIM ARE TRUE**

SIGNED: /s/

NAME: JOHN WHITTAKER

**POSITION HELD: PARTNER**

DATED this 20 March 2008

Clyde & Co, 51 Eastcheap, London, EC3M 1JP

**Solicitors for the Claimants**

LDNLIT 1900200.1

9

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>

BETWEEN:

|     |                                   |
|-----|-----------------------------------|
| (1) | ED&F MAN COMMODITY ADVISERS LIMITED |
| (2) | ED&F MAN SUGAR INC                |

<u>Claimants</u>

-and-

|     |                                   |
|-----|-----------------------------------|
| (1) | FLUXO-CANE OVERSEAS LIMITED       |
| (2) | S/A FLUXO-COMERCIO E ASSESSORIA INTERNACIONAL |

<u>Defendants</u>

---

**PARTICULARS OF CLAIM**

---