# EXHIBIT O

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

2008 Folio 276



19 MAY 2008

**BETWEEN:**

(1) ED&F MAN COMMODITY ADVISERS LIMITED
(2) ED&F MAN SUGAR INC.

<u>Claimants</u>

-and-

(1) FLUXO-CANE OVERSEAS LIMITED
(2) S/A FLUXO-COMERCIO E ASSESSORIA
    INTERNACIONAL

<u>Defendants</u>

---

## DEFENCE AND COUNTERCLAIM

---

*Save where otherwise indicated, this Defence and Counterclaim will adopt headings and definitions used in the Particulars of Claim ("the Claim").*

## DEFENCE

**The Customer Agreement**

1. Paragraphs 1-7 of the Claim are admitted[1]. The Defendants will also refer to and rely upon the Customer Agreement for its full terms and effect at trial.

2. In addition the Customer Agreement provided as follows:

---

[1] The citations from the Customer Agreement contain minor typographical errors: line 1 of clause 14.1 in fact reads "other than <u>one</u> for the purchase…"; line 4 of clause 14.3 in fact reads "Customer Contract <u>or</u> any matching contract…".

*"1 Our particulars*
*We are regulated by the Financial Services Authority ("FSA")...*

*6.4 Short Positions*
*We may establish short positions on your behalf, that is to say sell on your behalf investments which you do not own at the time, leaving you with an open exposure related to any increase in the price of those investments before settlement. We may cover your obligations by borrowing for you the relevant investments. We may require you to sign appropriate documentation covering such borrowing...*

*7.5 Acceptance and Execution of Transactions*
*7.5.1 Our capacity*
*We will usually deal with you as principal and no other person will have an interest in respect of any specific transaction which is entered into between us. ...*

*7.6 Best Execution*
*We do not owe you a duty of best execution under FSA's Rules or otherwise in any circumstances.*

*17 Consequences of default*
*If any of the events of default specified in Clause 16 above (except for the event of default specified in Clause 16.1.6) occurs we shall be entitled at our discretion and with or without prior notice to you to do any of the following:-*
*17.1 to close out all or any unperformed Customer Contracts notwithstanding that any date fixed for performance of all or any of you [sic] Contracts to be closed out may not have arrived; or...*
*17.4 to exercise or, if possible, abandon any option the subject of an open Customer Contract; ...*

*18 Exercise of Remedies*
*18.1 Where we exercise our right under clause 17.1 to close out an unperformed Customer Contract we shall effect the closing out by making a matching (save as to price) but opposite Customer Contract with you for an amount of property equal to the amount bought or sold being closed out. The amounts payable under you [sic] Contract being closed out and the matching Customer Contract shall then be netted off and the only obligation thereafter of either of us or you in respect of the closed out Customer Contract shall be our obligation or your obligation, as the case may be, immediately to pay the net amount. The price of the matching Customer Contract shall be the prevailing price for delivery of the property at the same time as delivery was due under the unperformed Customer Contract as of the date when we choose to effect the relevant*

2

*closing out. We shall be entitled to choose the time of closing out at our absolute discretion...*

**21.2 Limitation of exclusion**
*Nothing in this Agreement will exclude or restrict to an extent prohibited by FSA's rules any duty or liability we may have to you under the regulatory system (as defined in FSA's rules)."*

**24.8 Assignment**
**24.8.1 Right to Assign**
(i)     *Assignment by us*
        *We may assign this Agreement to any person or associate without your consent, provided that we give you at least seven business days prior written notice.*
(ii)    *Assignment by you*
        *Your rights under this Agreement are personal to you and not capable of assignment.*

**25 Notices**
**25.2 Method of transmission**
*Any Notice in writing may be given as follows:*
*(d)     by sending by electronic mail and it will be deemed delivered 12 hours after transmission. ...*

3.  On the true construction of the Customer Agreement, which is an adhesion contract, and/or by a term or terms to be implied therein (such term(s) to be implied as a matter of necessity and/or on the ground of obvious inference from the express terms of the agreement):

    (1)  Margin demanded by the Claimant was due for payment by the close of business on the Business Day next following the day on which the demand was made.

