# EXHIBIT P

IN THE HIGH COURT OF JUSTICE                    2008 Folio 276

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N :


       (1)    **ED&F MAN COMMODITY ADVISERS LIMITED**

       (2)    **ED&F MAN SUGAR INC**          **Claimants**


- and -


       (1)    **FLUXO-CANE OVERSEAS LIMITED**

       (2)    **S/A FLUXO-COMERCIO E ASSESSORIA**
             **INTERNACIONAL**       **Defendants**


---

### REPLY AND DEFENCE TO
### COUNTERCLAIM

---


1.    Save insofar as the same consists of admissions or non-admissions the Claimants join issue with the Defendants on the Defence.


**The Customer Agreement**

2.    Paragraph 2 of the Defence is noted.  The Claimants will refer to the Customer Agreement in full at trial for its full terms and effects.


3.    As to paragraph 3 of the Defence:

a.  The Defendants' observation that the terms of the Customer Agreement appear to be in standard form is noted but its relevance to the claim is not understood.

b.  The implied term pleaded at paragraph 3(1) is denied: it is neither obvious nor necessary.  On the contrary the term would be contrary to the express terms of the contract at clause 14 which stated that margin had to be paid "on demand" and clause 25.2 which provided precise time measurements as to when notifications would be deemed delivered.  The deemed delivery of notification by electronic means measured in hours (as opposed to days) is strongly indicative of the demand being effective when actually communicated or alternatively when deemed delivered under clause 25.2(d).  It is admitted that the Defendant was entitled to a reasonable time to make payment following an effective demand: however this is irrelevant since in fact the Defendants did not have the moneys readily available to meet the demand and did not make payment at the earliest reasonable opportunity (which would have been at the commencement of Friday 18th January 2008). The Claimants will rely on the cases of *Cripps v Wickenden* [1973] 1 WLR 944; *Bank of Baroda v Pannesar* [1987] Ch 335; and *Sheppard v TSB* (1996).

c.  As to paragraph 3(2): it is admitted that as a general rule a creditor may not treat its debtor as being in default at the instant a demand is made.  However it is averred that all that a debtor is entitled to is a reasonable time to make payment which does not include a reasonable time to raise the moneys.  This is referred to in the authorities as time to effect the "mechanics of payment" and nothing beyond this.  It is furthermore averred that where a debtor has by words or conduct asserted its inability to meet the demand: a creditor is entitled to treat the debtor as being in default at the instant a demand is made.

d.  The implied term at paragraph 3(3) is not understood.  Insofar as the contract provided a primary obligation to act or to refrain from acting a particular way

then a party so acting (or refraining so to act) might be in breach of that contract. Save as aforesaid paragraph 3(3) is denied.

e.  Save that is it is admitted the Defendants were under an obligation to exercise any discretion honestly and rationally, paragraph 3(4) is denied. The Claimants will rely *inter alia* on the case of *Keen v Commerzbank* [2007] 1 ICR 623 and the authorities referred to therein. For the avoidance of doubt it is admitted that where the contract provided a discretion which was by the express terms of the contract to be exercised reasonably (see clause 16.1.14) the requirement of reasonableness arose but not otherwise.

f.  The implied term pleaded at paragraph 3(5) is denied: it is neither necessary nor obvious. Further and in any event the Claimants will say that a distinction is to be drawn between the assignment of the benefit of the Customer Agreement itself and an assignment of a debt (which is a separate chose in action) that has arisen by virtue of the terms of the Customer Agreement. It is denied, insofar as it is alleged, that the Second Claimant was not a "permitted assign".

4.  Paragraph 4 of the Defence is embarrassing for want of particularity and is in any event denied. Concerning the close out of the First Defendant's positions there was no "Best Interests Obligation" whether arising by an implied term (it would be contrary to the express terms of the Customer Agreement) the FSA Rules (no particulars having been provided of the rules relied on or the legal mechanism by which they became incorporated into the contract nor any particulars as to how these could have application with regard to New York trading with ICE) nor by a duty of care or otherwise. The Claimants reserve their right to revisit this issue as and when proper particulars are provided to them.

5.  It is denied that clause 7.6 of the Customer Agreement was null and void. In the premises paragraph 5 of the Defence is denied.

**The Guarantee**

6.     The Defendants' admissions at paragraphs 7, 8 and 10 of the Defence are noted.

7.     The Defendant's denial at paragraph 9(1) in relation to the indebtedness of the
       Second Defendant under the guarantee is noted.  The Claimants will say that the
       Second Defendant was liable as co-obligor with CIC; and that the moneys
       claimed herein not being recoverable from CIC by virtue of the merger of CIC
       and the First Defendant: the Second Defendant is nevertheless liable as principal
       debtor under the terms of clause 8.   Alternatively the Second Defendant is
       estopped from denying the same having:

       a.  At all times known that its guarantee was an essential pre-requisite for the
           First Claimant acting as broker for CIC (and therefore its successor, the First
           Defendant).

       b.  Represented to the First Claimant in an email timed at 14:15 on 11th
           December 2006 that there was no urgent need to execute any further
           documentation following the merger: when in truth and in fact there would
           have been had the guarantee not been valid as against the liabilities of the First
           Defendant.

       c.  Stood by and allowed the First Claimant to continue to provide credit to the
           First Defendant when the Second Defendant knew full well that it was relying
           on the guarantee from the Second Defendant.

       d.  Reinforced the impression that the First Claimant had that the Second
           Defendant remained liable to it pursuant to the guarantee for the liabilities
           under the Customer Agreement by providing financial information to the First
           Claimant as to the status of the Second Defendant.

e. In circumstances where it would be unconscionable now for the Second Defendant to deny its liability under the guarantee for the liabilities of the First Defendant.

