# EXHIBIT R

Filed on behalf of: Applicant / Claimant in an intended Action
John Daniel Whittaker
First Affidavit
Exhibit "JDW1"
25 April 2008

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:                                            2008 Folio No. 276


(1)   ED&F MAN COMMODITY ADVISERS LIMITED
(2)   ED&F MAN SUGAR INC

Applicant and
Claimant

-and-

(1)   FLUXO-CANE OVERSEAS LIMITED
(2)   S/A FLUXO-COMERCIO E ASSESSORIA
      INTERNACIONAL

Respondent and
Defendant

---

## FIRST AFFIDAVIT OF JOHN DANIEL WHITTAKER

---

I, JOHN DANIEL WHITTAKER of 51 Eastcheap, London, EC3M IJP in the United Kingdom do make oath and say as follows:

1.   I am a partner of the law firm Clyde & Co LLP of 51 Eastcheap, London EC3M 1JP. I am duly authorised to make this Affidavit on behalf of the Applicant, ED&F Man Commodity Advisers Limited and ED&F Man Sugar Inc. I do so on the basis of the documents and information provided to me by the Applicant's employees and officers: Mr Richard Askew, ED&F Man Group Legal Counsel, Mr Miles Marmion, ED&F Man Group Chief Financial Officer, Mr Christian Bouet,

LDNLIT 1913826.4                                                        1

ED&F Man Commodity Advisers Limited Chief Operating Officer, and Mr John Taylor, ED&F Man Commodity Advisers Limited Global Head of Compliance and Documentation.

2.    I make this affidavit in support of the Applicant's application for Orders prayed in the Application filed herein. The facts and matters deposed herein have been derived by me from the documents provided to me by the Applicant or based on information obtained in conducting this matter or supplied by the Applicant's representatives listed in paragraph 1 above. Insofar as the content of this affidavit is not within my personal knowledge it is true to the best of my knowledge and belief being derived from documents, information and instructions given to me by the Applicant's representatives listed in paragraph 1 above.

3.    There is now shown to me and marked "JDW1" a bundle of copy documents to which I shall refer.

Introduction

4.    The first Applicant, ED&F Man Commodity Advisers Limited ("MCA"), is a company incorporated in England under company number 01292851. At all material times MCA carried on business as a broker in futures and options.

5.    The second Applicant, ED&F Man Sugar Inc. ("Man Sugar"), is a company incorporated in Delaware, United States of America with Employee Identification Number 13-2861375, and with its principle place of business in Florida, United States of America. At all material times Man Sugar carried on business as a trader in physical sugar commodities.

6.    On 1st February 2005, MCA entered into an agreement ("the Customer Agreement") (attached at JDW1 Tab 1) with Cane International Corp. Ltd, a company incorporated in the British Virgin Islands ("CIC"). Under the Customer Agreement (at paragraph 14 , JDW1, Tab 1 / pages 9-10), CIC was obliged to pay, on demand, such sums of money by way of deposit or initial margin or margin or maintenance as MCA requires, to be supplemented from time to time on demand, as set out more particularly in that Agreement.

7.   MCA was only prepared to enter into the Customer Agreement upon a guarantee
     being provided in respect of CIC's liabilities under the Customer Agreement.
     Therefore, on 1st February 2005 MCA and the Second Respondent, S/A Fluxo-
     Comercio E Assessoria Internacional ("Fluxo-Comercio") entered into a
     guarantee agreement ("the Guarantee") (attached at JDW1 Tab 2).   In
     consideration of MCA giving credit to CIC, Fluxo-Comercio guaranteed all
     payments due from CIC to MCA.

8.   Both the Customer Agreement and the Guarantee are governed by English law
     and contain a submission to the Courts of England.  MCA will rely upon the full
     terms and effect of the Customer Agreement and the Guarantee at trial.

9.   On 20th December 2005 MCA entered into a Credit Facility Agreement with CIC
     with a credit limit of US$7 million ("the 2005 Credit Facility") (attached at JDW1
     Tab 3).   On 2nd October 2006 MCA entered into a further Credit Facility
     Agreement with CIC which raised the credit limit from US$7 million to US$10
     million ("the 2006 Credit Facility") (attached at JDW1 Tab 4).  Both credit facilities
     expressly referred to and relied upon the Guarantee.  MCA will rely upon the full
     terms and effect of the credit facilities at trial.