    (2)  Until that time had passed CIC (and subsequently FCO) would not be in default for non payment of margin and MCA would not be entitled to take any of the steps listed in clause 17 of the Customer Agreement.

    (3)  In the event that MCA purported to take such steps when it was not entitled to do so, such conduct would be wrongful.

3

(4) Where the Customer Agreement conferred discretionary powers on MCA it was under an obligation to exercise that discretion honestly, in good faith and not arbitrarily, capriciously or unreasonably.

(5) MCA was entitled to assign the Customer Agreement without CIC's (or subsequently FCO's) consent in the circumstances set out in clause 24.8.1(i) but not otherwise and any purported assignment of MCA's rights otherwise than in accordance with clause 24.8.1(i) would be void and of no effect.

4. Further, in the circumstances and pursuant to the Customer Agreement and/or the FSA Rules, MCA was under an obligation to act honestly, fairly and professionally in accordance with the best interests of CIC (and, subsequently, FCO) when carrying out designated investment business. Further or alternatively MCA owed CIC (and, subsequently, FCO) a duty of care to the same effect ("the Best Interests Obligation"). Designated investment business included the taking of any of the steps identified in clause 17 of the Customer Agreement and, if and to the extent that clauses 17 or 18.1 purport to exclude or restrict MCA's duty to comply with the Best Interests Obligation, such exclusion or restriction is void and/or of no effect pursuant to clause 21.2.

5. Further or alternatively, while clause 7.6 of the Customer Agreement purports to exclude the Best Execution Obligation under the FSA's Rules, on its true construction that exclusion applies only to the execution of client orders placed by CIC (or subsequently FCO) and does not apply to the closing out of the customer's position pursuant to clause 17.1 of the Customer Agreement; alternatively if the exclusion does so apply, it is to that extent void and/or of no effect pursuant to clause 21.2.

**The Guarantee**

6. Paragraph 8 of the Claim is not admitted.

4

7. As to paragraph 9 of the Claim it is admitted that MCA and Fluxo-Comercio entered into the Guarantee on 1 February 2005 on the terms set out therein. The Defendants will refer to and rely upon the Guarantee for its full terms and effect at trial and note that MCA will do the same. Otherwise, this paragraph is denied.

8. Paragraphs 10 and 11 of the Claim are admitted.

9. Paragraph 12 of the Claim is denied:

   (1) As to the first sentence, Clause $8^2$ of the Guarantee makes provision for the recovery of moneys from the guarantor in certain specified circumstances, none of which arise on the facts of this case. However, Clause 8 does not have the effect of imposing any wider obligation on Fluxo-Comercio, whether as alleged or at all.

   (2) As to the second sentence, the Guarantee imposed certain limited guarantee obligations on Fluxo-Comercio but it did not give rise to any wider indemnity obligations, whether as alleged or at all.

10. Paragraph 13 of the Claim is admitted.


**Credit Facility**


11. Paragraph 14 of the Claim is admitted subject to production of the document referred to. Paragraphs 15 and 16 are admitted. The Defendants will refer to and rely upon both the 2005 Credit Facility and the 2006 Credit Facility for their full terms and effect at trial. MCA was keen to increase its business with CIC (and subsequently FCO) and therefore increased the amount of the facility from USD 2 million to USD 10 million.

---

[2] The reference in the Claim to clause 6 is assumed to be a typographical error.

### The merger of CIC with Fluxo Overseas

12. Save that the effective date of the merger was 21 December 2006, paragraphs 17-20 of the Claim are admitted[3]. The Defendants will refer to and rely upon the Plan of Merger as may be necessary for its full terms and effect at trial.