**Credit Facility**

8. Paragraph 11 of the Defence is noted.

**The Merger of CIC with Fluxo Overseas**

9. Paragraph 12 of the Defence is noted.

**Liabilities of CIC/FCO**

10. Paragraph 13 of the Defence is noted. It is observed that the Defendant has not challenged the calculation of the margin payments demanded on 17th January 2008, 18th January 2008, 4th February 2008, and 5th February 2008 in paragraph 29 of the Defence and Counterclaim or otherwise. The Claimants will therefore say that since the calculation of these margins was based on the "transactions" which were full particularised in the margin demands exhibited at Tabs 8, 9, 11, and 13 of the Particulars of Claim and in the absence of challenge to these calculations the Defendants are taken to have admitted the same.

11. As to paragraph 14 of the Defence:

a. It is admitted that ICE had concerns as to the short positions the First Defendant had adopted for the March 2008 No 11 sugar contracts which were in excess of the limits established by ICE for the First Defendant. In particular these concerns resulted in a special meeting of the Board of Directors of ICE Futures US Inc on 15th January 2008 at which certain actions were taken pursuant to Exchange Rule 21.29: including a determination that there was a substantial question as to whether a "Financial Emergency" had arisen under Chapter 21 of the Exchange Rules. Mr Garcia of the First

Defendant was notified of this meeting by letter dated 16th January 2008 which accused the First Defendant as follows

> *"Fluxo has significantly exceeded the position accountability levels established for it by the Exchange with respect to the futures equivalent position permitted to be held by Fluxo in the March 08 Sugar No.11 delivery month and in all delivery months of the Sugar No.11 contract, combined; Fluxo has refused to bring its positions into compliance with the levels established by the Exchange, notwithstanding repeated requests to do so by the Exchange; and Fluxo has increased its short futures equivalent position when instructed to reduce such position in the March 08 delivery month."*

b. That letter referred to the "gravity" of the situation and invited the First Defendant to request a hearing with regard to the actions taken by ICE in writing within five business days of 16th January 2008. In the premises any challenge to the allegations made by ICE had to be initiated by 23rd January 2008. No such challenge was initiated.

c. The letter amounted to a declaration by ICE that the First Defendant was in default of the Exchange's rules and/or demonstrates that the First Defendant was in violation, contravention, or conflict of a regulation or rule binding upon it.

d. It is admitted that ICE had instructed the First Defendant to reduce its short position for the March 2008 No 11 sugar contracts. In particular in accordance with rule 6.13 ICE instructed MF Global Inc to reduce the First Defendant's short futures equivalent position with the First Claimant to no more than 8,000 futures equivalent contracts by no later than the close of trading on Wednesday 23rd January 2008. ICE had instructed MF Global Inc that they expected it to accomplish a reduction in the First Defendant's positions each day until the specified levels had been achieved.

e.  It is admitted that on 14th January 2008 ICE instructed clearing brokers including MF Global (which was the First Claimant's clearing broker) to collect an additional 20% above the then current margin call on all positions in the March 2008 No 11 sugar contracts as at close of business on 14th January 2008.

f.  It is denied that the First Defendant was taking steps to reduce its March position.  The Claimants will rely on the contents of the letter from ICE dated 16th January 2008 and the Defendants' failure to challenge the allegations made in that letter promptly or at all.

Save as aforesaid paragraph 14 of the Defence is denied.

12.   As to paragraph 15 of the Defence:

a.  It is admitted that ICE notified its members that all orders for the account of the First Defendant (and its affiliates) could only be accepted directly from a clearing member.

b.  It is denied that the result of this the First Defendant was deprived of access to the market: any of the brokers acting on its behalf were permitted to accept instructions to reduce the First Defendant's March position.  The letter dated 16th January 2008 to the First Defendant stated that firms carrying positions for the First Defendant should:

> *"not accept orders, electronic or otherwise, that would <u>result in an increase</u> of Fluxo's short futures equivalent position in the March 08 Sugar No.11 delivery month or its short futures equivalent position in all delivery months combined..."* [emphasis added]

Save as aforesaid paragraph 15 of the Defence is not admitted.

13.   As to paragraph 16 of the Defence: the instruction from ICE to clearing houses dated 16th January 2008 stated that it should reduce the First Defendant's short March position to *"no more than 8,000 future equivalent contracts"* [emphasis added] as opposed to a "specified level". Save as aforesaid paragraph 16 is admitted.

14.   The Claimants are unable to admit or deny paragraph 17 of the Defence and the Defendants are therefore required to prove the same.

15.   Paragraph 18 of the Defence is admitted.  On 16th January 2008 Mr Garcia had stated on the telephone to the First Claimant that if ICE's demands were complied with it would put "fire in my Company" by which he was stating that it would be financially disastrous for the First Defendant.

16.   As to paragraph 19 of the Defence:

   a.   It is admitted that pursuant to clause 25.2(d) of the Customer Agreement the margin call timed at 10:23 on 17th January 2008 was deemed to have been delivered at 22:23 on 17th January 2008.  It is denied that this is the same as demand being made which was made upon actual receipt of the electronic mail the time of which is not with the knowledge of the Claimants but is believed to be a few minutes after 10:23 on 17th January 2008. The Claimants will rely on an express acknowledgment of the said demand for payment at around noon on 17th January 2008 when a Mr Kevin Dyke of the First Claimant called the First Defendant and asked the position with regard to the margin call due that day: he was told that no payment would be made and that the First Defendant would not be authorising any payments until after the meeting in New York between Mr Garcia and the First Claimant along with the First Defendant's other clearing brokers.

b. It is denied, insofar as it is alleged that this was the first time that margin had been demanded in respect of the position at close of business on 16th January 2008. The first demand for margin was made by email on 17th January 2008 at 1:17am in the sum of $7,525,179.39. This call was then repeated by email at 10:23am on 17th January 2008 but to which was added the 20% super margin that ICE had required to be added giving a total of $9,468,847.79.

c. Alternatively and in any event if clause 25.2(d) governs the time of the demand then the demand was made and effective at 1:17pm on 17th January 2008.