10.  On 29th October 2006 CIC merged with the Second Respondent, Fluxo Overseas
     Ltd ("Fluxo Overseas"), a company incorporated in the British Virgin Islands.
     Pursuant to the merger the surviving company was Fluxo Overseas and its name
     was changed to Fluxo-Cane Overseas Ltd ("FCO").

11.  On 11th December 2006 Flavia Turci of Turci Advocados, lawyers appointed by
     and acting for CIC and FCO and Fluxo Comercio, sent an email to MCA
     (attached at JDW1 Tab 5) which stated:

     "*It is a merge of a parent company (Fluxo Overseas) with it's [sic] subsidiary
     (Cane). As you will see in the plan of merge, and in accordance with BVI laws,
     upon the merger, the separate corporate existence of Cane shall cease and
     Fluxo Overseas shall: (i) become owner, without other transfer, of all the rights
     and property of Cane; and (i) [sic] become subject to all liabilities, claims, debts,
     obligations and penalties of Cane. So, all the existing contracts of Cane will*

*remain in full force. That's why, in our opinion, there's no need, or at least no hurry, to execute new contracts..."*

12.    The plan of merger (attached at JDW1 Tab 6) stated:

*"5. Upon merger, the separate corporate existence of Cane shall cease and Fluxo-Cane shall: (i) become owner, without other transfer, of all the rights and property of the Constituent Companies; and (ii) become subject to all liabilities and penalties of the Constituent Companies.*

*6. As a result of the above, any contracts and arrangement entered into by the Constituent Companies shall continue to be fully binding to Fluxo-Cane, without any amendment or transfer."*

13.    As background, each client on an exchange is given an 'initial margin' by his broker. The margin is a cash payment that the client makes to the broker, and which is an estimate of how much the client would lose if the market moved against him. The market exposure usually changes from day to day, to reflect changes in the market, and therefore the broker sends a daily statement to the client which sets out whether or not the exposure has changed. If the market has moved against the client and thus the likely exposure has increased, this will increase the amount of margin needed, and thus the daily statement will also make a 'margin call', for a 'variation margin', pursuant to which the client makes a further payment to the broker, to ensure that the margin is kept paid up.

14.    A 'super margin' is a special payment requested over and above the initial margin and variation margin. It is extremely rare, and a super margin payment is usually only requested in an extremely volatile market. The amount of the super margin will be specified by the exchange, depending on the view taken by the exchange of the likely risk.

15.    Pursuant to the Customer Agreement, MCA carried out transactions on behalf of CIC and/or FCO. Pursuant to the 2005 Credit Facility and the 2006 Credit Facility MCA gave credit to CIC and/or FCO. In MCA's relations with those companies, it was the standard practice that a daily statement (including, where appropriate, a request for payment of any outstanding margin) would be provided

LDNLIT 1913825.4

to FCO, as explained above. FCO did not usually respond to these statements, simply making payments as and when required. In early January 2008, as explained in more detail below, the market moved against FCO. On 17th January 2008, MCA demanded payment of US$9,468,847.79 in margin payments due under the Customer Agreement (attached at JDW1 Tab 7). This included a 20% 'super margin' which had been requested by the international commodities exchange 'Intercontinental Exchange' ("ICE"), on which the relevant trades had been executed, see paragraphs 34 and 35 below.

16.     On 18th January 2008, MCA demanded payment of US$29,783,602.29 in margin payments under the Customer Agreement (attached at JDW1 Tab 8). This included the margin call of 17 January, which had not yet been paid by FCO, and again also the 20% 'super margin' which had been requested by ICE, but not paid by FCO.

17.     Also on 18 January, MCA gave notice to FCO (attached at JDW1 Tab 9) that, by reason of the failure to pay sums due under the Customer Agreement, MCA would liquidate FCO accounts. MCA considered that FCO and Fluxo-Comercio were in breach of their contractual obligations, and accordingly, following the notice to FCO on 18 January 2008, MCA proceeded to mitigate its loss (see paragraphs 23 and 48 below). MCA continued to provide daily account statements and to make daily margin calls.