### Alleged liabilities of CIC/FCO

13. Paragraphs 21 and 22 of the Claim refer without proper particulars to "transactions" under the agreements but do not identify any particular transactions relied upon. Accordingly those paragraphs are admitted as general statements but, if and to the extent that MCA relies on any particular transactions the Defendants reserve their position, pending the provision of proper particulars by the Claimants.

14. In early January 2008 the ICE Futures U.S., Inc. ("ICE") was concerned that FCO held a short position for the March 2008 No 11 sugar contract in excess of the limits established for it. As a result the ICE instructed FCO to reduce its short March position, which FCO was taking steps to do. However, on 14 January 2008 the ICE instructed clearing houses acting for FCO, of which MF Global, MCA's clearing house, was one, to increase the margins to be demanded from FCO by 20%.

15. Further, on 16 January 2008 the ICE notified its members that all orders for the account of FCO and its affiliates might only be accepted directly from a clearing member of the ICE and from no other person. As a result FCO no longer had direct access to the market via the TT trading platforms which it had previously been able to use in order to place trades.

16. On the same day the ICE informed clearings houses holding FCO's positions by letter that it was required to reduce its short March position to a specified level by close of

---

[3] The citations from the Plan of Merger contain typographical errors, in particular line 4 of clause 5 reads "liabilities obligations and…"; line 1 of clause 6 reads "any contracts and agreements".

business on 23 January 2008, so that by that time FCO would be in compliance with the position limits which the ICE had set.

17. Accordingly Mr Manoel Garcia, the President of FCO, who was at that time in Brazil, set up a conference telephone call with the commission and clearing houses acting for FCO (including MCA) in which he explained that it was necessary to meet the ICE's requirements and wished to arrange a meeting for the following day in New York in order to organise with them an orderly and coordinated approach to the partial liquidation of FCO's position, thereby treating all the commission and clearing houses fairly and avoiding disruption in the market and losses to everyone. The commission and clearing houses including MCA agreed to such a meeting.

18. By close of business on 16 January 2008 FCO had paid all margin demanded by MCA (and by the other commission and clearing houses) including the margin demanded that day.

19. At 1023 London time on 17 January 2008 MCA made a margin call by email of USD 9,468,847.79. This was the margin call referred to in paragraph 23 of the Claim. Accordingly that call was deemed to have been made at 2223 hours and was therefore effectively made on 18 January. Therefore payment was due by close of business on the following business day, 21 January (18 January being a Friday), although payment could not, in practice, have been made before 22 January because 21 January was a national holiday in the USA with the result that no wire transfers could be made as these could only be effected through correspondent banks in the USA. Alternatively payment was due by close of business on 18 January.

20. The meeting arranged by Mr Garcia took place in New York on 17 January 2008 and was attended by representatives of the commission and clearing houses including Mr John Taylor of MCA. In addition Mr Igor Placet and Mr Christian Bouet of MCA were attending by telephone. FCO's representatives arrived at about 1230 local time. Mr Garcia explained that his purpose in calling the meeting was to find a way of reducing FCO's short March 2008 position in an orderly manner so as to minimise as much as possible the effect on the market price (which otherwise would inevitably increase dramatically causing significant losses). Mr Jeff Bauml of BNP agreed with

7

the suggestion of an orderly liquidation and proposed that one of the commission/clearing houses should carry it out so as to reduce FCO's short position as required by the ICE, giving up the contracts thereby concluded to the other houses in proportion to the positions which they were carrying. Others present also agreed to this proposal. Nobody (including the MCA representatives) expressed any disagreement. Mr Bauml also suggested that the least expensive and damaging way to achieve this would be through the use of spreads (ie rolling forward the position into other months where FCO was within the limits accepted by the ICE, and thereby smoothing out any potential volatility in the market). Mr Louis Caiafa of BNP then spoke on the telephone with Mr Thomas Farley the President of the ICE in order to ensure that this proposal was acceptable to the ICE and reported to the meeting that it was.