d. At the meeting on 17th January 2008 Mr Garcia on behalf of the First Defendant had admitted that the First Defendant's position was "difficult" and that it had failed to make margin payments; he also failed to give a confirmation that existing and future margin calls would be honoured when asked to do so and stated in terms that future margin calls would not be made until he received an assurance from the clearing brokers present that they would keep and implicitly (given the movement in the market and Mr Garcia's request that the positions be left open notwithstanding the failure to pay margin) extend their credit lines. Mr Garcia also informed the meeting that he was to meet with the First Defendant's bankers on 18th January 2008 to see whether he could raise further moneys to satisfy the margin calls. Those statements taken together were an admission by the First Defendant that it was unable to meet the margin calls being made; particularly given that as at the time of this meeting the First Defendant was in fact in receipt of the email timed at 1:17am. In the premises the First Defendant was immediately in default upon receipt (or alternatively deemed receipt) of the email and no further time was permissible to allow for the "mechanics of payment".

e. Further or alternatively if, which is denied, the Defendants were to have a further reasonable time to meet the demand this was no more than sufficient

time to effect the "mechanics of payment" following demand.  It is averred that this was such time until the First Defendant's bankers were to open for business the following working day and to make an immediate telegraphic transfer of the sums that had been demanded.

Save as aforesaid paragraph 19 of the Defence is denied.

17.   As to paragraph 20 of the Defence:

a.   It is admitted that a meeting took place on 17th January 2008 between representatives for the First Claimant, Bache Commodities, ADM Investor Services Inc, BNP Paribas, Bridgeton Global Investment Services, Bear Stearns, Marex Financial, Sucden, Fortis, and Prudential Bache, and Mr Garcia along with two lawyers: Mr David Yaris and Ms Flava Turci.

b.   The purpose of the meeting was to discuss the First Defendant's failure to make margin calls.  The detailed conversations that occurred at the meeting will be the subject of evidence in due course but the Claimants will say that the conversations concluded on a common understanding of Mr Garcia's *(a)* acceptance of default in relation to margin calls already made; *(b)* admission that existing margin calls would not be met; *(c)* assurances that he was attempting to arrange additional credit lines with the First Defendant's bankers to address the situation.  In particular Mr Garcia stated in terms that the First Defendant would stop payment of its margin calls until he was told whether the clearing brokers would keep the First Defendant's credit lines open.

c.   It is denied that the First Claimant agreed to any concession or waiver of its legal rights under the Customer Agreement.  It is denied that any agreement (which is not admitted) between Mr Jeff Bauml of BNP Paribas and Mr Garcia as to an "orderly liquidation" has any bearing or relevance to the

position as between the First Claimant and the First Defendant. It is denied that the First Claimant agreed to this proposal or was even aware of the said "agreement"; further and in any event any agreement as to an "orderly liquidation" *simpliciter* would be void for uncertainty.

d.  The First Claimant is unaware of any agreement with Mr Thomas Farley of ICE and avers that if and insofar as any agreement was reached it was in order to satisfy ICE's concerns as regulator and had no bearing on the position as between the First Claimant and the First Defendant.

Save as aforesaid paragraph 20 is denied.

18.  The agreement pleaded at paragraph 21 of the Defence is denied.  The Claimants have sought further information as to the said agreement which as matters stand would be void for uncertainty.  In the premises paragraph 21 is denied.

19.  Save that it is admitted and averred that Mr Garcia was asked about the payment of margins that were due and that were to be demanded, paragraph 22 of the Defence is denied:

a.  The First Defendant had told Mr Kevin Dyke on behalf of the First Claimant that the First Defendant would not be paying the demand for margin that had been made that day.

b.  The discussions on 17th January 2008 were on the basis that demands for margin payments had been made and not honoured.

c.  Mr Garcia stated that no margin payments would be made unless the clearing brokers confirmed that they would keep their credit lines open.

d. For the avoidance of doubt the request by the First Claimant for information as to when the First Defendant would be in a position to make its margin payments (and in what amounts) and the First Defendant's refusal to provide any answer in this respect on 17th January and on 18th January was a further event of default under clause 16.1.1 of the Customer Agreement.

20. It is admitted that on 18th January 2008 the First Claimant carried out transactions that were aimed at reducing the First Defendants exposure in respect of the March 2008 No 11 sugar contracts. Those steps the First Claimant was entitled to take by virtue of clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6 of the Customer Agreement and without prejudice to the foregoing in mitigation of its loss. The Claimant was entitled to take these actions given:

a. The First Defendant's failure to make margin payments upon demand.

b. The First Defendant's admissions on 17th January 2008 that it was outside ICE limits.

c. The notification from ICE that the First Defendant had to reduce its short position in respect of the March 2008 No 11 Contracts and the declaration that the First Defendant was in breach of ICE rules.

d. The substantial question that had arisen as to whether a Financial Emergency had arisen under Chapter 21 of the ICE Exchange rules as determined by a special meeting of the Board of Directors of ICE Futures US Inc on 15th January 2008.

e. The extent of the First Defendant's exposure to the First Claimant coupled with the unusually high number of brokers that were involved, and the First Claimant's reasonable assumption that its exposure was not untypical and thus

there was a real risk that the First Defendant's total exposure was many times the exposure to the First Claimant.

f.  The First Defendant's refusal to respond to the First Claimant's request as to when and in what amounts it would be making its margin payments.

Save as aforesaid paragraph 23 is denied.

21.  As to paragraph 24 of the Defence:

a.  It is admitted that pursuant to clause 25.2(d) of the Customer Agreement the margin call timed at 10:37 on 17th January 2008 was deemed to have been delivered at 22:37 on 17th January 2008.  It is denied that this is the same as demand being made which was made upon actual receipt of the electronic mail which is not with the knowledge of the Claimants but is believed to be a few minutes after 10:37 on 17th January 2008.  Further and in any event, this was not the first demand.  The first demand had been sent by email timed at 1:17am on 17th January 2008.

b.  Alternatively and in any event if clause 25.2(d) governs the time of the demand then the first demand was made and effective at 1:17pm on 17th January 2008.

c.  The Claimants repeat paragraphs 16 and 17 of this Reply and will say that in the premises the First Defendant admitted on 17th January 2008 that it was unable to meet the margin calls being made.  In the premises the First Defendant was immediately in default upon receipt (or alternatively deemed receipt) of the email and no further time was permissible to allow for the "mechanics of payment".

d.   Further or alternatively if, which is denied, the Defendants were to have a further reasonable time to meet the demand this was no more than sufficient time to effect the "mechanics of payment" following demand.  It is averred that this was such time until the First Defendant's bankers were to open for business the following working day and to make an immediate telegraphic transfer of the sums that had been demanded.