18.     On 4th February 2008, MCA demanded payment by FCO of the sum due pursuant to the Customer Agreement, which at that date was US$41,961,982.07 (attached at JDW1 Tab 10).

19.     On 4th February 2008, MCA demanded payment by Fluxo-Comercio of US$41,961,982.07 pursuant to the Guarantee and in particular as co-obligor under the Customer Agreement and/or pursuant to the indemnity provisions of the Guarantee (attached at JDW1 Tab 11).

20.     On 5th February 2008 MCA demanded payment by FCO of US$39,409,623.27 due pursuant to the Customer Agreement (attached at JDW1 Tab 12).

21.   On 5th February 2008 MCA demanded payment by Fluxo-Comercio of US$39,409,623.27 pursuant to the Guarantee (attached at JDW1 Tab 13).

22.   Wrongfully and in breach of the Customer Agreement, FCO and Fluxo-Comercio (as co-obligor) failed to make payment in respect of any of sums demanded as set out above.

23.   In order to mitigate its loss, and also to comply with the instructions from ICE (and in accordance with the Consumer Agreement paragraph 14 page 9-10), MCA liquidated FCO's positions on the exchange (in that MCA sold, on FCO's behalf, futures contracts on the ICE exchange).   This was in accordance with the terms of the Customer Agreement.   During the liquidation process, MCA continued to provide daily statements and demands for payment until it had completed liquidating FCO's exchange positions, which occurred on 14 April 2008, crystalising a loss of US$22,056,154.62 (see paragraph 29 below).

24.   Wrongfully and in breach of the Guarantee Fluxo-Comercio (as indemnifier) has failed to make payment in respect of any of the sums demanded as set out above.

25.   Man Sugar owed FCO certain monies in relation to goods bought under a contract dated 7 January 2008 (attached at JDW1 Tab 14) and an invoice numbered 318/08 (attached at JDW1 Tab 15).   On 4 February 2008, MCA assigned to Man Sugar $6,013,149.93 of the debt owed by FCO to MCA under the Customer Agreement (attached at JDW1 Tab 16).   Man Sugar then set-off this debt against monies payable from Man Sugar to FCO under physical trading contracts, which set-off was permitted under the applicable contract and law. Man Sugar gave notice of this assignment to FCO on 4 February 2008, by means of an email from Machado Carlos of Man Sugar to Marcos Bruno of FCO (attached at JDW1 Tab 17).

26.   The Applicant commenced proceedings against the Respondent on 20 March 2008 (see JDW1 Tab 18), claiming the sum of US$24,474,161.20 and interest, or such sum that the Court finds due under the Customer Agreement.

27.  On 4 April 2008, MCA assigned to Man Sugar a further $598,802.90 of the debt owed by FCO to MCA under the Customer Agreement (attached at JDW1 Tab 19). Man Sugar then set-off this debt against monies payable from Man Sugar to FCO under physical trading contracts, which set-off was permitted under the applicable contract and law. Man Sugar gave notice of this assignment to FCO on 7 April 2008, by means of an email from Randall Nelson of Man Sugar to Rodrigo de L.Franca of FCO (attached at JDW1 Tab 20).

28.  The Respondent brought proceedings against Man Sugar in the Courts of Baltimore, United States of America, arguing that the assignments and set-offs were unlawful. In those proceedings, Man Sugar have provided security to FCO, by way of an irrevocable standby letter of credit (attached at JDW1 Tab 21) in the amount of US $6,300,000.00 which letter is currently held by FCO's lawyers, Messrs Winston & Strawn LLP and is subject to certain conditions contained therein, such as that the letter of credit is not payable unless a final award is made by the Courts of Baltimore in favour of FCO equal to the amount of the letter of credit (partial drawings permitted).

29.  Subsequently the Applicant was successful in mitigating its loss further, such that the overall loss has reduced from US$24,474,161.20 to US $22,056,154.62 (before set-off). An application to amend the Particulars of Claim will shortly be made in this regard.

30.  In the meantime, I am advised by the Applicant's representatives that the Applicant believes that the Respondent is in a difficult financial position, and that there are grounds to believe that the Respondent is acting or will act in such a way as to protect it from a judgment obtained against it in these proceedings. The grounds for the Applicant's belief are set out in the following section.