21. Accordingly it was agreed by those present at the meeting including MCA that FCO's short March 2008 position would be reduced in a coordinated manner with one commission/clearing house carrying out the necessary transactions on the exchange, including the use of spreads, and giving up the contracts thereby concluded to the other houses in proportion to the positions which they were carrying.

22. The commission and clearing houses asked Mr Garcia about payment of margins (although at that stage no margin payments were due) and it was agreed to meet again the following day to formalise the agreement which had been reached and to finalise payment instructions for margin payments as necessary.

23. However, in the morning of 18 January 2008 MCA began to liquidate FCO's position. Such conduct was wrongful:

    (1) because it was contrary to the agreement reached at the meeting on 17 January 2008; and/or

    (2) because FCO was up to date with its margin payments and MCA was not entitled to take any of the steps listed in clause 17 of the Customer Agreement; and/or

(3) because it was contrary to the Best Interests Obligation and the Best Execution Obligation.

24. Later on 18 January 2008, at 10.37 London time, MCA made a margin call for USD 29,783,602.29. This was the margin call referred to in paragraph 24 of the Claim. Accordingly that call was deemed to have been made at 2237 hours and was therefore effectively made on 21 January. Therefore payment was due by close of business on the following business day, 22 January, alternatively by close of business on 21 January. The call threatened, wrongfully, that failure to meet the call "today" might result in FCO's positions being liquidated, but did not explain that in fact such liquidation was already taking place.

25. Later on 18 January 2008 MCA gave notice that due to what was described as FCO's "failure to make the required margin payments", MCA had already exercised, was exercising and would continue to exercise "our right to liquidate all of your accounts with us."

26. Such conduct on the part of MCA was wrongful for the reasons set out in paragraph 23 above. Accordingly paragraph 25 of the Claim is denied.

27. As a result of the premature and wrongful liquidation of FCO's position by MCA and by other commission and clearing houses who failed to adhere to the agreement reached at the 17 January meeting:

(1) There was a dramatic "spike" or "bubble" in the market price during 17 and 18 January as commission and clearing houses rushed to purchase futures contracts in order to reduce FCO's short position, meaning that contracts were closed out at artificially distorted prices rather than in an orderly manner.

(2) This caused substantial losses to FCO and also meant that margin calls based on a calculation of FCO's position by reference to those artificially distorted prices greatly exceeded what they would otherwise have been.

9

      (3)  Therefore there was no purpose in a further meeting and accordingly the meeting which nevertheless took place on 18 January lasted no more than a few minutes.

28. Further or alternatively, even if (which is denied) the right to close out FCO's position had arisen, both MCA's decision to exercise that right and its subsequent conduct in carrying out that operation were wrongful and in breach of duty and/or the Customer Agreement. Further details of these matters are set out in the Counterclaim below.

29. As to paragraphs 26-29 of the Claim:

      (1)  It is admitted that MCA issued certain payment demands in the form set out at tabs 11-14 of the Claim[4].

      (2)  However, it is denied that MCA was entitled to issue such demands (or any of them) and each was therefore invalid.

      (3)  Further, all of these demands (and the subsequent claims made pursuant to those demands) arose out of and were caused by MCA's own breaches of duty and/or the Customer Agreement (as set out above and in more detail below) and therefore all such claims (and each of them) fall for its own account and/or fail for circuity of action.

      (4)  Otherwise, these paragraphs are denied.

30. As to paragraphs 30 and 31, it is admitted that the sums demanded were not paid but it is denied that FCO or Fluxo-Comercio were obliged to make such payments (or any payment) whether as alleged or at all: the allegations of breach as against both parties and each of them is consequently denied.

---

[4] The document at tab 12 was dated 4 February 2008. The document at tab 14 is undated.