Save as aforesaid paragraph 24 of the Defence is denied.

22.   Paragraph 25 of the Defence is admitted.

23.   As to paragraph 26 of the Defence the Claimants repeat paragraph 19 herein.  In the premises it is denied that the First Claimant was not entitled to take the steps that it did on 18th January 2008 and following.

24.   As to paragraph 27 of the Defence:

a.   It is denied that any transactions carried out on behalf of the First Defendant on 18th January 2008 and thereafter were "premature" or wrongful".  The Claimants repeat paragraph 19 herein.

b.   It is denied that there was any agreement between the First Claimant and the First Defendant on 17th January 2008.  The agreement pleaded in the Defence would be void for uncertainty in any event.

c.   It is trite that the reasonableness of any person's actions must be determined as at the date of those actions and without the benefit of events occurring afterwards, see *Bairstow v Queen's Moat Houses (No.1)* (1997) CA.  The existence of "bubbles" or "spikes" in the market cannot be known as at the relevant time and can only be assessed with the benefit of hindsight.  Thus the assertions at paragraph 27(1) are irrelevant, embarrassing and designed to

prejudice the fair determination of this action and should be struck out in their entirety.

Save as aforesaid paragraph 27 is denied.

25. Paragraph 28 of the Defence is denied.

26. As to paragraph 29 of the Defence:

   a. No basis has been advanced in the Defence as to why the Claimant was not entitled to make the demands pleaded in the Particulars of Claim. The only issue that is put forward is as to the time at which those demands were "effective" and the time at which the First Defendant could have been in default. Thus paragraph 29(2) is embarrassing and liable to prejudice the fair determination of this action and should be struck out.

   b. Similarly in relation to paragraph 29(3) no case has been advanced as to why the demands when made were caused by the First Claimant's breach. The Defence states that the demand on 17th January 2008 was transmitted at 10:23 London time which precedes any breach alleged against the First Claimant which is said to have occurred on 18th January 2008. In the premises paragraph 29(3) discloses no reasonable defence and is frivolous and vexatious and should be struck out.

Save as aforesaid paragraph 29 is denied.

27. Paragraph 30 of the Defence is embarrassing and liable to prejudice the fair determination of this action. No defence has been put forward as to non-payment of the demands regardless of the First Defendant's case as to the premature liquidation of its positions. In the premises paragraph 30 is denied.

**The Assignment to ED&F Man Sugar Inc**

28.   The contract for the sale of 25,000 mt of raw sugar is admitted but it is denied that this was on ICE Sugar Contract No 14 terms.  In any event the existence of a set off in respect of this contract is presently pending before the courts of Baltimore USA and in the premises this averment is irrelevant.  The Claimants will rely on the assertions made by the First Defendant in those proceedings including that the contract was on Domino Terms.  In the premises paragraph 31 is denied.

29.   As to paragraph 32 of the Defence: it is denied that the Second Claimant paid any sums to "induce" the loading of the second tranche of sugar.  The payment was made because it was lawfully due.  The allegation regarding inducement is in any event irrelevant and has been made to prejudice the fair determination of this action and should be struck out.  Save as aforesaid paragraph 32 of the Defence is admitted.

30.   Paragraph 32 of the Defence is noted.

31.   For the reasons stated herein paragraph 34 of the Defence is denied.  The letter dated 8th February 2008 referred to at paragraph 34(3) of the Defence was a letter referring to other physical sugar trades and not the one that was the subject of the assignment.  Further it is denied that the absence of prior notice has any bearing on the Second Claimant's cause of action:

   a.   The requirement for prior written notice related only to an assignment of the benefit of the Customer Agreement and not to debts that had arisen under the agreement.

   b.   Further and in any event the liability to make the margin payments arose under the Customer Agreement and under the Credit Facility dated 20th December 2005 and the Credit Facility dated 2nd October 2006 which contain no limit on assignment by the First Claimant.

    c. Further and in any event as has correctly been stated by Mr Andrew Meads on affidavit sworn on 16th May 2008 at paragraph 35: clause 24.8.1 applied only to the assignment of the complete agreement. Partial assignment of a debt was therefore governed by the default position at common law which is that it is assignable.

    d. Further and in any event the assignment would operate as a declaration of trust which would have an equivalent practical effect.

    e. Alternatively the Second Claimant's right to a valid assignment (with prior written notice) to cure the alleged defect in the assignment dated 4th February 2008 is itself sufficient to give rise to an equitable assignment (equity assumes done that which ought to be done): this not being a case where the contract contains an absolute prohibition on assignment or one which requires the First Defendant's consent.

32. Paragraph 35 of the Defence is noted.

33. For the reasons stated herein paragraph 36 of the Defence is denied. It is further denied that any agreement (which is not admitted) as to confidentiality could have any bearing on the First Claimant's right to assign a debt between the First Defendant and the First Claimant.

34. Paragraph 37 of the Defence is noted.

**MCA's Claim against FCO**

35. Paragraphs 38 and 39 of the Defence are noted.

36. As to paragraph 40 of the Defence:

a. It is denied that an interest provision in an agreement can be a penalty. The Claimants will say that a claim in debt is of a different nature to a claim in damages and that the former is not subject to the rules on recoverability of damage.

b. Further and in any event the facts stated at paragraph 40 do not raise a reasonable defence to the claim for interest and/or are embarrassing and liable to prejudice the fair determination of this action and should therefore be struck out.

## MSI's Claim against FCO

37.  As to paragraph 44 of the Defence:

a. It is denied that any part of the Claimants' claims arise from their own breach of duty and/or the Customer Agreement.

b. It is denied that the First Claimant has failed to mitigate any of the consequences of the Defendants' breaches. The First Claimant's claim is in debt which is not subject to the rules as to mitigation of damage. The allegation of negligence is denied.