31.  The Applicant therefore seeks a Freezing Order in the amount of US$15,444,201.79, being the Applicant's loss of US $22,056,154.62 less the sums set-off by Man Sugar pursuant to assignments from MCA (namely, $6,013,149.93 and $598,802.90).

**Financial Position of the Respondent and Risk of Dissipation of Assets**

32. I am advised that in early January 2008, ICE raised concerns about the positions that FCO had taken on the exchange, in that FCO had significantly exceeded its trading limit and this was distorting the market.

33. Neither Man Sugar nor MCA were clearing members of ICE, and thus, could not operate directly on the ICE exchange. Therefore, MCA used MF Global, a company which was a clearing member of ICE. This is a typical type of arrangement between brokers and operated under the terms of the contract attached at JDW1 Tab 22. Thus, ICE had no direct jurisdiction over MCA, but it operated effective regulatory jurisdiction over MCA in that MF Global had contractual obligations to ICE, and MF Global had in turn passed such obligations on to MCA, as set out in the contract attached at JDW1 Tab 22.

34. On 14 January 2008, ICE requested that MF Global collect an additional 20% margin (the "super margin") on all positions held by MCA on the FCO account (attached at JDW1 Tab 23). Unfortunately this information was not relayed to MCA by MF Global until 16 January 2008.

35. When ICE requested that FCO's brokers each call for a super margin payment from FCO, this meant that FCO would be required to make cash payments to each of its brokers for each position FCO owned on the market, over and above those margins FCO would normally pay. It was extremely rare for an exchange to give this type of instruction to clearing brokers, and it was even rarer for the instruction to be public in this fashion, in that it was made to all clearing brokers, as I understand occurred here. In 15 years of trading, MCA's Chief Operating Officer Mr Taylor has never heard of another client-specific super margin. The reason it is so rare for this to be public is that the market reacts to the announcement, as it advertises that there is a problem with a particular client and commodity and this lowers confidence immediately. For ICE to issue such a notice was a strong warning to FCO that it must reduce its positions on the exchange immediately.

36.  On 16 January 2008, ICE sent a notice to MF Global Inc (attached at JDW1 Tab 24), stating that FCO had exceeded its permitted trading limits and that FCO's positions held by MCA should be reduced.  ICE also directed that no orders should be accepted from FCO which would increase FCO's trading position.

37.  During the week of 14 -18 January 2008, as a direct result of the correspondence from ICE, there was a series of three meetings between Mr Manoel Fernando Garcia, head of the Fluxo group of which FCO and Fluxo-Comercio are part, and clearing brokers from various companies including MCA, to discuss the concerns which had been raised by ICE and a general concern among the clearing brokers about FCO's ability to maintain the position which it had taken on ICE and to meet the margin calls which were being made.  FCO had not paid the sums due as margin payments to any of the brokers under various contracts and the brokers urgently wanted to know why.  They also wanted to know when the margin payments would be made.

38.  I am advised by MCA's representative that the first meeting took place by telephone on Wednesday 16 January 2008, with Mr Garcia telephoning from Brazil and the clearing brokers including MCA representatives dialling in from New York and London.  At this time, MCA and Man Sugar had not yet been provided with a copy of the ICE letter of 16 January 2008.  The telephone meeting lasted approximately 20 minutes.  Its primary purpose was to seek answers to the concerns which the clearing brokers had about FCO's position in the market.  Mr Garcia admitted that ICE had imposed trading restrictions on FCO.  However, Mr Garcia did not answer the brokers' questions concerning FCO's financial position and why the margin payments had not been made, but he did agree to fly to New York to attend a meeting the next morning in order to, as he put it, "look his clearers in the face".  It was agreed that a face to face meeting would take place the next morning at 10.00 at the offices of Prudential Bache (one of the clearing brokers which had an exposure to FCO).