### The Alleged Assignment to ED&F Man Sugar Inc.

31. On or about 7 January 2008 FCO concluded a contract for the sale of about 25,000 mt of raw sugar to E D & F Man Sugar Inc. ("MSI") but it is denied that this contract was between the parties mentioned in or on the terms of the document at Tab 15 of the Claim, which document was never sent to FCO. Rather the contract incorporated the terms of the ICE Sugar Contract No 14 which terms expressly exclude any right of set off for the buyer. Paragraph 32 of the Claim is therefore denied.

32. Loading under the sugar contract took place at two ports, Recife and Maceio. MSI paid for the sugar loaded at the first load port notwithstanding the claims which MCA claims to have against FCO. It did so in order to induce FCO to load the balance of the sugar at the second load port as it knew that if it refused to pay for the sugar in purported exercise of some right of set off FCO would refuse to load the balance of the sugar, as it would have been entitled to do.

33. Paragraph 33 of the Claim is admitted. The sum demanded was payment for the sugar loaded at the second load port pursuant to the sugar contract.

34. No admission is made as to paragraph 34 of the Claim. In any event the purported assignment of "the Initial Assigned Debt" was void and of no effect as is the purported reservation of rights in respect of future debts:

    (1) It was not in accordance with 24.8.1(i) of the Customer Agreement which does not permit such a partial assignment and requires notice to be given.

    (2) In any event the so-called "Initial Assigned Debt" was not owed by FCO.

    (3) Further, by a letter dated 8 February 2008 E D & F Man Sugar Limited ("MSL") confirmed it would make payment for outstanding refined sugar contracts on presentation of shipping documents without set offs or counterclaims.

35. Paragraph 35 of the Claim is admitted as a summary of what the purported assignment says but is otherwise denied.

11

36. It is admitted that MSI purported to give notice of set off as stated in paragraph 36 of the Claim. However, the set off was of no effect:

    (1)  It was prohibited by the terms of the sugar contract.

    (2)  The assignment was void and of no effect.

    (3)  As MCI and other ED&F Man Group companies are competitors of FCO and Fluxo-Comércio. Because of that, before entering into a Customer Agreement with MCA, FCO asked Mr. Igor Placet (already mentioned) to confirm that, in any case, no FCO information whatsoever would be disclosed to others companies of Man Group. Mr. Placet gave FCO such confirmation, stating that disclosure was not permitted not only for ethical reasons but also because it was prohibited by the Conduct Rules of the Group.

37. Paragraph 37 of the Claim is admitted.

**MCA's Claim against FCO**

38. The summary of MCA's claim against FCO given in paragraph 38 of the Claim is noted. For the avoidance of doubt MCA's right to such relief, or any relief, as against FCO is denied.

39. As to paragraph 39, the purported assignment was invalid and of no effect and thus the matters referred to do not arise. Otherwise, this paragraph is denied.

40. As to paragraph 40 of the Claim, if contrary to this Defence it is found that sums are payable by FCO to MCA it will be the Defendants' case that the interest provisions of the Customer Agreement are penal and unenforceable in law. Interest, if any, would only be payable pursuant to section 35A of the Supreme Court Act 1981. Otherwise, this paragraph is denied.

41. Paragraph 41 of the Claim is noted.

**MCA's Claim against Fluxo-Comercio**

42. The summary of MCA's claim against Fluxo-Comercio given in paragraph 42 of the Claim is noted. For the avoidance of doubt MCA's right to such relief, or any relief, as against Fluxo-Comercio is denied.

**MSI's Claim against FCO**

43. The Second Claimant is not entitled to the declaration claimed.

44. If, contrary to this Defence, it is found that the sums claimed or any sums are payable by FCO and/or by Fluxo-Comercio to the Claimants it will be the Defendants' case that:

    (1) All or alternatively part of the sums claimed arose by reason of MCA's breach(es) of duty and/or the Customer Agreement: accordingly all such claims fail on the ground of causation and/or by reason of circuity of action; and/or

    (2) That the sums claimed fall to be reduced by reason of MCA's failure to take all reasonable steps to mitigate the consequences of the Defendants' alleged breaches in that it negligently mishandled the closing out of FCO's positions (as to which, see further below); and/or in any event

    (3) The Defendants will seek to set off alternatively extinguish the entirety of any such liability by reference to the amounts counterclaimed as set out below.