In the premises paragraph 44 is denied.

## DEFENCE TO COUNTERCLAIM

38.  Paragraphs 1 to 37 herein are repeated.

39.  Paragraphs 46 to 48 of the Counterclaim are denied. The actions of the First Claimant were neither premature nor wrongful for the reasons stated herein. The Claimants repeat paragraph 19 herein in this respect.

40.   Paragraph 50 of the Counterclaim is denied.  Once the right of the First Claimant
to liquidate the First Defendant's positions it had no duty to wait to exercise those
rights on the grounds that to do so might cause a "bubble" in the sugar futures
market:

    a.   The duty to act or to refrain from acting has to be assessed by reference to the
facts known at that point in time.  The existence of a "bubble" can only be
assessed after the event.

    b.   Provided the First Claimant entered into transactions at the market price at
that particular moment no further duty to act or to refrain from acting can be
established.

    c.   In the premises the Defendant's case with regard to the "timing" of the
transactions entered into on 18th January 2008 and following discloses no
reasonable defence and/or is embarrassing and/or is liable to prejudice the fair
determination of this action.

    d.   Thus the fact pleaded at paragraph 50(3) is irrelevant for determining whether
the reasonableness of the First Claimant's actions on 18th and 19th January
2008.

Save as aforesaid paragraph 50 is denied.

41.   Paragraphs 51 and 52 of the Defence are denied.  Save in relation to the express
duty to act reasonably arising under clause 16.1.14 of the Customer Agreement
the First Claimant was entitled to exercise its discretion provided only that it was
not acting irrationally or perversely.

42.   The Claimants will also rely on clause 21.1 of the Customer Agreement which
excluded the liability of the First Claimant save insofar as the same consisted of

negligence, wilful default or fraud. The Defendants have not pleaded any relevant facts that disclose a defence of negligence, wilful default or fraud and in the premises the Counterclaim does not disclose a reasonable claim nor a defence.

43. Paragraph 53 is embarrassing: the Defendants have not stated what actions would have amounted to a proper exercise of its rights. The Claimants have sought further information in this respect and in respect of the allegations in Appendix 1. The Claimants reserve their right to plead further to these allegations as and when they are properly particularised.

44. It is denied that the First Defendant has suffered a loss of $27,232,313.43 or any loss attributable to the Claimants' breach of contract or duty. From the preamble to Appendix 1 this figure appears to be based on the assumption that had the Claimants acted in a certain manner the First Defendant's position as at 16th January 2008 could have been maintained until March 2008. Such a case is devoid of reality and is in any event denied.

45. It is denied that the Defendants are entitled to the relief claim or to any relief.

46. As to Appendix 1 annexed to the Defence and Counterclaim: this appears to be a list of trades carried out by the First Claimant on behalf of the First Defendant coupled in each case with an assertion that the First Claimant should either *(i)* not have carried out these trades at that time or *(ii)* should not have carried out these trades at all or *(iii)* should have carried out some different trade. Each of these allegations is denied. The Claimants will say that the Defendants' whole approach in Appendix 1 is misconceived and liable to be struck out for the following reasons:

    a. The First Defendant had adopted positions in the market which as at close of business on 17th January 2008 had unpaid losses of $13.7m  As the First

Defendant well knows this position could have given rise to further (theoretically unlimited) losses.

b. To the extent that the First Defendant admits the First Claimant's authority to enter into the trade it cannot then say that the trade was negligent on the grounds that it was "premature". All transactions were carried out at the then prevailing market prices and it is trite that a creditor in this situation has no duty to wait for the market to become more favourable. The First Defendant's case with regard to premature or untimely trading is misconceived and should be struck out.

c. To the extent that the First Defendant relies on market movements after the trade was carried out to prove that the trade either *(i)* should not have been carried out at that time or *(ii)* should not have been carried out at all or *(iii)* that some other trade should have been carried out: the case discloses no reasonable defence or claim and/or is frivolous and vexatious and should be struck out.

d. The First Defendant's case on loss and damage is itself embarrassing and deliberately so. In particular the First Defendant has not pleaded any case as to precisely what action the First Claimant should have taken on 18th January 2008 and following and then calculated how this position would have differed from the position that in fact arose as against the position that would have arisen if nothing had been done. The reason that the First Defendant has failed to carry out this essential and basic step in calculating its loss is because it knows that any calculation would lead to a substantial liability that the First Claimant would be entitled to claim judgment on under CPR 14.1.

In the premises save that the trades listed in Appendix 1 are admitted it is denied that the contents of the Appendix disclose any case in negligence or breach of duty on the part of the Claimants and the Schedule should be struck out. Without

prejudice to this contention the Claimants' individual answers to the contents of Appendix 1 are set out in Appendix 1A annexed hereto.

PAUL DOWNES

**Statement of Truth**

I, John Daniel Whittaker, on behalf of the Claimants believe that the facts stated in this Reply and Defence to Counterclaim are true.

Signed,

...............................