39.  I am advised that, at 10.00 on Thursday 17 January 2008, the clearing brokers met in person at Prudential Bache.  Present were representatives of MCA (Mr Taylor), Bache Commodities, ADM Investor Services Inc., BNP Paribas, Bridgeton Global Investment Services, Bear Stearns, Marex Financial, Sucden,

LDNLIT 1913826.4

Fortis, and Prudential Bache. This was the first time that the Applicant became aware that FCO was using an unusually large number of brokers and that the ICE trading limit must have been exceeded. At this time, the sugar futures market was rising sharply and FCO had a short position which consisted of a great number of purchase and sales contracts, with a net sale position. I am advised that Mr Taylor knew that FCO's margin call due to MCA was now in the region of $27million, as compared to only around $9million the previous day. Mr Taylor realised that if FCO's exposure held by MCA was multiplied by the number of brokers involved, which was ten, then the problem was potentially extremely serious.

40.     As the meeting between the clearing brokers began, Mr Taylor and the other brokers were advised that Mr Garcia and his lawyer were delayed. The clearing brokers decided to begin their meeting without Mr Garcia. It was agreed that no issues which might be subject to client confidentiality would be discussed until a representative from FCO arrived. What was discussed were the questions which the clearing brokers wished to raise with FCO. Examples of these questions are as follows. Why had FCO been in excess of the ICE exchange limits for 11 days? Would FCO be making payment of the outstanding margin calls? Would it be possible for the clearing brokers present to agree to take reductions of positions in concert in order to bring the positions within the ICE limits? Would one clearing broker be able to act for all of the group? In the absence of Mr Garcia, the meeting was adjourned until 13:00.

41.     Mr Garcia arrived at 13:00, accompanied by two lawyers, Mr David Yaris of Clifford Chance, and Ms Flava Turci (described as Mr Garcia's personal lawyer). The meeting was reconvened with MCA attending both in person (John Taylor) and also by telephone (Myles Marmion, Christian Bouet, and Igor Placet).

42.     Mr Garcia stated that FCO's position was difficult but he wanted to discuss its difficulties face to face with the clearing brokers. Mr Garcia advised that FCO had been above the ICE limits 11 days in a single month. Mr Garcia went on to say that he was surprised that ICE sent a letter on 11 January to FCO advising that ICE was considering liquidating FCO's positions. Thereafter, Mr Garcia advised that on 14 January ICE had ordered super margins to be paid by FCO.

LDNLIT 1913826.4

These margins were paid by FCO, but not however the regular margins due to MCA (MCA were advised too late in the trading day to add super margins to the margin call on 16 January). Thereafter Mr Garcia advised that ICE had asked him to reduce FCO's trading positions. Mr Garcia concluded his initial remarks by stating that FCO would stop payment of its margins until FCO knew what the clearing houses were going to do. Mr Garcia said he was looking for a commitment from the brokers to keep the credit lines, which they had provided to FCO, in place.

43.     From Mr Garcia's comments, it was apparent to MCA that ICE and FCO both acknowledged that FCO's position was difficult. A number of the clearing brokers then demanded FCO's confirmation that it would honour all outstanding margin calls and continue to pay any future margin calls. Mr Garcia made no commitment on behalf of FCO to pay outstanding or future margin calls. Instead, Mr Garcia said he was asking the clearing brokers for a commitment that they would continue to carry FCO's positions.

44.     The response from the clearing brokers, including MCA, was that the position being put forward by Mr Garcia amounted to FCO asking the clearing brokers to maintain positions in the face of ICE instructions that these positions be reduced below specific levels as soon as possible. MCA was required by its contract with MF Global to follow ICE instructions, and MF Global would have similar obligations to ICE under its contract with ICE. The clearing brokers reminded Mr Garcia that, as clearing members of ICE, they had no option but to follow ICE's demands for a specific reduction of positions. In effect, Mr Garcia was asking everyone involved in FCO trading to ignore their exchange regulator, ICE, and to breach their contracts with each other and/or ICE, in order to support FCO's vulnerable market position. Mr Garcia was a professional sugar trader, who had been trading for more than twenty years in this market, and he would have been well aware of the details of the situation and the implications of his behaviour.

45.     The meeting ended with Mr Garcia advising that he would have a meeting with his bankers regarding additional credit lines. It was agreed that there should be a further meeting with the clearing brokers on Friday, 18 January 2008, in order

LDNLIT 1913826.4

to allow Mr Garcia to report on his meeting with his bankers and whether this might enable FCO to pay existing and future margin calls.