13

## COUNTERCLAIM

45. Paragraphs 1-44 above are repeated.

### FCO's claims against MCA

46. In breach of duty and/or in breach of the Customer Agreement, in particular clause 16.1.1 and the implied term and/or in breach of the Best Interests Obligation and/or Best Execution Obligation as set out above, and/or in breach of the 17 January 2008 agreement, MCA prematurely and wrongfully exercised a purported right to close out FCO's contracts. As explained above, MCA began to close out FCO's contracts before the earliest possible time that such a right can have arisen, namely close of business on 18 January 2008; see paragraph 19 above.

47. Further or alternatively, even if the right to close out FCO's contracts had arisen, MCA's decision to exercise that right on or before 18 January 2008 (and thereafter) was premature, wrongful and taken in breach of duty and/or in breach of the Customer Agreement, in particular the implied term and/or it amounted to a breach of the Best Interests Obligation and/or Best Execution Obligation.

48. Further, and in further breach of duty and/or the Customer Agreement, in particular clause 17.1, MCA in fact went on to close out all of FCO's contracts, not simply the March 2008 contracts.

49. Further, not only was the decision to close out wrongful but the operation itself was grossly mismanaged by MCA in further breach of duty and/or in further breach of the Customer Agreement, in particular the implied term and/or in further breach of the Best Interests Obligation and/or Best Execution Obligation.

50. MCA's breaches and/or wrongful actions created and/or contributed to a three day price bubble in the sugar futures market which caused considerable damage to FCO's financial position:

14

(1) Shortly before MCA acted to close out positions the market for March 2008 futures was trading in the region of 11.30/11.32 cts/lb;

(2) MCA's actions and the similar actions of other commission and clearing houses led to the price rising to twin highs of 13.09cts/lb and 13.04cts/lb on 17 and 18 January 2008 respectively;

(3) When the market reopened on 22 January 2008 the price had returned to the 11.30-11.50cts/lb range.

51. As to all these matters, it is the Defendants' case that a broker, acting and exercising its discretionary powers reasonably and in accordance with its Best Interests Obligation and/or Best Execution Obligation would have refrained from closing out a client's position during periods when market price and volatility were such as to be likely to cause serious damage to that client's position.

52. Further or alternatively a broker acting reasonably in such a market would have purchased spreads in order to manage the process in a coordinated and orderly fashion thereby minimising the likely losses to its client's position.

53. However, MCA did not adopt a reasonable approach but instead it acted without proper regard, or any regard, to the position of its client and closed out all or substantially all of FCO's Customer Contracts in an uncoordinated and ad hoc manner during the worst of the adverse market conditions summarised above.

54. As a result of the matters set out above FCO has suffered loss and damage which is provisionally estimated to amount to US$27,232,313.43. Pending proper disclosure the best particulars that the Defendants can presently provide are set out in Appendix I.

55. Further, FCO claims interest pursuant to section 35A of the Supreme Court Act 1981 on the amount found due to FCO at such rate and for such period as the Court may think fit.

**Fluxo-Comercio's claim against MCA**

56. For the reasons set out above Fluxo-Comercio seeks a declaration that it has no liability to MCA, whether pursuant to the Guarantee or to the Customer Agreement or otherwise.

**The Defendants' claim against MCA**

57. For the reasons set out above, the Defendants seek a declaration that the purported assignment of the "Initial Assigned Debt" was void and of no effect as is the purported reservation of rights in respect of future debts.

AND FCO counterclaims against MCA:

    (1) US$27,232,313.43 and/or damages;

    (2) Interest pursuant to section 35A of the Supreme Court Act 1981 to be assessed;

    (3) Costs.

AND Fluxo-Comercio counterclaims against MCA:

    (1) A declaration as aforesaid;

    (2) Costs.