Dated

IN THE HIGH COURT OF JUSTICE                    2008 Folio No 276

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

    (1)    **ED&F MAN COMMODITY ADVISERS LIMITED**

    (2)    **ED&F MAN SUGAR INC**      **Claimants**

- and -

    (1)    **FLUXO-CANE OVERSEAS LIMITED**

    (2)    **S/A FLUXO-COMMERCIO E ASSESSORIA
INTERNATIONAL**    **Defendants**

---

**APPENDIX 1A:
CLAIMANT'S COUNTER SCHEDULE
TO APPENDIX 1 TO THE DEFENCE
AND COUNTERCLAIM**

---

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| **18th January 2008** | | |
| 1A.   Sale of 1000 lots of March 08 10.50 call at 1.50cts/lb. | This was well outside the traded range for the day of 1.60-2.25 cts/lb.   FCO held a long position in these calls at an equivalent | 1A.1 The sale of call options was conducted through floor brokers on the Intercontinental Exchange in New York at market prices prevalent on the exchange at that time.  For the avoidance of doubt the trade was not an OTC trade and does not |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | futures value of 10.91989 cts/lb. MCA should have waited for these calls to be exercised but instead they purchased futures at 12.66 cts/lb. | appear in the range of traded price officially published by ICE because it was a spread.<br><br>1A.2  The sale was a partial liquidation of the position that FCO held and was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6<br><br>1A.3  This sale took place on 18th January and there is no reasonable prospect of showing that it was premature.<br><br>1A4  This sale was part of the series on transactions to close out FCO's open positions in accordance with the customer agreement.<br><br>1A5.  It is admitted that with hindsight it would have been better to wait until 8th February, but there was no way of knowing this as at 18th January. |
| 1B.  Purchase of 1000 lots of March 08 11.50 call at 0.80 cts/lb. | This purchase inflated the 11.50 call strike position at an inflated price.  As MCA was liquidating the position they should have purchased futures instead. | 1B.1  There is no reasonable prospect of showing that MCA had a duty to refrain from purchasing on the basis that a sale would inflate the market price. MCA owed a duty to close out transactions and to mitigate potential losses in the close out of FCO's open transactions.  The obligation to mitigate losses was carried out by hedging the risk in the FCO portfolio that had been abandoned.    These hedge transactions resulted in and overall profit to the account of $1,694,052.30 and reduced the losses incurred<br><br>1B.2  This trade was to offset FCO's overall short position and to hedge the risk of a rise in sugar prices.  The sale was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.  This trade was the other half of a spread (ie matched with 1A) and |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | this trade was bought below the market making $56,000.<br><br>1B.3 The premium paid for these options was $896,000. The options were exercised on 8th February 2008 making a profit for FCO. |
| 1C. Purchase of 1000 lots May 08 12.50 call at 1.308 cts/lb | MCA should have waited for these calls to expire but instead they unnecessarily bought them back. | 1C.1 The purchase of these options was to liquidate FCO's short position: it was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>1C.2 The premium paid was $1,464,960 |
| 1D. Purchase of 2000 lots of May 08 13.50 call at 0.7083 cts/lb. | This was considerably above the day's average trade price of 0.64 cts/lb.<br>MCA should have waited for these calls to expire but instead they unnecessarily bought them back. | 1D.1 The purchase was at market price. FCO is not entitled to use hindsight to show that a price was too high/low. The price was within the traded range for the day.<br><br>1D.2 As at 17th January FCO had a short position in these call options to the extent of 1980 lots. The purchase was a liquidation of FCO's short position of 1980 lots (plus an additional 20 lots hedge) in these options. The sale was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>1D.3 1050 of these lots were purchased on 18th January and there is no reasonable prospect of showing that it was premature.<br><br>1D.4 The premium paid for these options was $1,586,592. |
| 1E. MCA bought 1850 lots of May 08 14.00 call at 0.45 cts/lb. | MCA should have waited for these calls to expire but instead they unnecessarily bought them back. | 1E.1 FCO's position as at 17th January was short in these call options to the extent of 1850 lots. This was therefore a liquidation of the position and was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | 1E.2  The premium paid was $932,400. |
| 1F. | In summary the May 08 position was delta long so that MCA should have sold futures according to the delta hedging strategy instead they purchased out of the money calls. | 1F.1 MCA under the contract was required to closeout FCO's positions and to manage the risk position to mitigate future losses. MCA had no obligation to manage the FCO position so as to target speculative profits. Globally FCO had a short position so buying call May options reduced the global short position in a more efficient way than doing everything on March contracts where the market pressure was very high. |
| | | 1F.2 In this respect and elsewhere the Defence relies on the fact that an option was out of the money as being a reason to allow the option to expire (or not to purchase it) and that the option was in the money as a reason not to sell it.  The Defendant is not entitled to use hindsight to assess whether the purchase or sale of an option was reasonable and the fact that an option is in the money or out of the money on a particular day is irrelevant for determining whether it will remain so the following day or till expiry. |
| **22nd January 2008** | | |
| 2A.   MCA bought 800 lots of March 08 11.00 call at an average price of 0.72 cts/lb. | FCO was already long in this strike and thus this only increased the holding instead of closing it out.   Further the purchases were at a high premium compared to the possibility of buying futures as they were doing at 11.54 cts/lb | 2A.1 FCO's position was long in 11.00 calls to the extent of 1964 lots.  However FCO was short in 11.00 puts to the extent of 4740 lots. This trade was a "synthetic trade": buy call + sell future = buy put. Thus by buying 800 lots of 11.00 call and selling 795 futures (which MCA did) the short put position was partially closed out.  The purchase was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 2A.2   Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum. |
| | | 2A.3  The price of 11.54cts/lb is not a true comparator since the premium paid for an option is not derived from the differential between the market price and the strike price: it is a payment for the option seller taking the risk that the market price will (in the case of a call option) be above the strike price when the option comes to be exercised. |
| | | 2A.4  The premium paid for this purchase was $645,120. |
| 2B.  MCA bought 1475 lots of March 08 $330 put at an average price of $4.67. | This was an in-the-money option and MCA should have let the options expire. | 2B.1 This was a partial liquidation of FCO's short position of 1628 lots at 330 put.  The purchase was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 2B.2  The fact that the option was in-the-money is irrelevant.  FCO is not permitted to use hindsight to prove negligence. |
| | | 2B.3  The premium paid was $344,412.50 |
| 2C.  MCA bought 200 lots of March 08 330.00 call at an average price of $7.175. | There was no good reason for this trade; MCA had bought 330 puts the same day. | 2C.1  As at 17th January FCO was short in 330 puts to the extent of 1628 lots and short in 330 calls to the extent of 1469 lots.  This was the position MCA inherited.  On 22nd January MCA partially liquidated the short 330 put position by purchasing 1475 lots.  This was unconnected with the purchase of the 330 calls.  This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 2C.2  The purchase of an additional 200 lots was a synthetic trade which, along with the sale of futures was the equivalent to |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | purchasing a put option: this served to close out the short position in 330 puts completely leaving an equivalent long position of 330 puts to the extent of 47 lots, which was effectively a hedge to mitigate losses that would otherwise result from a rise in the price of sugar.  This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 2C.3    Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum. |
| | | 2C.4  The premium paid was $71,750 |
| **23rd January 2008** | | |
| 3A.   MCA bought 125 lots of March 08 10.00 put at 0.03 cts/lb. | This was an out-of-the-money option and MCA should have let the option expire | 3A.1  This was a partial liquidation of FCO's short position of 4034 lots at 10.00 put.   The purchase was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 3A.2  The fact that the option was out-of-the-money is irrelevant.   FCO is not permitted to use hindsight to prove negligence. |
| | | 3A.3  The premium paid was $4,200. |
| 3B.    MCA bought 1500 lots of May 08 11.00 call at an average price of 1.2350 cts/lb. | This was well outside the traded range for the day of 1.13-1.20 cts/lb. Further this was an unnecessary purchase the position was already long in this option stake. | 3B.1  This purchase was at market price.