46. Thereafter the brokers left the meeting and liquidated FCO's positions if they saw fit to do so. I am advised that the situation was thought to be so urgent, that some of the other brokers were liquidating FCO's positions even during the meeting at which Mr Garcia was asking them not to.

47. The meeting which followed on 18 January 2008 was short. Mr Garcia gave no confirmation that additional credit lines had been obtained or that he would pay existing and future margin calls. On the contrary, he noted that some brokers had started liquidating his positions and that the market was going up further, putting him in an impossible financial position. I am advised that MCA believe that Mr Garcia mentioned the word "*bankruptcy*", although the telephone line was poor and it was very difficult to understand what he was exactly saying.

48. As explained above, FCO did not pay the MCA margin calls for 17 January 2008 or for 18 January 2008, at which time the margin call was US$29,783,602.29. FCO chose not to respond to the margin call. Therefore, as there had been no commitment or indication that FCO would be meet its margin calls, MCA started liquidating FCO's positions on 18 January 2008, after giving notice to FCO that it would do so. MCA continued to provide FCO with daily statements and amounts for margin calls, and also continued to close out the FCO positions in the most orderly way possible, so as to best mitigate the loss.

49. No substantive reply was received to any of the margin calls to FCO, other than a request from FCO for detailed information regarding the FCO positions which had been closed out by MCA.

50. Thereafter MCA representatives attempted to contact FCO. These attempts were not successful. Mr Garcia did not answer his mobile telephone or correspondence.

51. I am advised by Mr Myles Marmion, an MCA Director and Chief Financial Officer of the ED&F companies Group, that in early February 2008, Mr Garcia contacted Bernardo Rodrigues of the Man Sugar physical trading desk, to ask for a meeting

LDNLIT 1913826.4

12

in New York with MCA representatives. Mr Marmion attended that meeting, as did Mr Phillip Howell, Director and Chief Operating Officer of the ED&F companies Group.

52.    The meeting took place on 8 February 2008 at Mr Garcia's hotel in New York. I am advised that the MCA representatives went to that meeting with the intention of finding a commercial solution to FCO's problems. It was not the intention to discuss fine points of law, but rather, MCA was offering to help Mr Garcia restructure the FCO business, and to make suggestions as to how the Fluxo Group business could recover. However, it swiftly became apparent to the MCA representatives that the meeting was a waste of time. Mr Garcia alleged that he had been persecuted by ICE, that some brokers had gained prior knowledge of FCO's problems and had started liquidating FCO's position before it had breached any obligations, and that this had exacerbated FCO's problems.

53.    Mr Garcia told Mr Marmion that FCO had paid out around US $107 million in margin calls. Mr Garcia speculated that if FCO went into liquidation it would have a huge loss. Mr Garcia's estimate of the loss figure rose throughout the meeting, beginning at around $60 million early on in the meeting and resting at around $85 million towards the end of the meeting. Mr Garcia said that this loss would "*blow a hole*" in the FCO balance sheet. Mr Marmion thought that Mr Garcia was essentially saying FCO was balance sheet insolvent, despite the fact that FCO was still trading.

54.    It had been strongly rumoured in the market that Mr Garcia as head of the Fluxo Group had made around US $150 million in the previous trading year. It is not clear to the Applicant whether this is correct nor, if correct, where this money is now.

55.    Mr Marmion asked Mr Garcia whether he intended to make FCO solvent again. Mr Garcia simply said that he had people looking at what to do and MCA would hear from him on this in around 10 – 12 days. However, neither MCA nor Man Sugar ever heard from Mr Garcia, FCO, or Fluxo-Comercio on this point.

LDNLIT 1913826.4

13

56.  Mr Marmion noted that FCO's debts to MCA had been guaranteed by Fluxo-Comercio. Mr Garcia said that Fluxo-Comercio would probably survive but might not have the capital to remain in business. Mr Garcia argued that it was immoral for Man Sugar to have accepted an assignment of FCO's debt to MCA and then to have set off this debt against sums payable to FCO for physical contracts. Mr Garcia did not raise any legal objection to the conduct of Man Sugar or MCA.