AND the Defendants counterclaim against MCA:

    (1) A declaration as aforesaid;

    (2) Costs.

**STEPHEN MALES Q.C.**

**SEAN SNOOK**

## STATEMENT OF TRUTH

The Defendants believe that the facts stated in this Defence and Counterclaim are true.

I am duly authorised by the Defendants to sign this statement of truth.

Signed:

Full name: _Andrew Meads_

Position held: _Partner_

Name of Defendants' solicitors: MIDDLETON POTTS

Served this 16th day of May 2008 by Middleton Potts, 3 Cloth Street, Barbican, London EC1A 7NP, Solicitors for the Defendants.

## APPENDIX I

Based on the information presently available the Defendants estimate that their loss and damage totals US$27,232,313.43. This figure is calculated as follows:

(1)      As at 16 January 2008 FCO's position with MCA was valued at positive US$2,758,152.23.

(2)      Following the mismanaged closing out by MCA that same position was said to be worth negative US$24,474,161.20.

(3)      The net difference between the two positions is the loss and damage now claimed by the Defendants.

Further, as to the mismanagement of the closing out of FCO's position, and again based on information presently available, FCO refer to and rely on the following facts and matters:

All trade dates are 2008.

### A: Trades identifiable by single trade date

1. On 18 January:

(a) MCA sold 1000 lots of March 08 10.50 call at 1.50cts/lb which was well outside the traded range that day of 1.60-2.25cts/lb; FCO held a long position in these calls at an equivalent futures value of 10.9189 cts/lb. MCA should have waited for these calls to be exercised but instead they purchased futures at 12.66 cts/lb;

(b) MCA bought 1000 lots of March/08 11.50 call at 0.80 cts/lb; this purchase increased the 11.50 call strike position at an inflated price (it amounted to an equivalent futures purchase at 12.30 cts/lb when the market was trading at around 12.00 cts/lb); as MCA was liquidating the position, they should have purchased futures instead.

279966-1

(c) MCA bought 1000 lots of May 08 12.50 call at 1.308cts/lb. MCA should have waited for these calls to expire but instead they unnecessarily bought them back;

(d) MCA bought 2000 lots of May/08 13.50 call at 0.7083 cts/lb which was considerably above that day's average price traded of 0.64 cts/lb. Besides, MCA should have waited for these calls to expire but instead they unnecessarily bought them back;

(e) MCA bought 1850 lots of May/08 14.00 call at 0.45 cts/lb. MCA should have waited for these calls to expire but instead they unnecessarily bought them back;

(f) In summary, the May/08 position was delta long so that if MCA were managing the position (as they should have been) according to the delta hedging strategy, they would sell futures but instead they purchased out-of-the-money calls.

2. On 22 January:

(a) MCA bought 800 lots of March/08 11.00 call at an average price of 0.72 cts/lb. In fact, FCO was already long in this strike and thus this only increased the holding instead of closing it out. Further, the purchases were made at a high premium compared to the possibility of buying futures as they were doing at 11.54cts/lb;

(b) MCA bought 1475 lots of March/08 US$330.00 put at an average price of US$4.67. However, this was an in-the-money option and MCA should have let the options expire;

(c) MCA bought 200 lots of March/08 330.00 call at an average price of US$7.175. There was no good reason for this trade; MCA had bought US$330.00 puts the same day.

3. On 23 January:

(a) MCA bought 125 lots of March/08 10.00 put at 0.03 cts/lb; however, this was an out-of-the-money option and MCA should have let the options expire;

2

        (b) MCA bought 1500 lots of May/08 11.00 call at an average price of 1.2350 cts/lb which was well outside the traded range that day of 1.13-1.20 cts/lb. Further, this was an unnecessary purchase; the position was already long in this option strike.

4. On 25 January:

        (a) MCA bought 500 lots of March/08 320.00 put at US$1.50; however, this was an out-of-the-money option (the market was trading at US$340.00) and MCA should have let the options expire.