3B.2 The purchase of these additional call options at 11.00 was carried out using floor brokers on the Intercontinental Exchange in New York to mitigate losses from closeout transactions.   This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | 24.5, and 24.6.<br><br>3B.3    Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum.<br><br>3B.4  The premium paid was $2,074,800. |
| **25th January 2008**<br>4. MCA bought 500 lots of March 08 320.00 put at $1.50 | This was an out-of-the-money option (the market was trading at $340) and MCA should have let the options expire. | 4.1 FCO was short in 320 puts to the extent of 1911 lots.  This was therefore a partial liquidation of this position and was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>4.2  The fact that the option was out-of-the-money is irrelevant.  FCO is not permitted to use hindsight to prove negligence.<br><br>4.3 The premium paid was $37,500. |
| **28th January 2008**<br>5.    MCA bought 1500 lots of March 08 10.50 put at 0.02 cts/lb. | This was an out of the money option (the market was trading at around 12 cts lb) and MCA should have let the options expire. | 5.1  FCO was short in 10.50 March 08 puts to the extent of 6558 lots.    This was therefore a partial liquidation of this position and was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>5.2  The fact that the option was out-of-the-money is irrelevant.    The Def is not permitted to use hindsight to prove negligence.<br><br>5.3 The premium paid was $33,600. |
| **30th January 2008**<br>6. MCA bought 350 lots of May 08 350.00 call at | This trade was pointless; the option was not exercised and | 6.1    The purchase of these call options offset generally FCO's risk of losses against a rise in the price of sugar. |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| $17.35. | expired without value. | 6.2  Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum.<br><br>6.3  The premium paid was $303,625. |
| 7.  On 18, 29, 30 January MCA bought 13,941 lots of May 08 10.50 put at 0.1954 cts/lb | The option was out of the money. Furthermore of these purchases 559 lots were simply not required and were later sold at a discounted average of 0.0364 cts/lb. | 7.1 As 17th January FCO was short in these options to the extent of 13146 lots.  This position was liquidated as follows:<br><br>18th January 12200 lots<br><br>29th January 1500 lots (thus liquidating the 17th January position in its entirety and giving rise to a long position of 554 lots)<br><br>30th January 800 lots were purchased.<br><br>The liquidation was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>7.2  The purchase of an additional 1354 lots 10.50 put (the Claimant does not understand where the figure of 13941 comes from) was to mitigate losses from the close out of FCO positions. The overall May 08 put position which was long and to offset the risk of a fall in the price of sugar, especially below 9.5 cts/lb.<br><br>7.3  Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | claim increases in this sum.<br><br>7.4 The subsequent sale is irrelevant: the Def is not entitled to use hindsight.<br><br>7.5 In any event the 559 lots were sold on 7th April 2008 at 0.0365 cts/lb and the balance of 795 lots expired on 14th April. Thus the maximum loss attributable to the purchase is $83,364.29 The remaining 795 lots expired out of the money on 14th April 2008 |
| 8. On 18 January, 1 and 12 February MCA bought 1100 lots of May 08 13.00 call at 0.81 cts/lb. | This was an equivalent purchase of futures at 13.81 cts/lb when the market was trading at around 12.50 cts/lb. | 8.1 The total purchases for 18th January and 1st February was 1100 lots of 13.00 call. The reference to 12th Feb is therefore not understood.<br><br>8.2 As at 17th January 2008 FCO's position was short in these options and so the trades on 18th January and 1st February were a liquidation of the position which was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>8.3 The market position is irrelevant for determining whether the purchase of an option was negligent. |
| 9. Between 22 and 25 January MCA bought a total of 1880 lots March 08 11.00 puts at an average price of 0.1573 cts/lb. | This was an out of the money option and MCA should have let the options expire. | 9.1 As at 17th January 2008 FCO was short in March 08 11.00 puts to the extent of 4740 lots. The purchase of these options was therefore a partial liquidation of the position as follows:<br><br>500 options were purchased on 22nd January.<br><br>680 options were purchased on 24th January.<br><br>This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | 9.2 The fact that the option was out-of-the-money is irrelevant. The Def is not permitted to use hindsight to prove negligence. |
| | | 9.3 The premium paid for these options was $331,210.88 |
| 10. On 23, 24, 25, 28, 30 and 31 January and on 1, 5 and 6 February MCA sold 9,125 lots of March 08 11.50 call at an average price of 0.5791 cts/lb. when the market was trading at around 12.00 cts/lb. | They had bought some of these calls at a higher price. | 10.1 As at 17th January 2008 FCO had calls to the extent of 11089 lots. The decision to sell 9,125 was a partial liquidation of the position and was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>10.2 The fact that some of the calls had been purchased at a higher price is irrelevant. |
| 11. On 23, 24, 25, 28 and 30 January and 1, 5 and 13 February MCA bought 11,735 lots of May 08 10.00 put at 0.0824 cts/lb. | This purchase was unnecessary since the market was then trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore of these purchases 1600 lots were simply not required and were later sold at a discounted average of 0.04 cts/lb. | 11.1 As at 17th January 2008 FCO was short in these options to the extent of 13637 lots. This was position was liquidated as follows:<br><br>5000 lots purchased on 18th January (of which the Def does not complain)<br><br>3000 lots purchased on 23rd January<br><br>1360 lots purchased on 24th January<br><br>2550 lots purchased on 25th January<br><br>825 lots purchased on 28th January<br><br>500 lots purchased on 1st February<br><br>402 lots purchased on 5th February (with a further 398 lots long position to offset the general risk of a fall in the sugar price against FCO's overall long position with regard to May 08 put options).<br><br>This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | 16.1.13, 16.1.14, 17.1, 24.5, and 24.6. |
| | | 11.2   Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum. |
| | | 11.3   The fact that the option was out-of-the-money is irrelevant.   The Def is not permitted to use hindsight to prove negligence. |
| | | 11.4 The total premium for the 398 lots was $22,288 at 0.05 cts/lb |
| 12. On 29 January and 12 February MCA bought 750 lots of May 08 12.00 put at 0.3217 cts/lb. | This was not part of the portfolio; moreover this was an unnecessary purchase because the market was trading at around 12.50 cts/lb and the option was out-of-the-money. Furthermore of these purchases 330 lots were later sold at a discounted average of 0.2539 cts/lb. | 12.1   The purchase of these options was a hedge against FCO's short position in May 08 put options which offset the risk of a fall in the price of sugar.   This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.