57.  Mr Garcia's predominant concern was that he wanted Man Sugar to pay him the $6,013,149.93 which had been set-off as described above at paragraph 25. Mr Marmion made many suggestions as to how FCO might be able to improve its position (for example, it could redo forward transactions, or restructure the Fluxo Group business). However Mr Marmion explained to Mr Garcia that Man Sugar could not be expected to give FCO $6 million for nothing in return.

58.  I am advised that Mr Garcia then stated to Mr Marmion and Mr Howell that Mr Garcia knew that Man Sugar needed further deliveries of physical sugar from FCO to enable Man Sugar to fulfil its obligations to third parties. Mr Garcia noted that Man Sugar currently has good relationships with those third parties, which might be endangered if Man Sugar were unable to comply with its obligations to the third parties. Mr Garcia suggested that, unless Man Sugar reversed the set-off and paid Mr Garcia $6 million, FCO might fail to meet other obligations under different contracts with Man Sugar, and the result of this would be that Man Sugar would have difficulties with third party companies. These remarks were, in effect, threats to disrupt the Applicant's relationships with third parties.

59.  The meeting was considered by the MCA representatives to have been a failure.

60.  Subsequently Mr Garcia telephoned Man Sugar (the physical side of the business, as opposed to the MCA futures contracts business). Mr Garcia informed Mr Rodrigues of the Man Sugar physical desk that Mr Garcia questioned whether FCO would be able to deliver to Man Sugar, and asked whether this would be a problem for Man Sugar. Mr Rodrigues noted Mr Garcia's comment, and said that if FCO did fail to comply with its contractual obligations, then Man Sugar would be able manage the position as regards third parties, but

would take legal action against FCO as regards any loss. At this, Mr Garcia said that FCO would perform its obligations to deliver sugar to Man Sugar.

61.   The Applicant has, by means of a letter dated 3 March 2008 (attached at JDW1 Tab 25), raised its concerns regarding the FCO and Fluxo-Comercio balance sheets, and has asked the Respondent's solicitors, Messrs Middleton Potts, to comment. The Respondent's solicitors stated on 5 March that the relevant casehandler was travelling until 10 March (attached at JDW1 Tab 26). On 10 March, the Applicant asked for the Respondent's urgent comments on this issue (attached at JDW1 Tab 27). On 20 March, the Respondent's solicitors stated *"we are not a firm of accountants and we are not in a position to answer this request substantively."* (attached at JDW1 Tab 28).

62.   On 18 April 2008 (attached at JDW1 Tab 29), the Applicant explained once again the reasons for its concern, and asked that the Respondent's solicitors:

   (a)   (questions 1 and 2): confirm that directors of each Respondent company believe that the Respondent is presently solvent;

   (b)   (questions 3 and 4): confirm whether an officer of each Respondent will undertake that each Respondent company will not trade whilst insolvent or engage in a rearrangement or other restructuring without giving the Applicant 14 days notice; and

   (c)   (question 5): set out the Respondent's proposals for payment of its debt of US $22,056,154.62.

   The Applicant requested a response by noon on 22 April 2008.

63.   On 21 April 2008, the Respondent's solicitors commented that they were taking instructions and thought the requested timing for their response was *"unreasonable"* (attached at JDW1 Tab 30).

64.   On 23 April 2008, the Respondent's solicitors sent a short fax (attached at JDW1 Tab 31) stating that *"With respect to your questions 1 to 4 inclusive, both our clients confirm that they will comply fully with the laws that govern them in their respective domiciles; As to your question 5, we have already stated that your*

LDNLIT 1913826.4

*client's alleged claims are being defended and that our client has counterclaims. If [sic] follows that our client will not be making any proposals for the payment of your client's disputed claims. Further details of our client's position will appear in the Defence and Counterclaim in due course."*

## Assets of FCO and Fluxo-Comercio

65.    FCO is a British Virgin Islands company and thus its accounts are not publicly available. However, the Applicant believes that FCO and/or its guarantor Fluxo-Comercio has had in the past significant assets and may still do so. For example, when four years ago a representative of the Applicant (Mr Rodrigues) saw the Fluxo-Comercio balance sheet, it was worth in the region of US $35 million. Similarly, FCO has provided MCA with details of its Art Collection, which was in 2001-2002 valued at US$2,116,700, (see JDW1 Tab 32) It is not clear why FCO is apparently used by Mr Garcia as a vehicle by which to invest in fine art. Also, as mentioned above, it is rumoured in the market that Mr Garcia made around $150 million from the Fluxo Group last year.