5. On 28 January:

        (a) MCA bought 1500 lots of March/08 10.50 put at 0.02cts/lb; however this was an out-of-the-money option (the market was trading at around 12 cts/lb) and MCA should have let the options expire.

6. On 30 January:

        (a) MCA bought 350 lots of May/08 350.00 call at US$17.35; this trade was pointless; the option was not exercised and expired without value.

**B: Other trading errors**

7. On 18, 29 and 30 January MCA bought 13,941 lots of May/08 10.50 put at 0.1954 cts/lb; this purchase was unnecessary since the market was trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore, of these purchases 559 lots were simply not required and were later sold at a discounted average of 0.0364 cts/lb.

8. On 18 January, 1 and 12 February MCA bought 1100 lots of May/08 13.00 call at 0.81 cts/lb. This was an equivalent purchase of futures at 13.81 cts/lb when the market was trading at around 12.50 cts/lb.

9. Between 22 and 25 January MCA bought a total of 1880 lots March/08 11.00 puts at an average price of 0.1573 cts/lb; however this was an out-of-the-money option and MCA should have let the options expire

10. On 23, 24, 25, 28, 30 and 31 January and on 1, 5 and 6 February MCA sold 9,125 lots of March/08 11.50 call at an average price of 0.5791 cts/lb when the market was trading at around 12.00 cts/lb. They had bought some of these calls at a higher price.

11. On 23, 24, 25, 28 and 30 January and 1, 5 and 13 February MCA bought 11,735 lots of May/08 10.00 put at 0.0824 cts/lb; this purchase was unnecessary since the market was then trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore, of these purchases 1600 lots were simply not required and were later sold at a discounted average of 0.04 cts/lb.

12. On 29 January and 12 February MCA bought 750 lots of May/08 12.00 put at 0.3217 cts/lb even though this was not part of the portfolio; moreover this was an unnecessary purchase because the market was trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore, of these purchases 330 lots were later sold at a discounted average of 0.2539 cts/lb.

13. On 30 January, 20 February and 26 March MCA bought 1035 lots of May/08 11.00 put at 0.1090 cts/lb; this purchase was unnecessary since the market was trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore, of these purchases 415 lots were later sold at a discounted average of 0.0831 cts/lb.

14. On 5 February MCA bought 110 lots of March/08 12.00 put at 0.14 cts/lb even though this was not part of the portfolio; MCA then sold these puts on 8 February 2008 when their price had fallen to 0.05 cts/lb.

15. On 12 February MCA sold 200 lots of May/08 11.50 put at 0.14 cts/lb which was well outside the traded range that day of 0.15-0.16 cts/lb.

16. On 18, 23 and 25 February MCA bought 2963 lots of March/08 12.50 call at an average price of 0.5628 cts/lb; this was equivalent to a long futures position at 13.0628 cts/lb but the position was short at 12.6017 cts/lb; MCA paid 0.5628

4

cts/lb to close out the calls when they should have bought the cheaper-priced futures.

17. On several occasions MCA unnecessarily bought and sold futures simultaneously in the same month when they were supposed to be closing out positions; these mistakes obliged MCA to buy and sell futures in excess of the initial position needs at unfavourable prices; for example:

   (a) ICE March/08: MCA sold 3843 lots at an average of 11.8993 cts/lb which were later repurchased at an average of 12.2139 cts/lb;

   (b) ICE May/08: MCA bought 4605 lots at an average of 13.0385 cts/lb which were later sold at an average price of 12.3887 cts/lb;

   (c) LIFFE March/08: MCA bought 556 lots at an average of US$340.0104 which were later sold at an average of US$336.1785;

   (d) LIFFE May/08: MCA sold 641 lots at an average of US$349.8818 which were later repurchased at an average of US$356.4613;

   (e) LIFFE October/08: MCA bought 20 lots at an average of US$390.20 which were later sold at an average of US$368.4828.

5