12.2   Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum.

12.3   The fact that the option was out-of-the-money is irrelevant.   The Def is not permitted to use hindsight to prove negligence. |
| 13. On 30 January, 20 February and 26 March MCA bought 1035 lots of May 08 11.00 put at 0.1090 cts/lb. | This purchase was unnecessary since the market was trading at around 12.50 cts/lb and the option was out of the money. | 13.1 On 17th January FCO had a short position on these put options to the extent of 2189 lots.   This position was liquidated as follows:

300 lots on 30th January |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | Furthermore of these purchases 415 lots were later sold at a discounted average of 0.0831 cts/lb. | 1000 lots on 20th February<br><br>150 lots on 26th March<br><br>739 lots expired on 14th April 2008<br><br>This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>13.2   The figure of 1035 is the net of a purchase of 1450 lots and a sale of 415 lots.<br><br>13.3   The net loss on this transaction was $87,727.92. |
| 14. On 5 February MCA bought 110 lots of March 08 12.00 put at 0.14 cts/lb. | This was not part of the portfolio.  MCA then sold these puts on 8 February 2008 when their price had fallen to 0.05 cts/lb. | 14.1   The purchase of these options was a hedge against FCO's short position in March 08 put options which offset the risk of a fall in the price of sugar.  This was not irrational or perverse and was justified under clauses 14.4, 16.1.1, 16.1.11, 16.1.13, 16.1.14, 17.1, 24.5, and 24.6.<br><br>14.2   Alternatively if which is denied MCA's hedging in relation to FCO's position as at 17th January 2008 is not permitted then the net effect of stripping all these trades out of the account is adverse to the extent of $1,694,052.30 and thus the Claimant's claim increases in this sum.<br>14.3   Further and in any event the Defendant is not entitled to use hindsight to show negligence.<br><br>14.4   The options were sold on 8th February and a loss of $11,088 overall was realised |
| 15. On 12 February MCA sold 200 lots of May 08 11.50 put at 0.14 cts/lb. | This was well outside the traded range for the day of 0.15-0.16 cts/lb. | 15.1   The sale of put options was conducted through floor brokers on the Intercontinental Exchange in New York at market prices prevalent on the exchange at |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| | | that time. For the avoidance of doubt the trade was not an OTC trade and does not appear in the range of traded price officially published by ICE because it was a spread. |
| | | 15.2 The sale made an overall profit (along with a further sale). |
| 16. On 18, 23 and 25 February [sic should be January] MCA bought 2963 lots of March 08 12.50 calls at an average price of 0.5628 cts/lb. | This was equivalent to a long futures position at 13.0628 cts/lb but the position was short at 12.6017 cts/lb. MCA paid 0.5628 cts/lb to close out the calls when they should have bought the cheaper priced futures. | 16.1 On 17th January FCO was short in these call options to the extent of 3000 lots. These trades were therefore a liquidation of this position as follows:<br><br>18th January bought 2313 lots<br><br>23rd January bought 300 lots.<br><br>5th February bought 350 lots.<br><br>8th February the remaining 37 lots were exercised.<br><br>16.2 Furthermore it is denied that the purchase of futures at 12.6017 would close out a short position in call options. |
| 17A. ICE March 08 MCA sold 3843 lots at an average of 11.8933 cts/lb which were later repurchased at an average of 12.2139 cts/lb.<br><br>17B. ICE May 08 MCA bought 4605 lots at an average of 13.0385 cts/lb which were later sold at an average of 12.3887 cts/lb.<br><br>17C. LIFFE March | On several occasions MCA unnecessarily bought and sold futures simultaneously on the same month when they were supposed to be closing out positions; these mistakes obliged MCA to buy and sell futures in excess of the initial position. | 17.1 It is denied that paragraph discloses any particulars of negligence. The fact that a futures trade made a loss with the benefit of hindsight does not amount to a prima facie case of negligence in relation to that trade.<br><br>17.2 Without prejudice to the burden of proof these trades were part of a hedging strategy which made a profit of $1,694,052.30 and/or were one half of a series of "synthetic trades" which served to liquidate short call/put positions by the purchase of a future coupled with the appropriate option as follows:<br><br>Buy Call + Sell Future = Buy Put |

| Trade | Particulars of Breach of Contract/Negligence | Claimant's Answer |
|---|---|---|
| 08 MCA bought 556 lots at an average of $340.0104 which were later sold at an average of $336.1785.<br><br>17D. LIFFE May 08. MCA sold 641 lots at an average of $349.8818 which were later repurchased at an average of $356.4613.<br><br>17E. LIFFE Oct 08. MCA bought 20 lots at an average of $390.20 which were later sold at an average of $368.4828. | | Buy Put + Buy Future = Buy Call<br><br>Buy Call + Sell Put = Buy Future<br><br>Sell Call + Buy Put = Sell Future |