66.    The Applicant does not have any details of the Respondent's assets within or outside the jurisdiction, save that:

(a)    the Applicant believes that FCO has a bank account numbered 5096.27.25 with BIC code BCVLCH2LXXX at Banque Cantonale Vaudoise, Lausanne, 14 Place Saint Francoise 1001 Lausanne, Switzerland.

(b)    FCO has a contingent asset, in that it has an interest in the standby letter of credit referred to in paragraph 28 above given as security by Man Sugar to FCO, payable as described at JDW1 Tab 21.

(c)    The Applicant believes that FCO may still own a quantity of high value fine art (see paragraph 65 above).

The Applicant seeks an order to freeze the Respondent's assets, worldwide.

67.    This application is made without notice because the Applicant believes that, if the Applicant had notice of the application, it would take immediate steps to dissipate

LDNLIT 1913826.4

16

its assets and/or remove them from the jurisdiction. This belief is based on the events outlined above, including the following:

(a)   FCO has, wrongfully and in breach of contract, failed to pay the sums due to MCA under the Customer Agreement and the Credit Facilities.

(b)   Fluxo-Comercio has failed to pay the sums due to MCA under the Guarantee.

(c)   Fluxo-Comercio has, in bad faith, refused to answer queries from MCA and Man Sugar concerning whether and when payment of the guaranteed sums will be made.

(d)   The Respondent companies have a bad reputation in the market to the extent that the ICE exchange ordered brokers to liquidate their positions, and not to accept further orders from them (see paragraph 36 above).

(e)   It appears that the Respondent companies may be balance sheet insolvent and/or may have been trading while insolvent, while under the control of Mr Garcia.

(f)   Mr Garcia has not acted in good faith towards MCA and/or Man Sugar, to the extent that the remarks made by him at the meeting of 8 February 2008 and subsequently by telephone to Mr Rodrigues on the same date were, in effect, threats to disrupt the Applicant's relationships with third parties, in an effort to force MCA and Man Sugar to reverse the set-off and thus assist FCO cash-flow.

(g)   Both Respondent companies are overseas entities privately owned by Mr Garcia and/or members of his family.  Mr Garcia has a history of restructuring the Group of which the Respondent companies are part, and might take steps to do so were he given notice of this application.

(h)   The fact that the Respondent has refused to give any constructive or substantive response to the Applicant's concerns regarding the Respondent's difficulties with its balance sheets (see JDW1 Tabs 25 - 31) has further exacerbated the Applicant's concerns.

LDNLIT 1913826.4

68.   The Applicant has a strong case against the Respondent for sums due under contract and has commenced proceedings. The strength of the Applicant's claim against the Respondent is effectively security in relation to costs or prejudice to the Respondent which might arise as a result of the Order applied for. In any event the Applicant is prepared to give a cross-undertaking as to damages.

## Conclusion

69.   I therefore respectfully ask the Court to grant the Orders prayed in the Application filed herein.

SWORN on 25 April 2008

At

_____

JOHN DANIEL WHITTAKER

Before me:

...............................................

A Solicitor/Commissioner to administer Oaths

This Affidavit is filed on behalf of the Applicant.

LDNLIT 1913826.4

18

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

2008 Folio No. 276

BETWEEN:

(1) ED&F MAN COMMODITY ADVISERS
LIMITED
(2) ED&F MAN SUGAR INC

Applicant and
Claimant

-and-

(1) FLUXO-CANE OVERSEAS LIMITED
(2) S/A FLUXO-COMERCIO E ASSESSORIA
INTERNACIONAL

Respondent and
Defendant

---

FIRST AFFIDAVIT OF JOHN DANIEL
WHITTAKER

---

Messrs Clyde & Co LLP
51 Eastcheap
London
EC3M 1JP
Tel: 020 7623 1244
Fax: 020 7623 5427
Email: john.whittaker@clydeco.com
DX: 1071 London/City

REF YJM/JDW/800645

Solicitors for the Applicant / Claimant

LDNLIT 1913826.4

19