IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FLUXO-CANE OVERSEAS LIMITED

Plaintiff

Case No. 08-cv-356 (WDQ)

v

ED & F MAN SUGAR INC et al

Defendants

---

## SUPPLEMENTAL DECLARATION OF

## MICHAEL SWANGARD

---

I, **MICHAEL SWANGARD** of 51 Eastcheap, London, EC3M IJP in the United Kingdom, declares as follows:

1.    I voluntarily and freely submit this supplemental declaration in support of ED & F Man Sugar Inc's ("Man") Opposition to the Motion for Reconsideration and Hearing filed by the Plaintiff Fluxo-Cane Overseas Ltd ("Fluxo-Cane"). I make this supplemental declaration on the basis of personal knowledge of the matters stated.

2.    I am a solicitor of the Supreme Court of England and Wales and a partner in the firm Clyde & Co LLP of the above address.   I represent ED&F Man Commodity Advisers Limited ("MCA") and Man in the case of ED&F Man Commodity Advisers Limited and ED& F Man Sugar Inc v Fluxo-Cane Overseas Limited and S/A Fluxo-Comercio E Assessoria Internacional, 2008 Folio No. 276, now pending in the High Court of Justice Queen's Bench Division, Commercial Court and Court of Appeal (such court, the "Court of Appeal" and the case, the "English Action").

3.    Attached hereto to my declaration are true and correct copies of:

Exh. A:      *Deposit Protection Board and Another v Barclays Bank PLC* [1994] 2 AC 367 (Ct. App.);

Exh. B:      *Central Insurance v Seacalf Shipping Corporation* (The Ailos) [1983] 2 LLR 25 (Ct. App.);

Exh. C:      Extracts from *Snell's Equity* (31st ed.), paras. 3-20 & 19-11.

4.     I previously submitted a declaration in this case specifically addressing many of the points raised again by Fluxo-Cane in its Motion for Reconsideration. *See* Declaration of Michael Swangard, attached as Exhibit 1 to Man's Reply in Support of Motion for Summary Judgment. My first declaration responded to the points raised by Fluxo-Cane's London solicitor, Andrew Meads, included by Fluxo-Cane in its opposition to Man's Motion for Summary Judgment.

5.     Fluxo-Cane has already responded to the points raised in my declaration when it filed a sur-reply which this Court accepted into the record.

6.     To the extent this Court is willing to consider the arguments raised by Fluxo-Cane in its Motion for Reconsideration, Fluxo-Cane has made several inaccurate statements concerning English law and the enforceability of equitable assignments. *See* Fluxo-Cane's Motion for Reconsideration at pp. 3-5.

7.     First, Fluxo-Cane selectively and incompletely quotes from the "basic propositions" enumerated in the decision of *Deposit Protection Board & Another v Barclays Bank Plc* [1994] 2 AC 367 (House of Lords and Court of Appeal)" ("the *Deposit Board Case*"). A copy of the decision is exhibited at Exhibit A. These propositions were made by the Court of Appeal rather than the House of Lords, which means that they are not generated, as Fluxo-Cane states, from "the highest court in the U.K." Fluxo-Cane's Motion for Reconsideration at p. 3. Fluxo-Cane refers to and set out only five submissions. It fails to identify the fourth proposition which states:

*"Once notice of an equitable assignment has been given to the debtor, he cannot deal inconsistently with the assigned interest for instance making payment to the assignor"*

8.     This is a highly important proposition because it is Man's submission that Fluxo-Cane was, following the assignment and notice hereof, obligated to pay Man (the assignee) and not MCA (the assignor). The fourth proposition makes clear that

upon receiving notice of the equitable assignment the Debtor must pay the Assignee not the Assignor. This proposition confirms the validity and enforceability of equitable assignments.

9. Second, English case law also confirms the validity of equitable assignments. Even if MCA was not a party to the proceedings this would still not prevent Man from suing in its own name and such proceedings would not be a nullity.

10. For example, in *Central Insurance v Seacalf Shipping (The Ailos)* [1983] 2 LLR 25, Oliver L.J. said at pp.32-34:

"But, as I understand the practice of the court, the insistence upon joinder of the assignor under an equitable assignment as a party - the reason and necessity for which I will consider in a moment - is dictated simply by the desirability of having him before the court and thus bound by the order. It is not because his presence as a plaintiff is essential to the prosecution by the assignee of the cause of action assigned to him. The purpose of joining him is equally well served by his being a defendant and indeed, if he refuses to join as plaintiff, he can and should be made a defendant simply in order to be bound by the result." (Our emphasis, page 32.)

"The argument runs thus: an equitable assignee can only assert his cause of action in a suit to which his assignor is a party. The plaintiffs did not make the buyers party to the action. Therefore they were not asserting a cause of action vested in them, but a cause of action vested in someone else, and the suit was not a relevant suit for the purposes of rule 6 [of article III of the Hague Rules]. Thus to allow the plaintiffs now to assert a right vested in them would deprive the defendants of a time bar which has already operated in their favour". "Whether or not the conclusion follows from the middle term, I have found myself unable to accept the major premise. That there is a long-standing practice that, before giving judgment in an action at the suit of an equitable assignee, the court will normally require him to bring his assignor before the court is beyond doubt. But it does not follow from that there is no cause of action vested in the assignee and capable of being asserted by him alone or, indeed, that the assignor has in all cases, and necessarily, to be a party. The reason for the requirement is not that the assignee has no right which he can assert independently, but that the debtor

ought to be protected from the possibility of any further claim by the assignor who should therefore be bound by the judgment. (Our emphasis, page 33.)

*See* Exhibit B.   In recognizing that the possible joinder of the assignee was "a purely procedural requirement" (at p. 34), the Court was also addressing only English procedural rules.

11.   Third, as stated in my first declaration, *Snell's Equity* also demonstrates that equitable assignments confer enforceable substantive rights on the assignee. *See* Exhibit C.   Specifically, paragraph 3.20(b) of *Snell's Equity* (31st ed.) reaffirms that there is only a "procedural" requirement of including both assignor and assignee and that courts do not view the failure to include either entity as a "nullity." *Id.* MCA and Man have also repeatedly and consistently said -- and would execute any suitable stipulation recognizing -- that Fluxo-Cane will be credited in the English Action with the amount of any set-off realized by Man in any final judgment following any appeal in the U.S. action.

12.   Fluxo-Cane also has made inaccurate statements concerning MCA and Man's position as to whether the assignment created a trust. *See* Fluxo-Cane's Motion for Reconsideration at pp. 5-6.   I addressed this point previously in paragraphs 11-15 of my first declaration. *See* Declaration of Michael Swangard, attached as Exhibit 1 to Man's Reply in Support of Motion for Summary Judgment.   Fluxo-Cane responded to these points when it sought and received permission to file a sur-reply, but it provided only a one-paragraph argument on that point. *See* Fluxo-Cane's Sur-Reply to Man's Motion for Summary Judgment at pp. 4-5.

13.   In further support on this proposition, paragraph 19.11 of *Snell's Equity* (31st Edition) states "*a bare or simple trust is one which property is invested in one person on trust for another, the nature of the trust imposing no active powers of management on the trustee*". *See* Exhibit C.   Indeed, the trustee must obey any direction given by the beneficiary as to the disposition of the property.   These principles demonstrate the error in Fluxo-Cane's submissions on this point.

\*       \*       \*

14.   Although not relevant to the English law issues, Fluxo-Cane has also misstated events concerning the English Action that warrant correction.   At page 7 and page 9 of its Motion, Fluxo-Cane refer to the judgment of Mr Justice Walker

dated 19 September 2008.  The Motion states at page 7 that "As noted earlier, the trial Court in the UK action, in response to the urging of Man Sugar & MCA for a summary decision, held that MCA's actions were _improper_ (my emphasis)" and further at page 9 that "Months ago, the UK Court rejected Man's Sugar's demand for summary decision, and instead held that Fluxo-Cane had been a victim of wilful breach of an agreement that would have prevented any losses to Man Sugar and to Fluxo Cane".

15.   As I indicated in paragraph 6 of my earlier Declaration, the English Court (Walker J) addressed only a single issue at the summary judgment hearing on 6th-8th August.  Nowhere in his judgment did Walker J find that MCA's actions were "improper" or that Fluxo-Cane had been a victim of "wilful breach of an agreement [.]"  Even if MCA do not prevail at the Court of Appeal, the English Action will still proceed on alternate grounds that have not yet been determined. Accordingly, I believe the Motion to that extent misrepresents the English Action. Furthermore, the Court of Appeal is considering the decision of Walker J and its decision is awaited within the next two weeks.

*          *          *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

MICHAEL SWANGARD

Subscribed and sworn to before me this 6th day of April in the year 2009 at London, England

Notary Public London, England
(Andrew J. Claudet)
(My Commission expires with Life)

0800645 3150756.1

**CHEESWRIGHTS**
NOTARIES PUBLIC

Bankside House, 107 Leadenhall Street,
London EC3A 4AF
Telephone: 020 7623 9477
Facsimile: 020 7623 5428

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FLUXO-CANE OVERSEAS LIMITED

                          Plaintiff

                                             Case No. 08-cv-356 (WDQ)

v

ED & F MAN SUGAR INC et al

                          Defendants

---

### EXHIBITS TO SUPPLEMENTAL DECLARATION

### OF MICHAEL SWANGARD

---



Sworn before me this 6th April 200
at London, England.

Notary Public London, England
(Andrew J. Claudet)
(My Commission expires with Life)

0800645 3150756.1                   7

# Exhibit A

2 A.C.

A                           [HOUSE OF LORDS]

DEPOSIT PROTECTION BOARD AND ANOTHER  .   .  RESPONDENTS

AND

BARCLAYS BANK PLC .    .    .    .    .    .   .  APPELLANTS

B                [On appeal from DEPOSIT PROTECTION BOARD v. DALIA]

1993  March 23, 24, 25;            Russell and Simon Brown L.JJ.
      May 6                              and Sir Michael Fox

1993  Dec. 8, 9;          Lord Keith of Kinkel, Lord Goff of Chieveley,
1994  May 19                    Lord Browne-Wilkinson, Lord Mustill and
                                                Lord Lloyd of Berwick

C
*Banking—Deposits—Deposit taking business—Fund to compensate
depositors in insolvent bank—Original depositors assigning sums to
third parties after presentation of petition to wind up bank—
Whether assignee of part of original deposit "depositor"—Banking
Act 1987 (c. 22), s. 58(1)—Banking Act 1987 (Meaning of
Deposit) Order 1991 (S.I. 1991 No. 1776), art. 2(1)*

D          The Banking Acts 1979 and 1987 respectively established and
continued the Deposit Protection Board and the Deposit
Protection Fund, from which the board was obliged to pay a
depositor in an authorised bank which became insolvent an
amount equal to three-quarters of the amount of his deposit, in
accordance with section 58(1) of the Act of 1987,[1] limited to a
maximum deposit of £20,000. There was no definition of
E       "depositor" in the Acts of 1979 or 1987. By section 59(1)(a) of
the Act of 1987 the event upon which a bank was deemed to have
become insolvent for the purpose of compensation becoming
payable was the making of the winding up order rather than the
presentation of the petition. On 5 July 1991 the Bank of England
presented a petition for an order that an authorised bank be
wound up on the ground that it was insolvent. Some depositors,
in order to maximise recovery from the fund, assigned sums of
F       £20,000 to friends and relations. On 30 July 1991 the Banking
Act 1987 (Meaning of Deposit) Order 1991 was made, which
provided that the definition of "deposit" in section 5 of that Act
excluded a sum to which a person became entitled, otherwise than
by operation of law, after presentation of a winding up petition
or, where a petition had already been presented, after 30 July
1991. On a summons brought by the board, the judge held that
assignees of deposits under assignments made between 5 and 30
G       July were depositors within section 58(1) entitled to compensation
from the fund. On appeal by the second defendant, a contributory
institution, the Court of Appeal upheld the judge's order.
       On appeal by the second defendant:—
       *Held,* allowing the appeal, that prima facie a "depositor" in
section 58(1) of the Banking Act 1987 was the person who made
the original deposit to the institution; that there was nothing in
H       the provisions of the Act which was inconsistent with that
meaning; and that, accordingly a person entitled to a debt by
reason of the assignment of part of a debt was not a depositor

----

[1] Banking Act 1987, s. 58(1): see post, p. 394E.

368

holding a protected deposit entitled to compensation under the     A
Act (post, pp. 391c–D, 396c–D, 401A–C).
      Decision of Court of Appeal, post, pp. 373H et seq.; [1994]
2 W.L.R. 732; [1994] 1 All E.R. 539 reversed.

The following case is referred to in the opinion of Lord Browne-Wilkinson:

Hanlon v. The Law Society [1981] A.C. 124; [1980] 2 W.L.R. 756; [1980] 2 All
      E.R. 199, H.L.(E.)                                                        B

The following additional cases were referred to in argument in the House of
Lords:

Brice v. Bannister (1878) 3 Q.B.D. 569, C.A.
Central Insurance Co. Ltd. v. Seacalf Shipping Corporation [1983] 2 Lloyd's
      Rep. 25, C.A.
Commissioners for Special Purposes of the Income Tax v. Pemsel [1891] A.C.     C
      531, H.L.(E.)
Forster v. Baker [1910] 2 K.B. 636, Bray J. and C.A.
Heydon's Case (1584) 3 Co.Rep. 7a
Jones v. Farrell (1857) 1 De G. & J. 208
Jones v. Wrotham Park Settled Estates [1980] A.C. 74; [1979] 2 W.L.R. 132;
      [1979] 1 All E.R. 286, H.L.(E.)
Performing Right Society Ltd. v. London Theatre of Varieties Ltd. [1924]       D
      A.C. 1, H.L.(E.)
Remon v. City of London Real Property Co. Ltd. [1921] 1 K.B. 49, C.A.
Steel Wing Co. Ltd., In re [1921] 1 Ch. 349
Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd. [1955] 2 Q.B. 584; [1955]
      2 W.L.R. 919; [1955] 1 All E.R. 843, C.A.
Weddell v. J. A. Pearce & Major [1988] Ch. 26; [1987] 3 W.L.R. 592; [1987]
      3 All E.R. 624                                                           E

The following cases are referred to in the judgments in the Court of Appeal:

Brandt's (William) Sons & Co. v. Dunlop Rubber Co. Ltd. [1905] A.C. 454,
      H.L.(E.)
Brice v. Bannister (1878) 3 Q.B.D. 569, C.A.
Britt v. Buckinghamshire County Council [1964] 1 Q.B. 77; [1963] 2 W.L.R.
      722; [1963] 2 All E.R. 175, C.A.                                         F
Forster v. Baker [1910] 2 K.B. 636, Bray J. and C.A.
Hanlon v. The Law Society [1981] A.C. 124; [1980] 2 W.L.R. 756; [1980] 2 All
      E.R. 199, H.L.(E.)
Jones v. Farrell (1857) 1 De G. & J. 208
Performing Right Society Ltd. v. London Theatre of Varieties Ltd. [1924]
      A.C. 1, H.L.(E.)
Steel Wing Co. Ltd., In re [1921] 1 Ch. 349                                    G
Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd. [1955] 2 Q.B. 584; [1955]
      2 W.L.R. 919; [1955] 1 All E.R. 843, C.A.
Warner Bros. Records Inc. v. Rollgreen Ltd. [1976] Q.B. 430; [1975] 2 W.L.R.
      816; [1975] 2 All E.R. 105, Willis J. and C.A.
Weddell v. J. A. Pearce & Major [1988] Ch. 26; [1987] 3 W.L.R. 592; [1987]
      3 All E.R. 624

The following additional cases were cited in argument in the Court of Appeal:   H

Becke v. Smith (1836) 2 M. & W. 191
Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg A.G.
      [1975] A.C. 591; [1975] 2 W.L.R. 513; [1975] 1 All E.R. 810, H.L.(E.)

A      Commercial Bank of Australia Ltd., In re (1893) 19 V.L.R. 333
       Copeland, Ex parte; In re Copeland (1852) 22 L.J. Bank. 17
       Courtauld v. Legh (1869) L.R. 4 Ex. 126
       Durham Bros. v. Robertson [1898] 1 Q.B. 765, C.A.
       Harrison v. Hammersmith and Fulham London Borough Council [1981]
           1 W.L.R. 650; [1981] 2 All E.R. 588, C.A.
       Heydon's Case (1584) 3 Co.Rep. 7a
B      Jones v. Wrotham Park Settled Estates [1980] A.C. 74; [1978] 3 W.L.R. 585;
           [1978] 3 All E.R. 527, C.A.
       Kirkness v. John Hudson & Co. Ltd. [1955] A.C. 696; [1955] 2 W.L.R. 1135;
           [1955] 2 All E.R. 345, H.L.(E.)
       Lennon v. Gibson and Howes Ltd. [1919] A.C. 709, P.C.
       McGreavy (orse. McGreavey), In re; Ex parte McGreavey v. Benfleet Urban
           District Council [1950] Ch. 269; [1950] 1 All E.R. 442, C.A.
       Macmanaway, In re [1951] A.C. 161, P.C.
C      Pepper v. Hart [1993] A.C. 593; [1992] 3 W.L.R. 1032; [1993] I.C.R. 291;
           [1993] 1 All E.R. 42, H.L.(E.)
       Portsmouth Corporation v. Smith (1885) 10 App.Cas. 364, H.L.(E.)
       Remon v. City of London Real Property Co. Ltd. [1921] 1 K.B. 49, C.A.
       Scarf v. Jardine (1882) 7 App.Cas. 345, H.L.(E.)
       Schroeder v. The Central Bank of London Ltd. (1876) 34 L.T. 735
       Stephens v. Cuckfield Rural District Council [1960] 2 Q.B. 373; [1960] 3 W.L.R.
D          248; [1960] 2 All E.R. 716, C.A.
       Walker v. Bradford Old Bank Ltd. (1884) 12 Q.B.D. 511, D.C.
       Williams v. Atlantic Assurance Co. Ltd. [1933] 1 K.B. 81, C.A.


       APPEALS from Sir Donald Nicholls V.-C.
       By notice of appeal dated 11 August 1992 in proceedings commenced
E   by originating summons dated 15 April 1992 between the plaintiffs, the
    Deposit Protection Board, and the defendants, Mrs. Varsha Dalia and
    Barclays Bank Plc., the second defendant appealed against the judgment
    of Sir Donald Nicholls V.-C. [1993] Ch. 243 given on 3 July 1992. The
    grounds of appeal were that (1) having rightly found, at p. 248E–F, that
    the natural meaning of the word "depositor" was "the person who made
    the deposit in question" the Vice-Chancellor had wrongly given undue
F   weight, in concluding that the natural meaning should nevertheless give
    way to a wider meaning for the purposes of the Banking Act 1987, to
    (a) the provisions relating to trusts and other accounts specified in section
    61 of the Act of 1987 (which provisions did not apply to assignments) and
    (b) the provisions of the Banking Act 1987 (Meaning of Deposit) Order
    1991 and (2) having rightly found, at p. 247A, that "Parliament never
G   intended that the limit on the amount of compensation payable to
    individual depositors could be side-stepped by dispositions made after
    formal steps had been taken to initiate the winding up process" under the
    Act, the Vice-Chancellor had wrongly given no weight or insufficient
    weight to (a) the purpose of the Act, namely the protection of vulnerable
    and small depositors who had banking relationships with insolvent
    institutions; (b) the express provisions of section 60(1)(2) and (6) of the
H   Act; (c) the fact that assignment of balances held in the bank accounts,
    particularly current accounts, were, save for assignments by way of
    security, very unusual (as the Vice-Chancellor recognised) and were not
    intended by Parliament to qualify for protection under the Act; (d) the

370

fact that section 61 of the Act was intended to define exhaustively the   A
exceptions to the natural meaning of the word "depositor" for the
purposes of the Act and the assignments in question did not come within
those specific exceptions, and (e) the fact that the assignments in question
were equitable assignments, such that the assignees did not acquire any
interests distinct and separate from those of their assignors.

By a notice of cross-appeal dated 4 September 1992, the board raised   B
the additional grounds that (1) the Vice-Chancellor had wrongly given weight
to an erroneous construction of section 61 of the Act of 1987 in holding
(a) that the effect of section 61(3) was that a person who fell to be treated
as entitled to a deposit without intervention of a trust under that
subsection should be regarded as a depositor for the purpose of receiving
compensation under section 58 and for the purpose of the definition of
protected interest under section 60; the Vice-Chancellor should have held   C
that section 61(3) was not intended to define who was a depositor for the
purpose of section 58 and that its purpose was to permit beneficiaries
behind a bare trust to claim payment directly from the plaintiff in respect
of a deposit held on trust without increasing the amount of compensation
payable in respect of each trust deposit; (b) that the effect of section 61(6)
was the same as that of section 61(3); the Vice-Chancellor should have   D
held that section 61(6) was only concerned with joint bank accounts where
no trust intervened, that joint accounts were dealt with by way of an
exception to the general rule for entitlement to compensation derived from
the natural meaning of the word "depositor," and that section 61(6)
demonstrated that the material person for the purposes of the protection
scheme was the person "having a deposit" at the onset of insolvency,
namely, the person in whose name a deposit was held at the authorised   E
institution; (c) that the effect of section 61(7) was to treat the person
beneficially entitled to moneys in a client or similar account as the material
person for the purposes of the protection scheme; having rightly observed
that the language of section 61(7) echoed that of section 61(3), the Vice-
Chancellor should have given it the same construction as that contended
for at (a) above, namely that the purpose of section 61(7) was to permit   F
the beneficial owners of moneys in a client account to claim directly from
the plaintiff a proportionate share of a single maximum compensation
payment of £15,000; and (d) that the effect of section 61(8) was to
demonstrate that generally the person beneficially entitled to a deposit was
the material person for the purposes of the protection scheme; the Vice-
Chancellor should have held that section 61(8) was a limited exception to   G
the general rule for entitlement to compensation derived from the natural
meaning of the word "depositor" and that section 61(8) demonstrated that
generally it was persons who had "made a deposit" who were entitled to
compensation, and (2) the Vice-Chancellor had been wrong in law in
holding that the Order of 1991 was a legitimate aid to construction of the
Act of 1987; having rightly observed that the draftsman of the Act may   H
not have had assignments in mind at all, the Vice-Chancellor should have
held that the Order was only a legitimate aid to the construction of the
Act after the date on which the Order came into force, namely 31 July
1991.

A    *Michael Brindle* Q.C. and *Bankim Thanki* for the second defendant. The judge gave insufficient weight to the ordinary and natural meaning of "depositor" which should have been applied unless it led to absurdity: see *Becke v. Smith* (1836) 2 M. & W. 191, 195. As used in sections 60(2)(*a*) and (6)(*c*) and section 61(8) "depositor" can only mean someone who has made a deposit.

B    No conclusions can be drawn from the Order of 1991 as to the true construction of the Act of 1987. Subordinate legislation is often passed ex abundanti cautela: see *In re Macmanaway* [1951] A.C. 161, 171. It can sometimes be used to construe the parent Act but that merely overcomes the general rule that subordinate legislation is inadmissible to construe an Act of Parliament: see *Stephens v. Cuckfield Rural District Council* [1960] 2 Q.B. 373, 381. *Hanlon v. The Law Society* [1981] A.C. 124 and *Britt v. Buckinghamshire County Council* [1964] 1 Q.B. 77 were concerned with regulations contemporaneous with the parent Act and therefore are distinguishable.

C    There is nothing in section 61 of the Act which would justify treating an assignee as having made a deposit. The better interpretation of the section is that it defines exhaustively the exceptions to the natural meaning of "depositor." However, in respect of a particular deposit one bank

D    customer may be substituted for another, the original deposit being effectively repaid and replaced by a new deposit from the new customer: *Scarf v. Jardine* (1882) 7 App.Cas. 345, 351. It is also legally possible to assign the credit balance of a current account (see *Walker v. Bradford Old Bank* (1884) 12 Q.B.D. 511), although the point was doubted in *Schroeder v. The Central Bank of London* (1876) 34 L.T. 735.

E    If, however, an assignee can qualify as a depositor, then he can only do so under an absolute assignment pursuant to section 136 of the Law of Property Act 1925. An assignee of part of a debt cannot be an assignee under section 136: *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349 and *Walter & Sullivan Ltd. v. J. Murphy & Sons* [1955] 2 Q.B. 584. Such an assignee can sue only in the name of the assignor. This is important protection for the assignor: see *Forster v. Baker* [1910] 2 K.B. 636, 639 and *Williams v.*

F    *Atlantic Assurance Co. Ltd.* [1933] 1 K.B. 81. *Weddell v. J.A. Pearce & Major* [1988] Ch. 26 does not support the judge's view that the joinder requirement is a mere technicality but establishes merely that an action by an equitable assignee is not a nullity.

G    The Protection of Depositors Act 1963 cannot assist the construction of the Acts of 1979 and 1987 because it is not in pari materia with them: see *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709, 711. The definition of "depositor" in the Act of 1963 does not occur in the later Acts. It is not therefore to be presumed that Parliament did not intend to change the law: see *In re McGreavy; Ex parte McGreavey v. Benfleet Urban District Council* [1950] 1 Ch. 269, 278.

H    The sections of the Act of 1987 on which the plaintiff relies appear in parts of the Act unrelated to the deposit protection scheme and ought not to be held to relate to that scheme unless it is clear that they do: see *In re Commercial Bank of Australia Ltd.* (1893) 19 V.L.R. 333.

Even if "depositor" in the Act of 1987 is wide enough on its literal construction to include an equitable assignee, the judge failed to give the

372

Act a purposive construction: see *Heydon's Case* (1584) 3 Co.Rep. 7a, 7b   A
and *Jones v. Wrotham Park Settled Estates* [1980] A.C. 74, 105. It is highly
unlikely that Parliament intended to provide for assignees at all. [Reference
was made to *Remon v. City of London Real Property Co. Ltd.* [1921]
1 K.B. 49 and *Harrison v. Hammersmith and Fulham London Borough
Council* [1981] 1 W.L.R. 650.]

*John Jarvis Q.C.* and *Jonathan Nash* for the board. The ordinary and   B
natural meaning of "depositor" in the Banking Act 1987 is the person
who made the deposit. The Vice-Chancellor erred in concluding, in
reliance upon section 61 of the Act, that the person beneficially entitled to
a deposit was the depositor within the meaning of section 58(1) of the
Act. To determine which persons are entitled to claim compensation it is
necessary to read sections 58(1) and 60(1) of the Act of 1987 together.
Section 61(1) is intended to modify the effect of sections 58 and 60 in   C
specified cases.

The Vice-Chancellor's view that equitable assignments should be
treated in the same way as statutory assignments was wrong. It is not
manifestly absurd that transactions which have different legal effects
should be treated differently under the Act of 1987. An equitable
assignment does not transfer the legal title in the debt to the assignee and
no contractual relationship arises between the debtor and the assignee: see   D
*Warner Bros. Records Inc. v. Rollgreen Ltd.* [1976] 1 Q.B. 430, 443, 445.
An equitable assignee of a cause of action cannot claim damages without
joining the assignor: *Weddell v. J.A. Pearce & Major* [1988] Ch. 26, 40G–
41B. The equitable assignee of a copyright cannot claim an injunction to
protect his rights without joining the assignor: *Performing Right Society v.
London Theatre of Varieties* [1924] A.C. 1, 14, 19, 29. The assignor has   E
not divested himself of the legal title to the debt and it is therefore
necessary to bind him so as to protect the debtor from a further demand
for payment. In the absence of an assignment effective to transfer the legal
title to the debt, i.e. an assignment falling within section 136 of the Law
of Property Act 1925, at the moment of insolvency the institution is not
liable to the equitable assignee within the meaning of section 60(1) of the
Act of 1987. *Jones v. Farrell* (1857) 1 De G. & J. 208 is unsatisfactory   F
because there was no analysis of how the debtor, having paid his legal
creditor, could be liable in equity to the assignee. *Brice v. Bannister* (1878)
3 Q.B.D. 569 is not authority for the proposition that a debtor who has
paid his legal creditor after notice of an equitable assignment will be liable
a second time to the equitable assignee. *Weddell v. J.A. Pearce & Major*
[1988] Ch. 26 was a decision solely on the question of whether an equitable   G
assignee of a cause of action had locus standi to issue a writ without
joining his assignor. To confine the right to claim compensation to
depositors and their statutory assignees only is correct in law and also
achieves a sensible result in the context of the Act of 1987. [Reference was
made to *Durham Brothers v. Robertson* [1898] 1 Q.B. 765.]

The Banking Act 1987 (Meaning of Deposit) Order 1991 is not a
legitimate aid to the construction of the Act in the period before the Order   H
came into force, the Order being subordinate legislation: see *Britt v.
Buckinghamshire County Council* [1964] 1 Q.B. 77, 88, 92–93 and *Hanlon
v. The Law Society* [1981] A.C. 124, 178E. [Reference was also made to

A  *Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg A.G.* [1975] A.C. 591 and *Pepper v. Hart* [1993] A.C. 593.]

   *Lord Irvine of Lairg Q.C.* and *Philip Sales* for the first defendant. A bank is liable to an equitable assignee of a deposit or part of a deposit made at the bank. There is no textual warrant for limiting the words "total liability . . . to him" in section 60(1) so as to exclude such liability. The assignee alone can sue the bank to judgment: *Walter & Sullivan Ltd.*

B  *v. J. Murphy & Sons* [1955] 2 Q.B. 584. The bank cannot get a good discharge from the assignor: *Jones v. Farrell*, 1 De G. & J. 208 and *Brice v. Bannister*, 3 Q.B.D. 569. After notice has been given of the assignment, the bank ceases to be liable to the assignor, although he retains the legal title: see *Treitel on Contract*, 8th ed. (1991), p. 585. The usual requirement that the assignor be joined in the proceedings is purely procedural:

C  *Weddell v. J.A. Pearce & Major* [1988] Ch. 26, 38–43 and *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349. It is irrelevant to the question of construction that the particular facts before the court arose in the context of a scheme designed to maximise the compensation payable in respect of the deposit.

   Section 58(1) of the Act of 1987 reproduced the language of section 28(1) of the Banking Act 1979. The presumption is that Parliament intended "depositor" to bear the same meaning in both: see *Ex parte*

D  *Copeland; In re Copeland* (1852) 22 L.J. Bank. 17, 21; *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709, 711–712 and *Portsmouth Corporation v. Smith* (1885) 10 App.Cas. 364, 371. There is no express definition of "depositor" in either Act. The definition in section 27(1) of the Protection of Depositors Act 1963 which would include the assignees of deposits is a legitimate aid to the construction of the later statutes in pari materia: see

E  *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709 and *Ex parte Copeland*, 22 L.J. Bank. 17. Further, other sections of the Act of 1979 plainly use "depositor" in a wide sense. The presumption must be that it is used in the same sense throughout the statute: see *Courtauld v. Legh* (1869) L.R. 4 Ex. 126. The provisions of section 61 of the Act of 1987 (section 30 of the Act of 1979) presupposed that "depositor" meant the person currently entitled to moneys held on deposit (which meaning would include an

F  equitable assignee).

   The Order of 1991 would be otiose if "deposit" bore the board's meaning. The court may have regard to subordinate legislation in construing an expression in a statute which is capable of more than one meaning, especially where the subordinate legislation is made subject to negative resolution: *Britt v. Buckinghamshire County Council* [1964] 1 Q.B. 77; *Hanlon v. The Law Society* [1981] A.C. 124 and *Kirkness v. John*

G  *Hudson & Co. Ltd.* [1955] A.C. 696.

   *Jarvis Q.C.* and *Brindle Q.C.* replied.

                                                                    *Cur. adv. vult.*

   6 May 1993.  The following judgments were handed down.

H
   SIMON BROWN L.J. This is an appeal by the second defendant, Barclays Bank Plc. ("Barclays"), and a cross-appeal by the plaintiffs, the Deposit Protection Board ("the board"), against the judgment of

374

Sir Donald Nicholls V.-C. [1993] Ch. 243 given on 3 July 1992 whereby   A
he made a declaration in favour of the first defendant, the claimant, upon
a point of law raised by all three parties with regard to the proper
construction and application of the Deposit Protection Scheme, a scheme
of compensation originally created by the Banking Act 1979 and now
contained in Part II of the Banking Act 1987.

Put shortly, the scheme is designed to alleviate hardship when a bank   B
becomes insolvent. It provides for a fund to be raised, held, managed and
applied by the board. The board raises the fund by levying contributions
from relevant institutions, notably banks. There are at present 500
contributing institutions of which Barclays are one, sued here in a
representative capacity. The obligation to make payment out of the fund
is to be found in section 58(1) of the Act of 1987, so far as material in
these terms:                                                             C

"if at any time an institution becomes insolvent ... the board shall
as soon as practicable pay out of the fund to each depositor who has
a protected deposit with that institution an amount equal to three-
quarters of his protected deposit."

Section 59(1)(a) provides that an institution becomes insolvent on the
making of a winding up order against it.                                 D

By section 60(1) it is provided that:

"Subject to the provisions of this section, in relation to an
institution in respect of which a payment falls to be made under
section 58(1) above any reference in this Act to a depositor's protected
deposit is a reference to the total liability of the institution to him
immediately before the time when it becomes insolvent, limited to a     E
maximum of £20,000 ..."

Thus the maximum sum payable to a depositor under the scheme is
£15,000 (three-quarters of £20,000).

Whilst, however, "deposit" is defined in section 5 of the Act of 1987,
and "protected deposit" is defined in section 61, the Act contains no
definition of "depositor" and it is this which has given rise to the present   F
difficulty. More particularly the question raised here is whether the
assignee of part of a bank customer's deposit is, within the meaning of
section 58(1), a "depositor" who, with respect to the assigned part of the
account, has himself "a protected deposit with that institution." The Vice-
Chancellor held that an equitable assignee is such a depositor. Barclays
and the board both submit that he is not.                                G

The particular circumstances in which the point presently arises for
decision I gratefully take from the following (re-ordered) passages in the
Vice-Chancellor's judgment [1993] Ch. 243, 246, 247–248, 247, 248:

"The Bank of Credit and Commerce International S.A., usually
known simply as 'B.C.C.I.,' was an authorised institution under the
Act of 1987. On 5 July 1991 the Bank of England presented a petition
to the court for an order that B.C.C.I. be wound up. One of the        H
grounds relied on was that the company was insolvent. Provisional
liquidators were appointed and B.C.C.I. ceased trading in England.
Depositors ceased to be able to withdraw their money. Fearing the

A     worst, some depositors took steps to maximise the amount of the payments from the deposit protection fund. An enterprising firm of accountants, having taken expert legal advice, wrote around to B.C.C.I. depositors telling them of a scheme the accountants had prepared. The scheme was that a depositor should formally transfer and assign part of his or her deposit to family members or close friends 'who can be trusted.' For instance, a depositor with a deposit

B     of £100,000 would transfer £20,000 to each of five relations or friends'—or, I would add, to each of four relations or friends, retaining £20,000 for himself—"Instead of the compensation payable to him being limited to £15,000 as the maximum amount of compensation payable to any one depositor, each of his five assignees could look to the fund for payment of £15,000 in respect of the £20,000 share of the deposit assigned to him. By this means the total

C     compensation payable by the fund would be increased to £75,000. Depositors were urged to hurry, 'for you only have until Monday evening 29 July.' This was because the winding up petition was due to come before the court again on 30 July."

    "The assignments were on a printed form of deed. The document recited the 'vendor's' deposit in a specified account with B.C.C.I. The

D     operative part provided that in consideration of £1 'the vendor by this deed sells, assigns and transfers the sum of [£20,000] of the deposit to the purchaser.' The depositor also signed a letter addressed to B.C.C.I., whereby B.C.C.I. was given notice of the 'absolute' assignment in question. The bank was instructed that the sum of £20,000 from the deposit account was now held by the assignee, who was described as 'the purchaser,' and that he should now be identified

E     by the bank 'as a depositor.' The letter added: 'If, for administrative reasons, you are unable to arrange for the completion of formalities to designate a separate deposit account in the name of the purchaser, I/we confirm that I/we hold the above-mentioned sum on trust for the purchaser.' . . . it was common ground that the assignments were not statutory assignments in conformity with section 136 of the Law of

F     Property Act 1925, but that they were effective as equitable assignments."

    "Some 50 or so depositors, possibly more, signed transfers in July 1991 in respect of sums totalling several million pounds. There were over 200 assignees. One depositor alone, whose deposits exceeded half a million pounds, executed 26 assignments of £20,000 each. The scheme was quickly stopped in its tracks. Parliament never intended

G     that the limit on the amount of compensation payable to individual depositors could be side-stepped by dispositions made after formal steps had been taken to initiate the winding up process. On 30 July 1991 the Banking Act 1987 (Meaning of Deposit) Order 1991 was made. It provided that in future the definition of 'deposit' in the Act excluded a sum to which a person became entitled, otherwise than by

H     operation of law, after presentation of a winding up petition. In the case of B.C.C.I., where a winding up petition had already been presented, the changed definition took effect from 31 July. So the loophole, if such it was, was closed although subsequently some

376

A

months elapsed before a winding up order was eventually made on 14 January 1992. . . . The first defendant is an assignee joined in the proceedings to represent all assignees."

"The overall sum required to meet the payments due under the scheme to B.C.C.I. depositors is in the region of £78m. The sum in issue [in these proceedings] is about £3·7m."

B

The Vice-Chancellor emphasised, as do I in turn, that the question raised—whether these assignments had their intended effect for compensation purposes—is one of law, to be answered on the assumption that the assignments were genuine and valid transactions and that there was no arrangement or understanding that an assignee would hold for the assignor any compensation received by him from the fund. The board have expressly reserved the right to pursue such matters should that become necessary.

C

Similarly the Vice-Chancellor emphasised that the answer given to the question before the court will be of general application. Its effect will not be confined to assignments made in circumstances similar to those which existed regarding B.C.C.I. in July 1991. Even in regard to the future, the Banking Act 1987 (Meaning of Deposit) Order 1991 leaves untouched any assignments made before the presentation of a winding up petition.

D

The issue before the court is accordingly whether arrangements of this nature, assuming always that they are not a sham, are effective to bring the equitable assignees thereby created within the protection scheme so that, upon a winding up, each will qualify in his own right for a payment out of the fund up to the maximum sum of £15,000.

All three parties agree that to qualify for such payment a depositor must at least be someone to whom the bank is liable immediately before the winding up order is made: so much is clear from section 60(1)—although it is altogether less clear what precisely is meant in this context by "liability," the question upon which most of the argument before us centred and to which I shall shortly return. Whereas, however, the claimant contends that such "liability" (whatever precisely that may be held to encompass) is of itself sufficient to constitute that person a depositor, Barclays argue that more is required, in particular that the person to whom the bank is liable must also be the person who made the deposit in the first place. This appears to have been the main argument advanced against the claimant below, and much of the criticism directed against the Vice-Chancellor's judgment has focused upon his reasons for rejecting it, notably his reliance, first, upon section 61 of the Act, and secondly, upon the Order of 1991. Before us, however, the emphasis of the submissions shifted away from this argument and towards the "liability" issue. Not least this was because Barclays came to recognise the clearly unsatisfactory consequences flowing from the "deposit maker" construction, above all: (a) the exclusion from the scheme in the case of statutory assignments of anyone at all in a position to claim as depositor— the assignor because the bank no longer remains liable to him, the assignee because he was not the original deposit maker, and (b) the difficulty— indeed, despite Mr. Brindle's submissions to the contrary, what I conclude to be the impossibility—of compensating under the scheme the trustee in

E

F

G

H

2 A.C.         Deposit Protection Board v. Dalia (C.A.)      Simon Brown L.J.

A    bankruptcy of an insolvent account holder and the executors or personal representatives of a deceased account holder.

In the event this was not a part of the case upon which we found it necessary to call upon Lord Irvine and I propose to deal with it comparatively shortly.

B    The argument in support of the "deposit maker" construction is based in part upon what is contended to be the natural meaning of the word "depositor," and in part upon various provisions of the Act of 1987, two of which in particular appear to assume that a depositor is the person who will himself have made the deposit in question. The following are the two provisions particularly relied upon (in each case with emphasis added). Section 60(2):

C    "in relation to an institution in respect of which a payment falls to be made under section 58(2) above"—that is a provision comparable to section 58(1) but applicable when an administration order is made under the Insolvency Act 1986—"any reference in this Act to a depositor's protected deposit is a reference to the liability of the institution to him in respect of—(a) the principal amount of each sterling deposit which was *made by him* with a United Kingdom office of the institution before the making of the administration order . . ."

D

Section 60(6):

"In determining the total liability of an institution to a depositor for the purposes of subsection (1) above, or the liability or total liability of an institution to a depositor for the purposes of subsection (2) above, no account shall be taken of any liability in respect of a deposit if . . . (c) the institution is a former authorised institution and the deposit was made after it ceased to be an authorised institution or a recognised bank or licensed institution under the Banking Act 1979 unless, *at the time the deposit was made*, the depositor did not know and could not reasonably be expected to have known that it had ceased to be an authorised institution, recognised bank or licensed institution."

E

F

As to the natural meaning of "depositor," Mr. Brindle not surprisingly relies upon the Vice-Chancellor's own stated view [1993] Ch. 243, 248E–F that: "In this context that word would, I believe, naturally be read as meaning the person who made the deposit in question." In the event, however, the Vice-Chancellor decided that that natural meaning had to give way to the extent necessary to enable the underlying purpose of the Act to be achieved. That purpose, discerned in particular from section 61, was, he concluded, to compensate those beneficially entitled to a deposit as at the date payment fell to be made under the scheme.

G

The Vice-Chancellor in addition expressed himself confirmed in that conclusion by the terms of the Order of 1991 which he said, at p. 254B: "proceeded on the basis that 'depositor' does embrace a person who did not make the deposit but subsequently became entitled to it, by operation of law or otherwise." I take each of those reasons in turn.

H

378

Simon Brown L.J.          Deposit Protection Board v. Dalia (C.A.)                    [1994]

*Section 61*                                                                          A

    Section 61(1) provides: "In the cases to which this section applies
sections 58 and 60 above shall have effect with the following modifications."
There then follow several subsections dealing with a number of disparate
situations, some of which, it has to be said, contain their own acute
difficulties of construction. For present purposes it is sufficient to cite only
the following. Subsection (3):                                                        B

    "Where a deposit is held for any person or for two or more
    persons jointly by a bare trustee, that person or, as the case may be,
    those persons jointly shall be treated as entitled to the deposit without
    the intervention of any trust."

"Bare trustee" is defined by section 106(1) of the Act to mean, in relation         C
to a deposit:

    "a person holding the deposit on trust for another person who has
    the exclusive right to direct how it shall be dealt with subject only to
    satisfying any outstanding charge, lien or other right of the trustee to
    resort to it for the payment of duty, taxes, costs or other
    outgoings; . . ."                                                                 D

Section 61(6):

    "where two or more persons are jointly entitled to a deposit . . . each
    of them shall be treated as having a separate deposit of an amount
    produced by dividing the amount of the deposit to which they are
    jointly entitled by the number of persons who are so entitled."
                                                                                     E
By subsection (10), "jointly entitled" is defined to mean "beneficially
entitled as joint tenants, tenants in common or coparceners."

    Mr. Brindle makes two main submissions with regard to section 61.
First, that its effect is expressly by way of modification to sections 58 and
60. Given, as all agree, that assignees are not included within its provisions,
they therefore fall to be considered under sections 58 and 60 in their         F
unmodified form. That clearly is right; indeed it can hardly be supposed
that the Vice-Chancellor thought otherwise. It does not follow, however,
that section 61 can throw no light upon the correct approach to the earlier
provisions. On the contrary—and this is surely what the Vice-Chancellor
had in mind—it is implicit in, for instance, subsections (3) and (6) that
the beneficiaries—those to be treated respectively as "entitled to the          G
deposit without the intervention of any trust" and as "having a separate
deposit"—shall on that basis be entitled to compensation under the
scheme even though themselves not the original deposit makers and,
indeed, irrespective of whether their trust (in a subsection (3) case) or
their joint entitlement (in a subsection (6) case) existed at the time the
deposit was made. In short it appears plain from section 61, that once a
person is treated as entitled to a deposit, that of itself qualifies him for   H
payment under the scheme. Thus entitlement to a deposit under section 61
is seen to be precisely correlative to the institution's liability to the
depositor under section 60(1).

2 A.C.                    Deposit Protection Board v. Dalia (C.A.)        Simon Brown L.J.

A   Mr. Brindle's second main argument with regard to section 61 is that so far from there being, as the Vice-Chancellor concluded [1993] Ch. 243, 251:

> "one thread running through [it] . . . that where A is the person who made the deposit but B is the person beneficially entitled to the deposit, B is the material person for the purposes of the protection scheme,"

B   the section contains a heterogeneous group of provisions disclosing no clear pattern of entitlement. In the case of an ordinary family trust, for instance, or a partnership (subsection (5)), compensation is to be paid only in respect of one protected deposit and it is by no means all beneficiaries who themselves can advance a direct claim for payment. So be it. This does not in my judgment undermine the central conclusion to

C   be drawn from section 61 which is, as stated, that it looks to compensate those who are treated as being entitled to a deposit at the moment when the question of compensation arises.

*The Order of 1991*

D   Article 2(1) of the Order reads:

> "For the purposes of sections 60, 61 and 62 of the Banking Act 1987 the definition of deposit in section 5 of that Act shall be treated as excluding any sum to which a person becomes entitled (otherwise than by operation of law), or comes to be treated as entitled for the purposes of sections 58 and 60 of that Act, after a petition is presented for the winding up of the institution, or, in the case of an

E   institution in respect of which such a petition has been presented before the date on which this Order comes into force, 30 July 1991."

It was made pursuant to section 7 of the Banking Act 1987 which permits the Treasury by order to amend the meaning of "deposit." Mr. Brindle submits that the Vice-Chancellor erred in regarding the Order as an aid to construction of the Act itself. This is not, he points out, a

F   case like *Britt v. Buckinghamshire County Council* [1964] 1 Q.B. 77 and *Hanlon v. The Law Society* [1981] A.C. 124 where the regulations relied upon were contemporary with the parent Act and, as Lord Lowry put it in *Hanlon*, at p. 193H, constituted a contemporanea expositio, providing a legitimate aid to construction on that basis. Here the Act was passed four years before the Order.

G   In any event, Mr. Brindle submits, all that the Order does is amend the Act of 1987; it does not illuminate its meaning before such amendment. True, it implicitly recognises that, unamended, the Act arguably fell to be construed as including within the word "depositor" those who become entitled to the deposit after the deposit was made. But that is not to say that the Order accepts that to be its true construction.

H   I acknowledge the force of these submissions and recognise too that subordinate legislation may well be passed, as Mr. Brindle submits this was, ex abundanti cautela. But all that said, it seems perhaps more likely that those responsible for the Order were intent on preserving, rather than merely leaving open to future argument, (a) the rights of those whose

entitlement arises by operation of law (ex hypothesi not the deposit          A
makers), and (b) the rights of those who become entitled (otherwise than
by operation of law) before a winding up petition is presented—"pre-
petition assignees" as the Vice-Chancellor called them.

In rejecting the "deposit maker" construction, however, I put aside the
Order of 1991 and summarise my reasons as follows. First, it seems
singularly improbable that Parliament intended to exclude from protection
under the scheme three particular categories of non-deposit makers:          B
personal representatives of deceased account holders, trustees in
bankruptcy, and legal assignees (those entitled to money on deposit
following a statutory assignment under section 136 of the Law of Property
Act 1925). Clearly the bank is liable to each of these for moneys in the
relevant account and, unless they are protected under the scheme, then
(for these accounts) no one is. Whatever at first blush may be thought the          C
most obvious meaning of the word "depositor" under the Act, I certainly
see nothing unnatural in using it to encompass these particular categories
of claimant.

Secondly, as the Vice-Chancellor pointed out, whichever construction
one adopts there is bound to be some untidiness in the Act. True,
subsections (2) and (6) of section 60 appear to assume that the claimant
will have been the original deposit maker—Mr. Jarvis's submission to the          D
contrary, advanced in a quasi-amicus capacity, I found difficult to follow.
But, as stated, section 61 appears clearly to recognise that in certain
circumstances that will not be so. Bearing in mind that section 60(2), the
most problematic of these two provisions, did not appear at all in the Act
of 1979—an Act which all agree is in pari materia with the Act of 1987—
it would be remarkable were it necessary on that account to give a          E
narrower meaning to "depositor" now than would earlier have been
appropriate. It would, I conclude, be wrong to allow these assumptions to
carry the day.

I turn therefore to what appears to me the critical issue in these
proceedings: given that the claimant need not be the original deposit
maker, what must be the nature of his entitlement against the bank to
make him a "depositor" qualifying for protection under the scheme?          F

Lord Irvine contends that a depositor is anyone directly entitled in law
or equity as against the bank to moneys standing on deposit. That, of
course, would include equitable assignees—at any rate those for whom
Lord Irvine is concerned, namely those entitled following an assignment
of which notice has been given and to which the bank has no equitable
defence. The board and Barclays contend on the contrary that depositors
are only those to whom the bank owes a legal liability, a construction that          G
would clearly exclude all equitable assignees.

In resolving this issue it is convenient to begin by considering what are
the essential characteristics of equitable assignments and, not least, what
distinguishes them from legal assignments. During the course of the
hearing we were taken to a large number of authorities in this field. To
none of them do I think it necessary to refer in detail. They support, I          H
believe, the following basic propositions.

1. An assignment of part of a debt cannot be an "absolute assignment"
within the meaning of section 16 of the Law of Property Act 1925 and

A   thus it takes effect solely as an equitable assignment: *Forster v. Baker* [1910] 2 K.B. 636; *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349.

2. A statutory assignee acquires exclusive rights in the debt assigned and can give a good discharge for it or sue the debtor to judgment without involving the assignor in any way.

3. In the case of an equitable assignment, the assignor remains the legal owner of the relevant chose (here the part of the debt assigned)
B   whilst the assignee becomes entitled to the equitable interest in it—the "creditor in equity" as P. O. Lawrence J. put it in *In re Steel Wing Co. Ltd.*, at p. 357.

4. Once notice of an equitable assignment is given to the debtor, he cannot thereafter deal inconsistently with the assigned interest, for instance by making payment to the assignor: *Jones v. Farrell* (1857) 1 De G. & J.
C   208; *Brice v. Bannister* (1878) 3 Q.B.D. 569.

5. In the case of an equitable assignment consisting of the assignment of part of a debt—we are not here concerned with assignments which are equitable rather than statutory only because of a failure to give due notice to the debtor—the assignee cannot give a good discharge in respect of the assigned part of the debt nor can he sue the debtor to judgment without first joining the assignor as a party to the proceedings—as co-plaintiff if
D   he co-operates, co-defendant if he does not: *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349; *Warner Bros. Records Inc. v. Rollgreen Ltd.* [1976] Q.B. 430; *Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* [1924] A.C. 1.

6. Conversely in such cases, the assignor likewise cannot give a good discharge even in respect of the non-assigned part of the debt and he, too,
E   must join the assignee in any proceedings brought against the debtor: *Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd.* [1955] 2 Q.B. 584.

7. The underlying rationale for all this is that there remains but one single debt: it would be oppressive for the debtor to have to defend more than one action arising out of the same transaction. He might, for instance dispute the existence of the debt or claim an equitable set-off in respect of it. Why should he have to do this more than once? Equally, as Scott J.
F   points out in his valuable review of the authorities in *Weddell v. J. A. Pearce & Major* [1988] Ch. 26, 41:

"if the legal owner of the chose were not a party to the action, the defendant might, notwithstanding he had paid the successful plaintiff, the equitable assignee, nevertheless remain liable to the legal owner. The legal owner, after all, might dispute the validity of the equitable
G   assignment, or might disclose a prior equitable interest in some third party."

8. Once that rationale is understood, cases like *William Brandt's Sons & Co. v. Dunlop Rubber Co. Ltd.* [1905] A.C. 454—where the House of Lords held it unnecessary to have sued the assignors too since the debtor,
H   by paying them, had already obtained discharge of any further liability to them—and, indeed, *Weddell v. J. A. Pearce & Major* [1988] Ch. 26 itself—where Scott J. held that an action commenced by an equitable assignee was not a nullity even though it could not have proceeded to judgment without first either joining the assignor or, as was there possible and in

the event done, giving notice so as to turn the equitable assignment into A
an absolute statutory assignment—are readily explicable.

Against that background I turn to consider the rival arguments.

Lord Irvine's argument at its most extreme is that once notice is given
of an equitable assignment the debtor ceases to be liable to the assignor—
his only liability from that time on is to the assignee. This submission is
based principally upon the following passage from *Treitel, The Law of* B
*Contract,* 8th ed. (1991), p. 585:

  "Where the assignment is statutory, the debtor ceases, as soon as
  notice has been given, to be liable to the assignor and becomes liable
  to the assignee. It is submitted that the same is true where the
  assignment is equitable; for it has been held that if the debtor in such
  a case ignores the notice and pays the assignor he is not discharged C
  and will have to make a second payment to the assignee."

This argument I reject: as Mr. Brindle points out, the authorities
footnoted to that passage support only the comment following the semi-
colon—they do not make good Professor Treitel's submission that the
debtor ceases to be liable to the assignor. Rather there remains a legal
liability to the assignor albeit, true, one which the debtor meets only at D
his peril.

At the other end of the spectrum, Mr. Jarvis for the board argues that,
even after notice, the bank remains liable solely to the assignor; the
assignee, he submits, has merely an equitable interest in the assigned part
of the debt in respect of which equity will give him relief. He has,
Mr. Jarvis accepted, a remedy; but that, he submits, is by no means the
same as saying that he has any entitlement against the bank or that the E
bank has any liability to him.

This argument, too, I reject. The word "liability" in my judgment is
plainly apt to embrace the nature of the bank's obligations to an equitable
assignee after notice is given.

I conclude, therefore, that both the assignor and the assignee are
persons to whom the bank may properly be said to be liable in respect of
an assigned part of a debt. Given, however, as must be plain, that in F
respect of that sum there can be only one "depositor" for the purposes of
the Act of 1987, the vital question becomes: which is it, the assignor or
the assignee? Which liability—or, conversely, whose entitlement—is the
Act concerned with?

Mr. Brindle, whose second line of argument expressly recognises that
an equitable assignee may indeed be someone to whom the bank is liable, G
addressed this issue directly. He submits that although liability is a
necessary ingredient of a successful claim under the Act, it should not of
itself be regarded as sufficient basis for such a claim. To say that because
X is someone to whom the bank is liable, therefore X is a depositor, is a
non sequitur—after all, section 60(1) is concerned rather with identifying
what is to be regarded as a protected deposit than with defining a
depositor. Therefore one must look at the scheme of the legislation as a H
whole to determine what characteristics apart from an entitlement against
the bank a person must have to qualify for protection as a depositor. As
to this Barclays and the board make these further submissions.

A     First, it is one thing to recognise as a depositor a legal assignee of a whole deposit, able to sue and give a good discharge in his own name; quite another to regard similarly an equitable assignee who, to perfect and enforce his rights, has to join the assignor in any proceedings he brings and who cannot alone give a good discharge. To describe him as a "depositor" is to depart from any natural meaning of that word.

B     Secondly, the liability of the bank to the equitable assignee—although in a real sense a liability—is not a liability independent of that owed by the bank to the assignor, nor such as to create the assignee a separate depositor in respect of a separate protected deposit. The very reason why there was not a legal assignment in the first place was because this was a single debt; that equally is the reason why claims by equitable assignees are subject to various procedural constraints. The inescapable consequence of this must be that there remains but a single deposit, the assignor and assignee having different interests in that same debt.

C     Thirdly, the right approach is therefore to regard only the assignor, the owner of the legal interest in the debt, as the depositor in respect of the single continuing debt. He, of course, can (as a statutory assignor cannot) recover on behalf of the equitable assignee as well as himself up to the limit of protection afforded by the scheme and can account to the assignee, as appropriate, in respect of moneys recovered.

D     Fourthly, there is at the very least room for doubt as to the meaning of the word "depositor" in this context and as to whether it is apt to embrace an equitable assignee. In these circumstances it is permissible to adopt a purposive construction to the statute. Such an approach would admit of only one answer. Parliament's intention is plain that even those holding very substantial deposits shall recover no more than a maximum of £15,000. It is equally clear that no one would be likely to assign part of a bank account credit balance except, as here, for the specific purpose of escaping just such a limitation. As Barclays and the board point out, not merely have no claims been made upon the board by equitable assignees other than those who have sought to exploit this particular accountant's scheme, but in the real world it could never be a sensible arrangement.

E     Quite apart from involving a liability both for stamp duty and legal fees, it achieves nothing that could not better be achieved either by a cheque (which would meet almost every case), or just possibly by a charge or trust (in circumstances which, although rare, one can just about envisage). Lord Irvine's examples of situations where it might make sense to assign part of an account prove on close examination to be unreal, fanciful and far-fetched. True, *Paget's Law of Banking*, 10th ed. (1989), expressly mentions the possible assignment of a credit balance where the sum to be assigned is on "time" or "notice" deposit, but this is contemplated specifically by way of statutory rather than equitable assignment; it does not appear to envisage part only of such balance being assigned. And, indeed, all this was appreciated by the Vice-Chancellor himself. He thought it quite possible and understandable that the draftsman had no thought whatever of assignments. As he said [1993] Ch. 243, 252:

H     "Assignments of money in a bank account, except by way of charge, are not everyday transactions. The absence of express provision in the section means that the court, treading circumspectly, must look at the

384
Simon Brown L.J.        Deposit Protection Board v. Dalla (C.A.)        [1994]

underlying purpose of the legislation and construe the draftsman's
language with that purpose in mind."                                        A

What Barclays and the board quarrel with, however, is the Vice-
Chancellor's subsequent holding that the compensation of assignees (or at
any rate equitable assignees) comes within that underlying purpose. The
Vice-Chancellor so held with regard to legal assignees for the reasons
already indicated, and with regard to equitable assignees because he took      B
the view that they cannot sensibly be treated differently. But, Barclays and
the board submit, this overlooks amongst other things the virtual certainty
that no equitable assignment will ever be made otherwise than with the
specific object of circumventing the £15,000 ceiling upon the sum
recoverable by each deposit holder, and thus ignores that evident purpose
of the legislation.                                                         C

These are formidable arguments. How does Lord Irvine meet them?
First and foremost he submits that under the Act of 1987 there can be
no logical distinction between statutory assignees on the one hand—a
category we have already indicated we regard as entitled to compensation—
and equitable assignees on the other. True, as indicated, statutory
assignments and equitable assignments have different legal consequences.
But, submits Lord Irvine, relying upon a passage in the Vice-Chancellor's     D
judgment [1993] Ch. 243, 253, central to his decision in the case, "These
differences are not material for present purposes." Only the assignee is
entitled to actual payment of the sum assigned to him. If he has to sue, he
does so to vindicate his own, not the assignor's rights. The assignor is
joined only to guard against or resolve in a single action any dispute as to
the validity or extent of the equitable assignment.                          E

With regard to the court adopting a purposive construction of the
statute, Lord Irvine submits first that the language of sections 58 and 60,
properly understood, unambiguously supports his contention. Difficult the
point of construction may be, but that is not to say that the Act is
ambiguous. Even, however, if that be wrong—or if, as Mr. Jarvis argues,
the court is in any event entitled to adopt a purposive approach to
construction—Lord Irvine submits that to admit equitable assignees         F
amongst the categories of those entitled to protection is not in any event
contrary to the intention of the scheme. In the first place, he submits, the
Vice-Chancellor was correct in holding that the protection of assignees is
within the underlying purpose of the legislation. And if that be right, then
to suggest that such transactions thwart Parliament's intention to limit
claims to a maximum of £15,000 is to beg the question. Secondly, he
submits that there was here in any event an opportunity for those            G
concerned in these assignments to have achieved the self-same consequence
of multiple recovery by setting up a bare trust and invoking the provisions
of subsections (3) and (6) of section 61. This, too, appears to have been
part of the Vice-Chancellor's reasoning as appears from the following
passage in his judgment, at p. 253:

"The trust provisions in section 61 draw no distinction of consequence     H
between a declaration of trust relating to the whole deposit and one
relating to a defined part of a deposit. That is not surprising. In the
present case the assignors declared themselves to be trustees of the

A     assigned parts of the deposits if B.C.C.I. was unable to designate separate deposit accounts in the assignees' names. I am unable to see why equitable assignments, with this fall-back declaration of trust, ought to be treated in any way differently for compensation purposes than if in place of assignments there had been simple declarations of trust. Had there been, there could have been no room for doubt."

B     With regard to this last point I respectfully doubt whether in fact the assignors here could have achieved multiple recovery by way of simple declarations of bare trust. Certainly the beneficiaries would have had to be "jointly entitled" within the meaning of section 61(10) and to have the exclusive right to direct the trustee how to deal with the whole deposit (section 106(1)). But be that as it may, it is not suggested here that the assignors' fall-back declarations of trust achieved any such entitlement,

C     and I cannot accept that the possibility of having been able to achieve such a result by other means, even had it existed, can logically avail the claimant in the present circumstances.

    As to Lord Irvine's other submissions, I acknowledge their force, in particular regarding the apparent narrowness of the differences between statutory and equitable assignments and the difficulty of distinguishing

D     between them, the foundation of the Vice-Chancellor's decision in the matter.

    I do not pretend to have found this by any means an easy case to decide. Having set out the competing arguments at some length, I propose to state my conclusions quite shortly. They are these.

    I have come to the view that the differences between legal assignments

E     and equitable assignments, even though in one sense narrow, are in the present context real and in the end decisive. These differences I would summarise as follows. First, whereas after a legal assignment only one person, the assignee, can be said to have any entitlement against the bank, in the case of an equitable assignment, for the reasons given, the bank remains in different ways liable to both assignor and assignee. And this is not merely a technical distinction—its consequence is that whereas to

F     exclude legal assignees from the scheme would leave no one entitled to protection in respect of the assigned account, in the case of equitable assignments, the assignor can still claim.

    Secondly, even after the assignment of part of a credit balance, there remains, as stated, but one single debt owed by the bank. That is why the transaction could not be by way of statutory assignment in the first place.

G     In my judgment, it is altogether easier to describe as a "depositor" under the scheme the new owner of an entire credit balance (a legal assignee) than the new equitable creditor of part only of that balance. After all, so to describe the equitable assignees means that in respect of one single debt there will be two or more quite distinct "depositors" under the Act of 1987, two or more people to whom the bank will in varying ways and in different sums be liable. To the extent that section 61 expressly provides

H     for such a situation, so be it. It does not follow that it can otherwise arise under the Act.

    Thirdly, whereas I envisage at least the possibility that the whole credit balance of a bank account may be legally assigned for good reason, it

A seems to me well nigh inconceivable that anyone would assign part of such a balance for any reason other than that which so plainly prompted the assignments in the present case, namely the hope of circumventing the limitation on recovery under the statutory scheme. To assume, as I must and do, that these assignments were genuine in the sense that they were legally effective as between the parties to them, does not require me to assume also that in the real world they would ever be used otherwise than

B as a device. To the extent, therefore, that it is necessary to construe the Act of 1987 purposively to achieve the conclusion to which I come, I do so with this consideration in mind.

For these reasons I have reached the view that only those to whom the bank is legally liable are depositors within the scheme and that it is the sum of a depositor's legal (rather than equitable) claims against the bank

C which delimits the size of his protected deposit under section 60(1). Accordingly I for my part would have proposed to allow these appeals, set aside the declaration made by the Vice-Chancellor, and declare instead that an assignee of part of a deposit is not to be treated as a depositor with a protected deposit for the purposes of Part II of the Banking Act 1987. Since, however, I understand Russell L.J. and Sir Michael Fox to take a different view upon the determining question concerning equitable

D assignments, it follows that these appeals will be dismissed.

RUSSELL L.J. I have had the advantage of reading in draft the judgment of Simon Brown L.J. I need not repeat the facts and I gratefully adopt all that he says as to the background of the appeal and his rehearsal of the competing arguments.

E In agreement with Simon Brown L.J. I also am satisfied that protection under the scheme extends beyond the original depositor, and for the reasons which he gives I too would reject the "deposit maker" construction advanced by Mr. Brindle. I part company from Simon Brown L.J., however, when he deals with the liability of the board to equitable assignees, although like him I have not found the resolution of this appeal an easy task.

F In my judgment, whilst I recognise that the differences between a legal assignee and an equitable assignee are real, they do not, in the context of this case, justify a fundamental distinction being drawn so that the board is liable to the one and not liable to the other.

Had there been no insolvency, each and every equitable assignee could have sued the bank to judgment if the bank, on demand, had declined to

G pay out whatever sum had been assigned to the individual assignee. The equitable assignment having been made by the original depositor pursuant to a transaction which we are expressly enjoined not to regard as a sham, there could have been no impediment to the assignee suing the bank to judgment. The bank would have had no defence to the assignee's claim. In reality the need to join the assignor in the proceedings would have been no more than a procedural technicality for no objection to the judgment

H could have been properly raised by the assignor. If the bank had paid the assignor any part of the sum assigned without the authority of the assignee, the latter would still have had an unanswerable claim. This, of

A   course, is on the basis that the bank had had notice of the assignment as it did in all the cases now under review.

In my judgment the scheme of the Banking Act 1987 is that the board, as compensating authority, should stand in the shoes of the defaulting bank, and I can see no reason why, subject to the financial limit, it should be in any better position vis-à-vis equitable assignees than the bank would

B   have been but for the insolvency. If the bank would have been liable to the equitable assignee by due process of law, and, absent any good cause demonstrated by the assignor, no longer liable to the assignor for the moneys assigned, then in my judgment the board must acknowledge the claim of the equitable assignee.

I am, of course, very conscious of the fact that what was done was plainly a device, but I emphasise that no argument was addressed to us

C   that because the assignments amounted to a device they did not, on that account, attract protection. The reservation of the board's position as to the true nature of the transactions may or may not lead to a different result from that which I have reached. I take the view that the Vice-Chancellor was right to make the declaration that he did and I would dismiss these appeals.

D     SIR MICHAEL FOX.  I agree with the judgment of Russell L.J. and would dismiss this appeal accordingly.

Basically, two arguments were advanced against the claims of the assignees to be entitled to protection, namely: (1) that a claimant is not entitled to protection under the Act of 1987 unless he was the original depositor, and (2) that, in any event, the rights of an equitable assignee

E   are not sufficient to make him a depositor qualifying for protection under the Act.

As to the first of those arguments, we did not call upon Lord Irvine. The reasons for that are set forth in the judgment of Simon Brown L.J.

The second argument is the central issue in the case. In order to deal with it, it is necessary to be clear as to the rights of an equitable assignee. I should add that the assignments in the present case were equitable

F   because, being assignments of part only of the debts, they were not absolute assignments for the purposes of section 136 of the Law of Property Act 1925.

An equitable assignee of a debt or part of a debt who has given proper notice of the assignment to the debtor, can recover the assigned amount from the debtor by an ordinary action in the courts. He must however

G   join the assignor as a party; that is merely for the protection of the assignor in case there are defences which he can raise to the validity of the assignment. The position of a legal assignee is different in that he can sue the debtor without joining the assignor as a party.

It is accepted that a legal assignment of a bank deposit would be sufficient to enable the assignee to obtain whatever benefit the Act of 1979 conferred in relation to that debt. The rights conferred by the general law

H   upon an equitable assignee are not in my judgment sufficiently different from those of a legal assignee to justify the conclusion that an equitable assignee is not entitled to the protection of the Act of 1979. In both cases the assignee is (subject to giving notice) entitled to recover the amount of

388
Sir Michael Fox          Deposit Protection Board v. Dalia (C.A.)          [1994]

the assigned debt from the debtor. The equitable assignee must, of course,   A
join the assignor as a party. If the assignment is a valid assignment the
assignee will get judgment against the debtor for payment of the assigned
amount. If it is not a valid assignment, he will not get judgment but on
that assumption he had no claim anyway. In the present case, it is assumed
for the purposes of this appeal that the assignment was a genuine and
valid assignment which takes effect accordingly to its tenor. We must
assume, therefore, that there would be no defence to the assignees' claims.   B

I appreciate, of course, that a legal assignment would not have served
the purpose of the assignors in the present case. But what is important is
that a legal assignment would plainly be effective to secure the protection
of the Act of 1979 and that the rights conferred by an equitable assignment
are not sufficiently different to those of a legal assignee to justify any
significant practical distinction between legal and equitable assignees for   C
the purposes of this case. The crucial matter to any assignee is whether he
can recover the debt. The practical position is that, provided he gives
notice (which the legal assignee also has to do) the equitable assignee will
get his money if it was an unimpeachable assignment. He has to join the
assignor in the action but that, in such cases (including the present),
would be a formality.

Looking at the matter from the point of view of liability therefore, it   D
seems to me that an equitable assignee under a valid assignment must
realistically be regarded as entitled to the debt or part of the debt which
has been assigned to him. The courts will enforce payment.

Accordingly, I think that the Vice-Chancellor was right. I would
dismiss the appeals.

                                                                              E

                                        *Appeals dismissed.*


    *Solicitors: Lovell White Durrant; Clifford Chance; Ashurst Morris
Crisp.*

              [Reported by JOHN SPENCER, Barrister]                          F


    The second defendant appealed.


    *Michael Brindle Q.C.* and *Bankim Thanki* for the second defendant.
The issue is: who is a "depositor" within the meaning of section 58(1) of
the Banking Act 1987? The Act should be construed so as to further its       G
purpose and not to retard it: see *Jones v. Wrotham Park Settled Estates*
[1980] A.C. 74, 105, *per* Lord Diplock echoing the classic statements in
*Heydon's Case* (1584) 3 Co.Rep. 7a, 7b; see also *Remon v. City of London
Real Property Co. Ltd.* [1921] 1 K.B. 49.

    The Act requires both that the claimant be a "depositor" and that the
institution be liable to him immediately prior to the winding up. Personal
representatives stand in the shoes of the original depositor, and trustees in   H
bankruptcy or statutory assignees inherit all the rights of the original
depositor to the exclusion of that person and can sue in their own name.
Thus, there is no difficulty in extending "depositor" to include those

389

A   persons who supplant or replace the original depositor in respect of claims against the institution.

Although an equitable assignee of part of a deposit is in a sense entitled as against the institution in question, he does not supplant or replace the assignor and the liability of the institution to him is not a liability independent of that owed by a bank to the assignor, nor such as B   to create the assignee a separate depositor in respect of a separate protected deposit.

An assignment of part of a debt cannot be an "absolute assignment" within the meaning of section 136 of the Law of Property Act 1925 and thus can take effect only as an equitable assignment: see *Forster v. Baker* [1910] 2 K.B. 636 and *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349. Whilst a statutory assignee acquires exclusive rights in the debt assigned to him, C   in the case of an equitable assignment the assignor remains the legal owner of the chose in action and is not removed from the picture vis-à-vis the debtor. The equitable assignee cannot give a good discharge to the debtor in respect of the assigned debt and cannot sue the debtor to judgment without joining the assignor as a party: *In re Steel Wing Co. Ltd.* and *Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* D   [1924] A.C. 1. Further, the assignor cannot give a good discharge even in respect of the part of the debt which he has not assigned and must join all equitable assignees of other parts of the total debt in any proceedings brought against the debtor: *Walter & Sullivan Ltd. v. J. Murphy and Sons Ltd.* [1955] 2 Q.B. 584. Since there is at all material times one single debt arising out of a single transaction with a single counterparty it would be oppressive for the debtor to defend more than one action: see *Weddell v.* E   *J.A. Pearce & Major* [1988] Ch. 26, 41A. Thus, the first defendant and those like her did not obtain any title independent of that of the relevant assignor. The "depositor" remained at all material times the assignor for the purposes of Part II of the Act of 1987, being the original depositor, the institution's customer, and also remaining entitled at law (although not in equity) to part of the deposit assigned.

F   Alternatively, a "depositor" is to be regarded as the person who made the deposit. This construction accords with the natural meaning of the word and fits the wording of the Act: see sections 5, 60(2)(a)(6)(c), 61(8). However, that construction creates possible anomalies in respect of three categories of non-deposit makers, namely, personal representatives of deceased account holders, trustees in bankruptcy and statutory assignees becoming entitled pursuant to section 136 of the Law of Property Act G   1925. The first construction removes these anomalies.

*John Jarvis Q.C.* and *Jonathan Nash* for the board, having adopted the submissions of the second defendant. The method chosen for limiting compensation indicates that Parliament had in contemplation that only one person would be entitled in respect of each deposit. Section 61 of the Act of 1987 was intended to modify the effect of sections 58 and 60. H   Drawing the line between legal and equitable assignees prevents the evasion of the limitation on compensation, achieves the purposes of the Act, does not violate the language of the statute and is most unlikely to produce unfairness or anomalies.

A

*Patrick Elias Q.C.* and *Philip Sales* for the first defendant. "Depositor" in sections 58(1) and 60(1) of the Act of 1987 means a person who, whether or not he made the deposit initially, is entitled in equity, at law or pursuant to statute to payment by the institution of moneys held on deposit by it. He is the person to whom the bank is liable. Thus, the first defendant as equitable assignee of part of the credit balance of a deposit is a depositor. There is no reason why the draftsman should have made a distinction between creditors at law and in equity. The key to understanding the Act is liability or entitlement. The board stands in the shoes of the defaulting bank and if the bank was under a liability to pay, so is the board: see, *per* Russell L.J., *ante,* p. 387A–B. [Reference was also made to sections 60(2)(6)(*c*) and 61(3)(6)(7).]

B

The amount of compensation payable to a depositor is 75 per cent. of his protected deposit, which is defined in section 60(1) as "the total liability of the institution to him." If the deposit maker construction were correct an anomaly would arise. An original depositor (in the payment sense) who was also an assignee of a deposit could count the value of the assigned deposit in calculating the amount of his protected deposit, and hence could claim compensation in respect of the assigned deposit under section 58(1). But an assignee of a deposit who had not himself made an original deposit as well would get no compensation. There is no sound basis for supposing that Parliament intended some assigned deposits to attract compensation but not others. Further, by the operation of section 61(3) a beneficiary under a bare trust is intended to have the benefit of the claim for compensation in respect of that deposit under section 58(1). It would also be anomalous for the Act of 1987, by the regime for bare trusts, to compensate such beneficiaries but not to compensate assignees of deposits: see [1993] Ch. 243, 251F–252F, 253C–D, *per* Sir Donald Nicholls V.-C.

C

D

E

Parliament must be assumed to have used the phrase "the total liability of the institution" in section 60 in its natural meaning and as referring to liability both at law and in equity: see *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349. "Liability" means liability to make payment to someone. Once the assignment has taken place and notice has been given to the debtor, he can resist any claim for payment by the assignor, who, for his part, cannot give good discharge to the debtor. The assignee then has an independent entitlement to enforce his claim. Once the debtor has paid the assignee, he has a defence to any subsequent action: see *Jones v. Farrell* (1857) 1 De G. & J. 208 and *Brice v. Bannister* (1878) 3 Q.B.D. 569. Thus in no sense can one talk of a continuing liability to the assignor. The procedure whereby the assignee may have to join the assignor in order to sue does not affect the assignee's substantive rights: see *Central Insurance Co. Ltd. v. Seacalf Shipping Corporation* [1983] 2 Lloyd's Rep. 25. If the assignor sues in respect of part of the fund retained by himself, he, too, must join the assignee: *Walter & Sullivan Ltd. v. J. Murphy and Sons Ltd.* [1955] 2 Q.B. 584. No one has suggested that the assignor does not have an entitlement to sue in such circumstances.

F

G

H

If "depositor" is limited to those with legal title, there would be a serious anomaly between the laws of England and Scotland in relation to

**2 A.C.**  Deposit Protection Board v. Dalia (H.L.(E.))

A   part assignments. Scots law does not make the distinction between law and equity.

    *Brindle Q.C.* in reply. It is probable that the Act of 1987 was drafted primarily with English law in mind: see *Commissioners for Special Purposes of the Income Tax v. Pemsel* [1891] A.C. 531, 579. The Act may therefore have a different result under Scots law to that under English law. Although Scots law does not use the law/equity distinction, it does not follow that
B   Scots law treats an assignment of part of a deposit as legally identical to an assignment of the whole.

    It would be dangerous to use the Banking Act 1987 (Meaning of Deposit) Order 1991 as an aid to the construction of the Act. There is no material to suggest that the draftsman of the Order had any relevant intention one way or the other as to the meaning of "depositor." All the
C   Order does is to amend the Act. It was made some four years after the parent Act, so "contemporanea expositio" cannot be prayed in aid.

    *Their Lordships took time for consideration.*

    *19 May 1994.* LORD KEITH OF KINKEL. My Lords, for the reasons set out in the speech to be delivered by my noble and learned friend, Lord
D   Browne-Wilkinson, which I have read in draft and with which I agree, I would allow this appeal and make the declaration which he proposes.

    LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

E     LORD BROWNE-WILKINSON. My Lords, the Deposit Protection Fund, established under Part II of the Banking Act 1987, is designed to provide compensation to depositors on the insolvency of an institution authorised to accept deposits under that Act. On the insolvency of the institution, a depositor is entitled to be paid three-quarters of the amount of his deposit, but limited to a maximum deposit of £20,000. Thus a depositor owed
F   £20,000 can obtain compensation of £15,000. A depositor owed £100,000 is also entitled to compensation, but his claim, too, is limited to the same maximum of £15,000.

*The facts*

    On 5 July 1991 the Bank of England presented a petition for the winding up of the Bank of Credit and Commerce International S.A.
G   ("B.C.C.I."). Provisional liquidators were appointed and depositors ceased to be able to withdraw their money. It was therefore clear that there was a substantial risk that depositors with B.C.C.I. would not recover the amount of their deposits and would have to look to the Deposit Protection Fund. A firm of accountants devised a scheme whereby a depositor would assign a part of his deposit to "family members
H   or close friends who can be trusted." For example, in the case of a deposit of £100,000 the depositor would assign £20,000 out of it to each of four friends. In consequence, if the scheme is effective, instead of the compensation payable in respect of the deposit of £100,000 being limited

A

to £15,000, the original depositor and each of the four assignees could claim compensation of £15,000 in respect of the £20,000 part of the deposit which belonged or had been assigned to him. In consequence, instead of £15,000 being the maximum compensation payable in respect of the original deposit of £100,000, the compensation payable would be increased to £75,000.

B

The accountants wrote to depositors in B.C.C.I. suggesting this scheme. A substantial number of depositors adopted the scheme. Before 30 July 1991, each depositor executed a deed of assignment which was in the standard form prepared by, or for, the accountants. It described the original depositor as "the vendor" and the assignee as "the purchaser." After reciting the vendor's deposit with B.C.C.I. (which was identified by its number) the deed provided: "in consideration of the sum of £1 . . . the vendor by this deed sells, assigns and transfers the sum of £——— of the deposit to the purchaser." At the same time, the original depositor gave notice of the assignment to B.C.C.I. and instructed B.C.C.I.:

C

"that the above-mentioned sum is now held by the purchaser and that the purchaser should now be identified by you as a depositor. If, for administrative reasons, you are unable to arrange for the completion of formalities to designate a separate deposit account in the name of the purchaser, I/we confirm that I/we hold the above mentioned sum on trust for the purchaser."

D

It is common ground that such assignments were not statutory assignments of the debts owed by B.C.C.I. to the original depositors within the meaning of section 136 of the Law of Property Act 1925, since only part of the debt was assigned. However it is also agreed that they took effect as equitable assignments under which in equity, but not at law, B.C.C.I. became liable to pay each assignee the part of the debt assigned to him.

E

Whilst it is accepted by all parties that the scheme devised by the accountants was a device designed solely to increase the amount of compensation recoverable, it is for the purposes of these proceedings accepted that the assignments were genuine and that there was no arrangement that the assignee would hold any compensation received by him for the benefit of the assignor. However, the Deposit Protection Board has reserved the right in future proceedings to challenge the validity of the assignments if necessary.

F

These proceedings are designed to establish whether or not the scheme devised by the accountants is effective. Any future resort to such a scheme has now been counteracted by the Banking Act 1987 (Meaning of Deposit) Order 1991 in such a way that any assignment of deposits made after 30 July 1991 and after a winding up petition has been presented will not qualify for compensation. But the Order does not affect this scheme which, if effective, will give rise to an additional £3·7m. of compensation being payable out of the fund in respect of deposits with B.C.C.I. The first defendant is an assignee of part of the debt owed to a Mrs. Dalia prior to the assignment: she is joined to represent all such assignees. The second defendant is Barclays Bank Plc. which is joined to represent all the

G

H

2 A.C.          Deposit Protection Board v. Dalia (H.L.(E.))          Lord Browne-Wilkinson

A   authorised institutions which, under the Act of 1987, are responsible for providing the funds necessary to meet the compensation payments.

### The issues

The question in this case is one of pure statutory construction. Under section 58(1), upon an authorised institution becoming insolvent

B   compensation is payable "to each depositor who has a protected deposit with that institution." The question is whether an assignee of part of the deposit is a "depositor." No argument was advanced before the House based on the final words of the notice to B.C.C.I. referring to a declaration of trust.

The Act contains no relevant definition of the word "depositor." Broadly stated three possible constructions of "depositor" have been put

C   forward, viz.:

(1) The deposit maker construction, i.e. the word "depositor" means only the person who originally paid the sum to the insolvent institution. On this construction, no assignee of a deposit (other than a limited class of deposits under certificates of deposit) is a "depositor."

(2) The entitled-at-law construction, i.e. the person entitled in law (as

D   opposed to equity) to the sum deposited. On this construction legal assignees of a deposit who acquire the whole legal and equitable right to the debts are "depositors" but equitable assignees such as the present claimants are not.

(3) The entitlement construction, i.e. any person entitled to the deposit as against the institution whether or not he was the person who originally paid the sum to the institution. On this construction the present claimants

E   and all other legal and equitable assignees are "depositors."

Sir Donald Nicholls V.-C. [1993] Ch. 243 rejected the deposit maker construction as did, unanimously, the Court of Appeal, ante, pp. 373H et seq. The entitled-at-law construction was not fully advanced before the Vice-Chancellor and was rejected by the majority of the Court of Appeal (Russell L.J. and Sir Michael Fox, Simon Brown L.J. dissenting).

F   Accordingly, the Vice-Chancellor and the majority of the Court of Appeal held in favour of the claimants. Barclays Bank appeal that decision to your Lordships' House.

Although the question raised is a simple one, the answer is far from simple and involves the very complicated interaction of a number of sections in the Act, not all of which were brought to the attention of the courts below.

G

### The Act

Although the Act of 1987 contains no definition of "depositor" it does contain a definition of "deposit" to which I attach considerable importance:

"5(1) Subject to the provisions of this section, in this Act 'deposit'

H   means a sum of money paid on terms—(a) under which it will be repaid, with or without interest or a premium, and either on demand or at a time or in circumstances agreed by or on behalf of the person making the payment and the person receiving it; and (b) which are not referable to the provision of property or services or the giving of

Deposit Protection Board v. Dalia (H.L.(E.))            [1994]

A

security; and references in this Act to money deposited and to the
making of a deposit shall be construed accordingly. . . . (3) Except
so far as any provision of this Act otherwise provides, in this Act
'deposit' does not include—(a) a sum paid by the bank or an
authorised institution; (b) a sum paid by a person for the time being
specified in Schedule 2 to this Act; (c) a sum paid by a person, other
than a person within paragraph (a) or (b) above, in the course of
carrying on a business consisting wholly or mainly of lending money;
(d) a sum which is paid by one company to another at the time when
one is a subsidiary of the other or both are subsidiaries of another
company or the same individual is a majority or principal shareholder
controller of both of them; or (e) a sum which is paid by a person
who, at the time when it is paid, is a close relative of the person
receiving it or who is, or is a close relative of, a director, controller
or manager of that person."

B

C

That definition applies for all the purposes of the Act but, for the purposes
of Part II, certain amendments are made by section 60(9).

Part II of the Act provides for the payment of compensation on the
insolvency of an authorised institution. Such payment is made out of a
fund constituted under Part II. Section 58(1) provides for compensation
to be payable in the event of an authorised institution becoming insolvent
which, by section 59(1) is defined as the date of the winding up order.
Section 58(2) provides for the payment of compensation in the event of
an administration order being made under section 8 of the Insolvency Act
1986. They provide:

D

E

"58(1) Subject to the provisions of this section, if at any time an
institution becomes insolvent and at that time—(a) it is an authorised
institution; or (b) it is a former authorised institution . . . the board
shall as soon as practicable pay out of the fund to each depositor
who has a protected deposit with that institution an amount equal to
three-quarters of his protected deposit. (2) Subject to the provisions
of this section, if at any time an administration order is made under
section 8 of the Insolvency Act 1986 in relation to an institution and
at that time it is such an institution as is mentioned in subsection (1)
above the board shall pay out of the fund to each depositor who has
a protected deposit with that institution an amount equal to three
quarters of his protected deposit; . . . "

F

G

These two subsections therefore require one to discover what is "a
protected deposit," a phrase defined by section 60:

"(1) Subject to the provisions of this section, in relation to an
institution in respect of which a payment falls to be made under
section 58(1) above any reference in this Act to a depositor's protected
deposit is a reference to the total liability of the institution to him
immediately before the time when it becomes insolvent, limited to a
maximum of £20,000, in respect of the principal amounts of and
accrued interest on sterling deposits made with the United Kingdom
offices of the institution. (2) Subject to the provisions of this section,

H

2 A.C.                    Deposit Protection Board v. Dalla (H.L.(E.))    Lord Browne-
                                                                          Wilkinson

A    in relation to an institution in respect of which a payment falls to be
     made under section 58(2) above any reference in this Act to a
     depositor's protected deposit is a reference to the liability of the
     institution to him in respect of—(a) the principal amount of each
     sterling deposit which was made by him with the United Kingdom
     office of the institution before the making of the administration order
     and which under the terms on which it was made is or becomes due
B    or payable while the order is in force; and (b) accrued interest on any
     such deposit up to the time when it is or becomes due and payable
     as aforesaid; but so that the total liability of the institution to him
     in respect of such deposits does not exceed £20,000. . . . (6) In
     determining the total liability of an institution to a depositor for the
     purposes of subsection (1) above, or liability or total liability of an
C    institution to a depositor for the purposes of subsection (2) above, no
     account shall be taken of any liability in respect of a deposit if . . .
     (c) the institution is a former authorised institution and the deposit
     was made after it ceased to be an authorised institution or a
     recognised bank or licensed institution under the Banking Act 1979
     unless, at the time the deposit was made, the depositor did not know
     and could not reasonably be expected to have known that it had
D    ceased to be an authorised institution, recognised bank or licensed
     institution. . . . (9) For the purposes of this section and sections 61
     and 62 below the definition of deposit in section 5 above—(a) shall
     be treated as including—(i) any sum that would otherwise be excluded
     by paragraph (a), (d) or (e) of subsection (3) of that section if the
     sum is paid as trustee for a person not falling within any of those
E    paragraphs; (ii) any sum that would otherwise be excluded by
     paragraph (b) or (c) of that subsection; (b) subject to subsections
     (10) and (11) below, shall be treated as excluding any sum paid by a
     trustee for a person falling within paragraph (e) of subsection (3) of
     that section; and (c) shall be treated as including any sum the right
     to repayment of which is evidenced by a transferable certificate of
     deposit or other transferable instrument and which would be a deposit
F    within the meaning of section 5 as extended by paragraph (a) and
     restricted by paragraph (b) above if it had been paid by the person
     who is entitled to it at the time when the institution in question
     becomes insolvent."

     Section 61 has a sidenote "Trustee deposits, joint deposits etc." It
     provides, so far as relevant:
G
        "(1) In the cases to which this section applies sections 58 and 60
     above shall have effect with the following modifications. (2) Subject
     to the provisions of this section, where any persons are entitled to a
     deposit as trustees they shall be treated as a single and continuing
     body of persons distinct from the persons who may from time to time
     be the trustees, and if the same persons are entitled as trustees to
H    different deposits under different trusts they shall be treated as a
     separate and distinct body with respect to each of those trusts.
     (3) Where a deposit is held for any person or for two or more persons
     jointly by a bare trustee, that person or, as the case may be, those

A  persons jointly shall be treated as entitled to the deposit without the intervention of any trust. (4) Subsection (3) above does not extend to Scotland and, in Scotland, where a deposit is held by a person as nominee for another person or for two or more other persons jointly, that other person or, as the case may be, those other persons jointly shall be treated as entitled to the deposit. (5) A deposit to which two or more persons are entitled as members of a partnership (whether or not in equal shares) shall be treated as a single deposit. (6) Subject

B  to subsection (5) above, where two or more persons are jointly entitled to a deposit and subsection (2) above does not apply each of them shall be treated as having a separate deposit of an amount produced by dividing the amount of the deposit to which they are jointly entitled by the number of persons who are so entitled."

C  I will deal first with the deposit maker argument since, if this is correct, no assignee can be a "depositor" for the purposes of section 58.

*The prima facie meaning of "depositor"*

Both Sir Donald Nicholls V.-C. and (to a lesser extent) the Court of Appeal considered that prima facie "depositor" means a person who

D  makes the deposit. This view was challenged by Mr. Elias for the claimants but, in the context of this Act, I agree with the courts below.
My view is strengthened by the definition of "deposit" in section 5. To my mind, a depositor within the meaning of the Act must at least be entitled to a "deposit" as defined in the Act. Section 5(3) excludes from the definition of "deposit" certain sums "paid" to the institution, such exclusions being formulated by reference to the personal characteristics of

E  the payer. Thus, a sum paid to an institution by a person who at the time when it is paid is, for example, a close relative of a director (whom I will call a "close relative") is not included in the definition of a deposit. One would assume therefore that the word "depositor" prima facie means the person whose characteristics at the time he paid the sum to the institution determined whether or not the sum so paid is a "deposit" within the

F  meaning of the Act.
As the courts below appreciated, this prima facie meaning of depositor as being the deposit maker is much supported by subsections (2) and (6)(c) of section 60. Subsection (2) deals with the meaning of a "depositor's protected deposit" in the event of an administration order being made. It is defined as the liability "to him" (i.e. to "the depositor")

G  in respect of a sterling deposit "which was made by him." It is therefore clear that, in the context of administration orders, a "depositor" for the purposes of Part II means the person who originally made the deposit. Nobody has been able to suggest any reason why, in this respect, Parliament should have intended to treat compensation payable on the insolvency of a company differently from compensation in the event of an administration order being made in relation to a company.

H  Section 60(6)(c) points in the same direction. It deals with a case where a sum is deposited with an institution which was formerly authorised but at the date of deposit had ceased to be authorised. Such a person is entitled to compensation under section 58(2). The effect of subsection

**2 A.C.**  Deposit Protection Board v. Dalia (H.L.(E.))

A  (6)(c) of section 60 is to exclude compensation unless, *at the time the deposit was made*, the depositor did not have notice that the institution had ceased to be authorised. Thus "the depositor" in this provision must be the person who originally paid the sums to the institution. If, as the claimants submit, "depositor" includes an assignee, in the case of a claim made by an assignee either the state of knowledge of the original payer would have to be investigated or an assignee of the debt would be entitled

B  to compensation even though he at all times (including the date of assignment) knew that the institution had ceased to be authorised. It seems improbable that Parliament intended either of these results.

*Is the prima facie meaning displaced?*

C  What, then, persuaded the courts below that an assignee of the debt was a depositor for the purposes of Part II of the Act? In broad terms there were three reasons, viz.: (1) That since the provisions of section 61 confer a right to compensation on beneficiaries under bare trusts, it was inconceivable that statutory assignees should be treated less favourably. (2) The Order of 1991, being a legitimate aid to construction, only operates to negate assignments made after a winding up petition is

D  presented; therefore, by inference, assignments made before such presentation entitle the assignee to compensation. (3) That it would be surprising if statutory assignees of a debt were not entitled to compensation.

I can deal with the second of those reasons quite shortly. Although there are occasions on which regulations can be used as an aid to construction of the Act under which they are made (*Hanlon v. The Law*

E  *Society* [1981] A.C. 124) that is only where the regulations are roughly contemporaneous with the Act being construed. In my judgment regulations made by a government department and rushed through in order to counteract an identified mischief (viz. the accountants' device which is the subject matter of this appeal) throw little if any light on the meaning of an Act passed by Parliament four years previously.

F  I turn then to the first reason urged, viz. the provisions of section 61 relating to deposits held on trust. I fear that the proper construction of section 61 depends upon a complicated interaction between section 5, section 60(9) and section 61. The courts below proceeded throughout on the basis that compensation is payable to a person who (a) is a "depositor" and (b) is entitled to a sum deposited with an institution. On that basis,

G  they treated it as being clear that since section 61(3) and (4) require one to treat the beneficial owner of deposits made by bare trustees or nominees as being "entitled to the deposit" such person must be a "depositor" for the purposes of Part II. In their view, this was the result whether the nominee originally paid the sum as nominee or, after making the payment to the institution, subsequently declared himself to be a bare trustee or nominee. Therefore, they considered, it must have been the underlying

H  purpose of the Act to provide compensation for a person who is beneficially entitled to the sum deposited. In particular, Parliament could not have intended to draw any distinction between a statutory assignee and a beneficiary entitled under a bare trust.

Lord Browne-
Wilkinson          Deposit Protection Board v. Dalia (H.L.(E.))                [1994]

A
I cannot agree with this conclusion for the reasons which in outline can be stated as follows. 1. The right of a beneficiary to compensation under section 61 depends on his entitlement to a "deposit" within the meaning of Part II of the Act: if there is no relevant "deposit" he cannot be the "depositor." It is therefore impossible to draw any firm conclusion as to the rights of an assignee by comparison with those of a beneficiary absolutely entitled under a bare trust without considering the provisions of section 60(9) which vary the meaning of "deposit" for the purposes, inter alia, of section 61. 2. Section 60(9)(c) expressly modifies the definition of "deposit" in relation to one type of assignment (those evidenced by a transferable instrument) but is significantly silent as to other assignments.

I will consider each of these reasons in turn.

C

*1. The meaning of "deposit"*

It is, in my view, clear that no one can be a "depositor" unless he is entitled or deemed to be entitled to a "deposit" within the statutory definition. Under section 5(3) sums paid by someone who falls within the classes excluded by paragraphs (a) to (e) of section 5(3) are not deposits within the meaning of the Act. Therefore, apart from the modifications introduced by section 60(9), in the case of a sum paid to the institution by a trustee, its status as a "deposit" under section 5(3) depends upon the personal characteristics of the payer (the trustee) not the beneficiary. Thus, if A (who is a close relative of a director of the institution) pays a sum to an institution as bare trustee for B (who is not a close relative) under section 5(3)(e) the sum is not a deposit, since it was "paid by" A, a close relative, and sums so paid are excluded from the definition of "deposit." The characteristics of B, the beneficiary, are irrelevant for the purposes of section 5(3).

When Parliament determined that compensation should be payable to certain beneficiaries under trusts, this necessarily required a modification of the definition of "deposit" so as to determine whether or not a debt owed by an institution is a "deposit" by reference to the characteristics of the beneficiary, B. This variation was effected by section 60(9)(a) and (b) under which the status of the sum as a "deposit" is made to depend on the characteristics of the beneficiary, not those of the trustee. Thus, in the example given above, for the purposes of sections 60 and 61 of the Act, a sum which would have been excluded by section 5(3)(e) from being a "deposit" falls to be treated as a deposit since it was paid by A, as trustee, for B who, not being a close relative, was not an excluded person under section 5(3)(e).

It follows that the provisions of section 61(3) which say that the nominee "shall be treated as entitled to the deposit" do not, as the courts below considered, lead to the conclusion that he is a "depositor." A claimant who is a beneficiary under a bare trust also has to show that, within the definition in section 5(3) as amended by section 60(9), the sum falls to be treated as a "deposit:" unless it is a deposit he will not be the depositor.

Once the importance of the definition of "deposit" is apparent, the analogy between the rights to compensation of a beneficiary under a bare

**2 A.C.**          **Deposit Protection Board v. Dalia (H.L.(E.))**          Lord Browne-Wilkinson

A    trust and the right of an assignee to such compensation becomes very strained. A (a close relative) pays a sum to the institution as trustee for B (not a close relative): B is entitled to compensation since the sum is to be treated as a deposit (section 60(9)(*a*)). Compare the case where A (a close relative) assigns an existing deposit to B (not a close relative). B is not entitled to compensation: the sum is not a "deposit" since its status

B    falls to be determined according to the characteristics of A at the date of payment under section 5(3), there being nothing to modify that definition for the purposes of Part II of the Act. Therefore the rights of an assignee to compensation would not be the same as a beneficiary under a bare trust.

C    Take another case. A (not a close relative) pays the sum to the institution as trustee for B (a close relative). The sum is not a "deposit" (section 60(9)(*b*)): therefore no compensation is payable. Contrast the case where A, instead of declaring himself trustee, assigns the debt to B (a close relative). If assignees are to be treated as "depositors," B would be entitled to compensation since there is nothing to link the definition of "deposit" to the status of the assignee as opposed to that of the person who made the original payment. One would therefore have the remarkable

D    result that close relatives who obtained assignments of debts would be entitled to compensation where, if they had made the original deposit themselves or were beneficiaries under a bare trust, they would have been expressly excluded.

For these reasons, in my judgment section 60 provides no clear guidance as to the meaning of the word "depositor."

E    *2. "Negotiable deposits"*

In the courts below it was thought that the draftsman of the Act had probably overlooked the position of assignees. However, section 60(9)(*c*) deals specifically with one type of assignment, viz. deposits evidenced by transferable certificates of deposit or other transferable instruments

F    ("C.D.s"). Therefore the rights of assignees of at least one kind were in the mind of the draftsman.

It is interesting to see how Parliament dealt with the definition of "deposit" in the context of C.D.s. The subject matter of a C.D. is to be included in the definition of "deposit" "if it had been paid by the person who is entitled to it at the time when the institution in question becomes insolvent." There are two points to be noted. First, the assignee is to be

G    deemed to have made the initial payment, i.e. he is deemed to be the deposit maker. This strongly suggests that Parliament was, throughout, considering a depositor to be the original payer and therefore had to deem an assignee to have paid the deposit. Second, unlike the personal characteristics of beneficiaries under a trust which are ascertained at the date of the original payment, it is the personal characteristics of the

H    assignee at the date of insolvency which determines the status of the C.D. As one would expect in the case of compensation for assignees, the entitlement to compensation is not made to depend on the personal characteristics of the original depositor.

**Lord Browne-**
**Wilkinson**          Deposit Protection Board v. Dalia (H.L.(E.))          [1994]          A

However, the most significant feature of section 60(9)(c) is that it deals only with one type of assignment, viz. assignments of sums deposited under C.D.s. If "depositor" includes all assignees, this would lead to extraordinary results. If A (not a close relative) makes a C.D. deposit and then transfers it to B (a close relative), B is not entitled to compensation since the sum is not a deposit by virtue of section 60(9)(c). If, on the other hand, A were to make an ordinary deposit (not a C.D.)          B
and then assign it to X (a close relative), X is entitled to compensation since there is nothing to exclude the debt from the definition of deposit. I find it impossible to accept that Parliament, having been to such lengths to exclude from compensation a close relative who was either the original depositor, or a beneficiary under a trust, or the holder of a C.D., intended an assignee who was a close relative at the date of insolvency to receive          C
compensation.

For these reasons I can find nothing in the provisions of section 61 which clearly indicate that an assignee is to be treated as a depositor and indications in section 60 that he is not to be so treated.

*No compensation for assignees*          D

There remains the final reason relied upon by the courts below for rejecting the prima facie meaning of the word depositor, viz. that it would be odd if Parliament had not provided compensation for a statutory assignee: in the case of an assigned debt, the result would be that neither the original deposit maker nor the assignee would be entitled to compensation.

The Court of Appeal, but not Sir Donald Nicholls V.-C., considered          E
that unless assignees were "depositors" neither the personal representatives nor the trustee in bankruptcy of the original deposit maker would be entitled to compensation. In my judgment this is not correct. Personal representatives and trustees in bankruptcy are, by operation of law, universal successors to those whom they represent. Therefore on any footing they are entitled to the compensation to which the persons they          F
represent would have been entitled had they survived or not become insolvent.

That leaves the undoubted fact that, on the deposit maker construction, a legal assignee of the debt (apart from deposits under C.D.s) will not be entitled to compensation. Although I agree that it is difficult to see the reason for such exclusion, it may well be that the rarity of assignments of deposits provides an explanation. In the ordinary way, deposits with          G
banks and other financial institutions are not assigned. The transfer of cash on deposit is normally achieved by drawing a cheque in favour of the transferee or drawing cash and paying it to the transferee. We were told that, apart from C.D.s and the assignments the subject matter of this action, the Deposit Protection Board had no experience of any statutory assignments and knew of only one equitable assignment where trustees          H
attempted to assign the deposit to themselves. The view may well have been taken that, apart from C.D.s, in the real world such assignments do not occur.

**2 A.C.**    Deposit Protection Board v. Dalia (H.L.(E.))

*Conclusion*

A    I therefore find nothing in the other provisions of the Act which is inconsistent with the prima facie meaning of "depositor" as being the person who makes the deposit. I would therefore allow the appeal on this ground and declare that a person entitled to a debt by reason of the assignment of part of a debt is not a depositor holding a protected deposit entitled to compensation pursuant to section 58(1) of the Act. In the

B    circumstances it is unnecessary for me to deal with the other arguments advanced. It is agreed that there will be no order as to costs.

LORD MUSTILL.   My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

C    LORD LLOYD OF BERWICK.   My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

> *Appeal allowed.*
> *No order as to costs.*

D

Solicitors: *Lovell White Durrant; Clifford Chance; Ashurst Morris Crisp.*

C. T. B.

E

———

F

G

H

# Exhibit B

Accordingly, with very considerable diffidence in view of the great experience in these matters of the learned umpire and the learned Judge, and with every desire to give full weight to the reasons given by Lord Justice Greer in *Monroe Bros. Ltd. v. Ryan* at pp. 181 and 35 why the drafting of charter-parties hardly accords with what those trained in other disciplines of law would expect, I would hold that the owners are protected by cl. 13 against liability in damages for breach of the warranties in cl. 26, and I would accordingly allow this appeal.

**Sir DENYS BUCKLEY:** I also would allow this appeal, and would do so for the reasons given in the judgment of Sir John Donaldson, M.R.

[*Order: Appeal allowed with costs in this Court. Each side to pay their own costs below. Application for leave to appeal to the house of Lords granted.*]

## COURT OF APPEAL

Feb. 1 and 2, 1983

———

CENTRAL INSURANCE CO. LTD.

v.

SEACALF SHIPPING CORPORATION

(THE "AIOLOS")

Before Lord Justice ACKNER and
Lord Justice OLIVER

Practice — Leave to amend — Subrogation — Insurers settled claim for short delivery — Insurers sued carriers in own name — Writ and summons struck out — Whether amendment to include all insured buyers should be allowed — Whether action reasonably arguable and therefore ought not to be struck out.

The plaintiff insurers effected in 1978, with 28 Taiwanese buyers, 30 policies of insurance covering quantities of soya bean meal which had been consigned to the buyers on board the defendants' vessel *Aiolos* and which were the subject matter of 30 separate bills of lading which were subject to the Hague Rules, art. III, r. 6 of which provided inter alia:

In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods . . .

The total quantity loaded was 18,923,245 tonnes but on discharge at destination in April, 1978, the cargo was found to be 682,901 tonnes short and the plaintiffs settled the claim brought by the buyers. They obtained from each buyer a formal document which was headed "Loss Subrogation Receipt" which acknowledged the receipt of the insurance money and stated inter alia:

In consideration of this payment we hereby relieve [the plaintiffs] . . . from any liability in regard to such loss and abandon to [the plaintiffs] . . . all our rights title and interest in the . . . goods. We also undertake and agree to allow any proceedings to be taken in our name in respect of the loss . . . of the . . . goods . . . and to assist in such proceedings in any form that may be required of us.

On June 28, 1979, an extension of time having been granted until July 3, 1979, the plaintiffs issued a writ in rem the only claim endorsed on the writ being the plaintiffs' claim for 8,127,681 Taiwanese dollars, being the amount due to the plaintiffs from the defendants in respect of rights of subrogation under contracts of insurance. A statement of claim was served on Aug. 20, 1979. No title to sue appeared on the face of the pleadings although the plaintiffs specifically pleaded their subrogation rights.

On Oct. 5, 1979, the defendants served their defence and expressly denied that the plaintiffs had title to sue the defendants.

On Oct. 30, 1980, the defendants applied to strike out the writ and statement of claim. The Admiralty Registrar granted the application.

On Dec. 5, 1980, the plaintiffs gave notice of appeal and also notified their intention of seeking leave to reamend their writ and amend the statement of claim to add the 28 buyers entitled to the 30 policies as plaintiffs and the addition of (i) a claim by the plaintiffs as assignees of the rights of the cargo-owners and (ii) claims for damages in the alternative by the 28 buyers.

———Held, by SHEEN, J., that the application to amend would be refused and the plaintiffs' appeal dismissed.

On appeal by the plaintiffs:

———Held, by C.A. (ACKNER and OLIVER, L.JJ.), that (1) the learned Registrar was right to order the claim to be struck out since it was not seriously argued that the only way in which that claim could be exerted was by action in the name of the insured; any claims which the insured themselves had were clearly now long since barred by art. III, r. 6 of the Hague Rules, for "suit" in the rules meant relevant suit, i.e., one in which the right to sue was vested in the plaintiffs; the right of subrogation entitled the insurer to call upon the insured to permit his name to be used in a suit for the benefit of the insurer but it did not vest the cause of action in him; an amendment which joined the insured as parties so that they could assert their right of action and which had the effect of relating that assertion back to the date of the original writ had the effect of depriving the defendants of a vested right to plead that the claim was time barred under r. 6 and could not on ordinary principles be allowed (see p. 30, col. 2);

(2) the learned Judge was right to refuse leave to amend under R.S.C., O. 20, r. 5 (2) and (3); here there was no error either as to the name or as to the identity of the party which fell to be corrected but simply an error of law as to the rights possessed by the correctly identified party and O. 20, r. 5 (3) did not extend to that sort of error and the application under this rule failed (see p. 30, col. 2; p. 31, col. 1);

(3) on the evidence the receipt arguably was an effective assignment in Taiwanese law (see p. 32, col. 1);

(4) if it were essential to have the buyers before the Court they could quite properly be joined as defendants without that joinder having the consequences of depriving the defendants of the right which had accrued to them of resisting the claim by relying on art. III, r. 6 of the Hague Rules (see p. 32, col. 1);

(5) subrogation was concerned solely with the mutual rights of the parties to a contract of insurance and it conferred no right and imposed no liability on any third party; it was not itself and did not create a cause of action against the debtor and to succeed the plaintiff had to prove that he had the right to make the claim; the reference to subrogation did not of itself show that the right to bring the action was not vested in the plaintiff; it merely failed to demonstrate that it was so vested (see p. 33, col. 1);

(6) there could be no doubt at all about what the claim was that was being asserted and what was missing from the statement of claim and what made it demurrable and liable to be struck out was any allegation of fact showing how the cause of action became vested in the plaintiffs (see p. 33, col. 1);

(7) the absence of any specification of the plaintiffs' title to sue in the writ in no way rendered the writ a nullity; there was nothing whatever to prevent the plaintiff from serving a statement of claim showing how the right to sue had become vested in them or if they had failed to do so in the statement to apply to amend to introduce the necessary averments (see p. 33, cols. 1 and 2);

(8) in a case where there was a dispute between the parties as to whether the documents relied upon constituted assignments at all, the ordinary requirement that the assignors should be before the Court was not one which could be dispensed with; the joinder was a purely procedural requirement and on the assumption that the receipts were effective assignments, the cause of action thus arose and the question of depriving the defendants of any vested right to rely on the time bar therefore arose, the suit having been properly begun within the period permitted by the rule (see p. 34, cols. 1 and 2);

(9) this was not a case in which the defendants had been in any way misled as to the nature of the claim made nor had any evidence been adduced to suggest that they had been prejudiced by the delay in any way which could not be compensated in costs; in these circumstances it was appropriate that the discretion of the Court be exercised in favour of allowing the proceedings to be amended so that the real issue between the parties could be determined; subject therefore to the writ and bringing in revised amendments to the writ and statement of claim to plead the assignment only and to join the buyers as defendants the appeal would be allowed (see p. 34, col. 2).

———

The following cases were referred to in the judgment of Lord Justice Oliver:

Actien-Gesellschaft für Cartonnagen Industrie A.G. v. Temler, (1899) 16 R.P.C. 447;

Aries, The, (H.L.) [1977] 1 Lloyd's Rep. 334;

Bowden's Patents Syndicate Ltd. v. Herbert Smith & Co., [1904] 2 Ch.D. 86;

Brandt's (William) Sons & Co. Ltd. v. Dunlop Rubber Co. Ltd., (H.L.) [1905] A.C. 454;

Durham Brothers v. Robertson, [1898] 1 Q.B. 765;

Evans Construction Co. Ltd. v. Charringtons & Co. Ltd., (C.A.) [1983] 2 W.L.R. 117;

Hill v. Luton Corporation, [1951] 2 K.B. 387;

King v. Victoria Insurance Co. Ltd., (H.L.) [1896] A.C. 250;

Lucy v. Henley's Telegraph Works Co. Ltd., (C.A.) [1970] 1 Q.B. 393;

Mabro v. Eagle Star and British Dominions Insurance Co. Ltd., [1932] 1 K.B. 485;

Performing Right Society Ltd. v. London Theatre of Varieties Ltd., [1924] A.C. 1;

Pontin v. Wood, (C.A.) [1962] 1 Q.B. 594;

Steel Wing Co. Ltd. In re, [1921] 1 Ch. 349;

Sweet v. Cater, (1841) 11 Simon's Rep. 572;

Vandervell's Trusts, In re, [1974] Ch. 269;

Wilson v. Ragosine & Co. Lim., (1915) 84 L.J.K.B. 2185;

Yorkshire Insurance Co. Ltd. v. Nisbet Shipping Co. Ltd., [1961] 1 Lloyd's Rep. 479; [1962] 2 Q.B. 330.

---

This was an appeal by the plaintiffs, Central Insurance Co. Ltd. from the decision of Mr. Justice Sheen dismissing their appeal and refusing their application to amend their writ and statement of claim in the action brought by the plaintiffs against the defendants, Seacalf Shipping Corporation, the Admiralty Registrar having granted the defendants' application to strike out the writ and statement of claim.

Mr. Jeffrey Gruder (instructed by Messrs. Ince & Co.) for the plaintiffs; Mr. Peter Irvin (instructed by Messrs. Clyde & Co.) for the defendants.

The further facts are stated in the judgment of Lord Justice Oliver.

Judgment was reserved.

---

Thursday, Feb. 17, 1983

---

JUDGMENT

**Lord Justice ACKNER:** I will ask Lord Justice Oliver to deliver the first judgment.

**Lord Justice OLIVER:** This is a case in which we are asked for leave to appeal and we have decided to give leave. Before I deliver judgment I ought to ask the appellants' Counsel for an undertaking that the appeal will be set down to come before the Court on motion.

Mr. GRUDER: Certainly, my Lords: I will give that undertaking.

**Lord Justice OLIVER:** This is an application for leave to appeal from an order made on Dec. 10, 1982, by Mr. Justice Sheen in Chambers in an Admiralty action, whereby he dismissed the plaintiffs' appeal from an order of the Admiralty Registrar of Dec. 2, 1980, striking out the writ and statement of claim on the ground that they disclosed no reasonable cause of action and refused leave to amend.

Although the initial application was for leave only, we indicated that if leave were given we would proceed straightaway with the hearing of the substantive appeal, and we have in fact heard full argument on the matter which arises in this way. The plaintiffs, Central Insurance Co. Ltd., are, as their name suggests, insurers and are incorporated in Taiwan. In the course of their business there they effected in 1978, with 28 Taiwanese buyers, 30 policies of insurance covering quantities of soya bean meal which had been consigned to the buyers on board the defendants' vessel, Aiolos, and which were the subject-matter of 30 separate bills of lading. The total quantity loaded was 18,923.245 tonnes, but on discharge at destination in April, 1978, the cargo was found to be 682.901 tonnes short and the plaintiffs were thus called upon to pay, and did pay to the buyers, a total of 8,127,681 Taiwanese dollars. Upon doing so, they of course became subrogated to the buyers' rights and, in addition to relying upon the ordinary insurers' rights of subrogation, they obtained from each buyer a formal document which was headed "Loss Subrogation Receipt", which acknowledged the receipt of the insurance money and contained this provision:

In consideration of this payment, we hereby relieve the above mentioned insurance company, its agents and/or representatives from any liability in regard to such loss, and abandon to the above mentioned insurance company, its agents and/or representatives all our rights title and interest in the said goods. We also undertake and agree to allow any proceedings to be taken in our name in respect of the loss or recovery of the said goods, if required, and to assist in such proceedings in any form that may be required of us.

The bills of lading were subject to the Hague Rules and in particular to art. III, r. 6 which is in the following terms, so far as material to the questions which have arisen in this case:

. . . In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.

Following the payment of the claims by the insurers, claims were pursued by loss adjusters on their behalf against the shipowners. The claims were resisted and in April, 1979, Messrs. Clyde & Co., the solicitors acting for the P. and I. club to which the defendants belonged, wrote granting an extension of time under the Hague Rules to July 3, 1979.

On June 28, 1979, that is to say, some five days before the extended time for instituting a suit ran out, the plaintiffs, through solicitors in London, issued a writ in rem, the only claim endorsed on which was in the following terms:

The plaintiffs' claim is for the sum of 18,923,245 New Taiwan Dollars being the amount due to the Plaintiffs from the Defendants in respect of rights of subrogation under contracts of insurance relating to goods shipped on a voyage from Brazil to Kaohsiung on the ship M.V. Aiolos and lost due to the default of the Defendants full particulars whereof have been delivered and exceed three folios.

That was subsequently amended to correct certain errors in the sums claimed.

A statement of claim was served on Aug. 20, 1979, claiming damages for breach of contracts of carriage by sea and it is important to note that the statement of claim followed precisely the specification of the cause of action adumbrated in the writ. It identified the plaintiffs as insurers, referred to the 30 policies, the shipping of the goods and the short delivery on arrival, and in par. 6 pleaded that the plaintiffs had suffered damage as a result of the defendants' failure to deliver. No title to sue appears on the face of the pleadings, but par. 5 is in these terms:

In the premises the said thirty separate consignees suffered loss and damage and the Plaintiff duly indemnified the said thirty separate consignees under the said thirty insurance contracts, in the sum of New Taiwan Dollars 8,127,681.00 and thereby the Plaintiffs became subrogated to all rights and entitlements possessed by the said thirty separate consignees against third parties including the Defendants (defendant vessel is the unit in rem).

A defence was served on Oct. 5, 1979, which put the short delivery and damage in issue and which contained the following paragraph:

6. It is expressly denied that the Plaintiff has title to sue the Defendant.

An unexplained delay for a year ensued and then on Oct. 30, 1980, the defendants issued a summons to strike out the writ and statement of claim. That came before the Admiralty Registrar on Dec. 2, 1980, and, perhaps not altogether surprisingly, it succeeded, for it is well established that an insurer has no right, in English law at any rate, to sue under his right of subrogation in his own name, but must bring his action in the name of the insured and the only fact relied on by the plaintiffs was their payment of the insured loss.

On Dec. 5, 1980, however, the plaintiffs gave notice of appeal and also notified their intention of seeking leave to reamend their writ and to amend the statement of claim. The amendments to the writ consisted of an addition of the 28 insured buyers entitled to the 30 policies as plaintiffs, and the addition of (i) a claim by the plaintiffs as assignees of the rights of the cargo-owners and (ii) claims for damages in the alternative by the 28 buyers. The amendments to the statement of claim reflect these amendments and in particular par. 10 sought to plead the loss subrogation receipts as effective legal and equitable assignments of the buyers' rights to claim against the defendants for loss of cargo.

This burst of activity at the end of 1980 was, however, illusory and a period of uninterrupted peace and calm appears to have ensued for the next two years which remained unbroken until November, 1982, when the plaintiffs changed their solicitors.

The appeal and the application to amend finally came on for hearing before the Judge and on Dec. 10, 1982, he dismissed the plaintiffs' appeal and refused their application for leave to amend. The learned Judge was not asked for leave to appeal, but it is accepted that the application fell to be treated as an interlocutory one and that leave is required.

On behalf of the plaintiffs Mr. Gruder puts his case in two ways. He accepts that the general rule is that an insurer relying upon his right of subrogation must sue in the name of his insured and therefore by inference that he needs leave to amend, although he argues that the leave required is not in fact as extensive as the leave which has been sought because, he claims, the plaintiffs were and are entitled to sue in their own names as assignees and do not strictly need to join the buyers as co-plaintiffs or as substitute plaintiffs. He submits: (1) that, on the basis of evidence put before the learned Judge, he should have come to the conclusion that there was at least an arguable case for saying that the loss subrogation receipts constituted assignments under Taiwanese law of the buyers' rights to sue for damages, Taiwanese law being the law governing the contractual relationships between the buyers and the insurers; (2) that if this is right the insurers were in fact entitled to sue in

their own name. While he accepts that, there having been no notice to the defendants prior to the action of any assignment, the documents relied on cannot qualify as anything but equitable assignments and, while he also accepts, as he has to, that the general rule is that an equitable assignee must join his assignor as a party in any action, either as plaintiff or defendant, he submits that this rule is a procedural rule only, evolved to protect the defendant from the possibility of subsequent claims by the assignor and that there are exceptions where it is clear that the assignee is solely and beneficially entitled and that there is no possibility of any claim by the assignor against the debtor.

Since in this case the *beneficial* claims of the 28 buyers must all be long since extinguished as a result of art. III, r. 6 of the Hague Rules, there can be no possibility of any such claim against the defendants, so the rationale of the procedural rule does not apply and, accordingly, the instant case is one of the exceptional cases in which an equitable assignee will be permitted to sue without joining his assignor.

At any rate, even if he eventually turns out to be wrong, Mr. Gruder argues that the proposition is a reasonably arguable one and therefore that the action should not be struck out. Mr. Gruder's second point, which assumes that it is essential to have the 28 shipowners as co-plaintiffs, both for a subrogation claim and for a claim on the basis of assignment, is that the addition of these persons as parties is something that the Court ought to allow under O. 20, r. 5 of the Rules of the Supreme Court. The relevant portions of the rule for present purposes are sub-rr. (1), (2) and (3) which are in these terms:

Subject to Order 15, rules 6, 7 and 8 and the following provisions of this rule, the Court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct. (2) Where an application to the Court for leave to make the amendment mentioned in paragraph (3), (4) or (5) is made after any relevant period of limitation current at the date of issue of the writ has expired, the Court may nevertheless grant such leave in the circumstances mentioned in that paragraph if it thinks it just to do so. (3) An amendment to correct the name of a party may be allowed under paragraph (2) notwithstanding that it is alleged that the effect of the amendment will be to substitute a new party if the Court is satisfied that the mistake sought to be corrected was a genuine mistake and was not misleading or such as to cause any reasonable

doubt as to the identity of the person intending to sue or, as the case may be, intended to be sued.

Now of course it is clear that there was not in fact any mistake about the name of the person originally named as plaintiff, nor about the capacity in which he sued as plaintiff. The company was rightly described and was made plaintiff as the insurer of the goods. The mistake which was made was the mistake of thinking that the cause of action was vested in that plaintiff and in that capacity. Mr. Gruder's submission under O. 20, r. 5 (3) can, I think, only apply to the subrogation claim. So far as a claim as assignee is concerned, the party named was, if there was an assignment, rightly a plaintiff and the appropriate application is therefore one under O. 20, r. (1) to add the claim of assignment and under O. 15, r. 6 to add the necessary party and not an application under O. 20, r. 5 (3). So one comes to the question, can the subrogation claim be saved by substituting the names of the 28 buyers for the name of the insurance company? Mr. Gruder argues that it was always intended to bring the action on behalf of the insurers, and the mistake made was in attributing to the insurers a quality which they did not in fact have, namely, that of being able to sue in their own name. He relies on the recent case of *Evans Construction Co. Ltd. v. Charringtons & Co. Ltd.*, [1983] 2 W.L.R. 117, and in particular the following passage from the judgment of Lord Justice Donaldson at p. 126 where his Lordship says this:

In applying Ord. 20, r. 5 (3) it is, in my judgment, important to bear in mind that there is a real distinction between suing A in the mistaken belief that A is the party who is responsible for the matters complained of and seeking to sue B, but mistakenly describing or naming him as A and thereby ending up suing A instead of B. The rule is designed to correct the latter and not the former category of mistake. Which category is involved in any particular case depends upon the intentions of the person making the mistake and they have to be determined on the evidence in the light of all the surrounding circumstances. In the instant case I have not the slightest difficulty in accepting Mr. Greenwood's assertion that he intended to sue the relevant landlord under the Act. After all, he was responding on behalf of his lessee client to a notice to quit given on behalf of the landlord and it would have been surprising, to say the least, if he had thought that it was appropriate to respond by claiming a new lease from the managing agent or any other stranger to the landlord and tenant relationship. Accordingly I would conclude that he made a genuine

mistake of a character to which Ord. 20. r. 5 (3) can apply.

In the instant case Mr. Gruder submits there is no question of anyone being misled: the defendants can never have thought anything but that the action was intended to be an action for the benefit of the insurers under their right of subrogation and therefore the learned Judge should have allowed the amendment.

Those then are the plaintiffs' principal contentions. The contrary argument of Mr. Irvin on behalf of the defendants can be summarized briefly in three propositions. (1) The action as originally framed was plainly demurrable and necessarily had to be struck out, for it provided no case to answer. Once struck out there was not, and is not, any cause of action at all on the bills of lading, for the effect of the lapse of time under r. 6 is to extinguish not merely the remedy but the cause of action itself (see *The Aries*, [1977] 1 Lloyd's Rep. 334). (2) No amendment can be made under R.S.C., O. 15, r. 6, because it is well established that you cannot add a party if the effect of doing so is going to be to deprive the defendant of a defence based on the expiry of a relevant period of limitation. In this context he refers to the judgment of Lord Justice Scrutton in *Mabro v. Eagle Star and British Dominions Insurance Co. Ltd.*, [1932] 1 K.B. 485, at p. 487. It is a short passage:

In my experience the Court has always refused to allow a party or a cause of action to be added where, if it were allowed, the defence of the Statute of Limitations would be defeated. The Court has never treated it as just to deprive a defendant of a legal defence. If the facts show either that the particular plaintiff or the new cause of action sought to be added are barred, I am unable to understand how it is possible for the Court to disregard the statute. [See also *Lucy v. Henley's Telegraph Works*, [1970] 1 Q.B. 393, per Lord Justice Megaw at pp. 411-412.]

(3) Therefore the application, to succeed at all, must do so by virtue of O. 20, r. 5 (2) and (3). As to this (a) the mistake here made is not a relevant mistake for the purpose of allowing that rule to operate and (b) the expiry of the contractual period allowed by the Hague Rules for bringing suit is a substantive contractual provision on which any cause of action depends and is not a relevant period of limitation for the purposes of r. 5 (2), that phrase being restricted to limitation in the procedural sense of a limitation on the period within which an action can be brought. There is, therefore, nothing in O. 20, r. 5 which would enable the Court to permit an amendment which would not simply allow the revival of a time barred remedy for a subsisting right, but would actually revive a right which has already been effectively extinguished.

We have had extensive and wide-ranging arguments from Counsel on both sides and I hope that I shall not be thought disrespectful of them if I do not rehearse them in extenso here. I have found them of great value in clarifying and isolating the points with which we have had to deal on this appeal, but on the view that I take of the matter many of them become immaterial. Let me first deal with the plaintiffs' claim so far as it rests solely upon the automatic right of subrogation arising from their payment of insured losses. Here, quite plainly, the learned Registrar was right to order the claim to be struck out, for it is not seriously contested that the only way in which that claim could be exerted is by action in the name of the insured. Any claims which the insured themselves may have are clearly now long since barred by art. III, r. 6 of the Hague Rules, for "suit" in the rules must mean a relevant suit, that is, one in which the right to sue on the contract is vested in the plaintiffs. The right of subrogation entitles the insurer to call upon the insured to permit his name to be used in a suit for the benefit of the insurer, but it does not vest the cause of action in him. An amendment, therefore, which joins the insured as parties so that they can assert *their* right of action and which has the effect of relating that assertion back to the date of the original writ does therefore in a very real way have the effect of depriving the defendants of a vested right to plead that the claim of the insured is time barred under r. 6 of the Hague Rules and could not, on ordinary principles, be allowed. If such an amendment is to be permitted at all, it can only be by virtue of O. 20, r. 5 (2) and (3) and the plaintiffs' claim, so far as this part of the case is concerned, stands or falls on the application of those provisions.

In my judgment the learned Judge was quite right in refusing leave to amend under this rule. For my part, I find it unnecessary to consider whether the Hague r. 6 period is or is not a relevant period of limitation for the purposes of r. 5 (2), for in my judgment the case is not one which falls within r. 5 (3). The analogy which Mr. Gruder seeks to draw with the *Charrington* case is not, in my judgment a permissible one. No doubt if the fact were that the actual insurer was not the plaintiff, but, say, a subsidiary company, there could or might be a true analogy with that case. But the instant case was not a case, as was the *Charrington* case, of a mistaken belief that the person made party to the proceedings fulfilled a particular description, videlicet that of landlord or insurer, but a case of an erroneous belief that the plaintiff, because he

was in fact what he was thought to be, that is, the insurer, had as a result of that certain legal rights which he did not in fact have. There was therefore no error either as to the name or as to the identity of the party which fell to be corrected, but simply an error of law as to the rights possessed by the correctly identified party. Order 20, r. 5 (3) simply does not extend to this sort of error and the application under this rule must, therefore, fail.

The critical question therefore appears to me to be whether the learned Judge was right to refuse to allow an amendment by pleading an assignment of the rights of the insured. It is not entirely clear from the notes of his judgment, but it seems that his grounds for doing so were: (a) that the documents relied on, that is, the subrogation loss receipts, clearly did not constitute statutory assignments under the Law of Property Act, 1925; (b) that if they had constituted equitable assignments they might support the plaintiffs' claim; (c) that whether they did or not was a question of Taiwanese law; but (d) that he preferred the view of the defendants' expert that they did not constitute assignments and therefore the amendment proposed was fruitless and led nowhere.

The two central questions which have been argued before us and upon which the appeal depends so far as this part of the case is concerned are, first, whether the learned Judge was right in his assessment of the evidence of Taiwanese law and, secondly, whether, even assuming an equitable assignment, an amendment to plead it is permissible having regard to the expiry of the time limit prescribed by r. 6 of the Hague Rules.

Now, as regards the first question, the learned Judge was clearly disposed to treat the subrogation loss receipt as in effect a notice of abandonment vesting in the insurers the title to the undelivered goods, if they ever turned up, and not as a document transferring to the insurers any right to damages created by the breach of the contract constituted by the bills of lading. Indeed Mr. Gruder was himself strongly resistant to the suggestion that, if it falls to be tested by English law, the receipt constitutes an equitable assignment of the buyer's rights of action. Whilst it may not be immediately apparent to the untutored mind why a document which purports to transfer the right to recover goods from a bailee does not constitute in English law an assignment of the right to sue for their non-delivery, I am certainly not prepared to dissent from the views of those very much more familiar than I with documents of this type. However, the principal question is not what is the effect of the document in English law, but its effect under Taiwanese law by

reference to which both insurer and insured may be thought to have been contracting and which would appear to be the proper law governing the construction and effect of the document. In this connection Mr. Gruder has referred the Court to r. 82 on p. 573 of the 10th ed. of Dicey & Morris from which that proposition emerged.

There was no sworn evidence of Taiwanese law before the learned Judge, but there were two telexes from lawyers instructed by the plaintiffs and the defendants respectively, a Mr. Chiang and a Mr. Huang. Both agree that the law of Taiwan recognizes assignments of choses in action and that they are regulated by art. 297 of the Civil Code under which notification to the debtor is a prerequisite to a valid assignment. Both agree that, under a judgment of the Republic of China Supreme Court no. 1162 of 1933, the assertion of the right assigned by litigation can itself constitute the essential notification. It is however at this point that they part company. Mr. Huang says that, for litigation itself to constitute the requisite notice, the fact of assignment must be stated expressly in the pleadings, and he goes on to say (a) that "abandon" (the phrase used in the receipt) does not in Taiwanese law mean "assign" or "transfer" and (b) that the receipt does not in his view constitute an assignment.

Mr. Chiang, perhaps predictably, expresses the opposite view. On what is perhaps the critical point of notification he is rather less definite than Mr. Huang, saying only that—

. . . if the assignee demands the performance of the debtor's obligation in its pleading, the demand could also be construed as having the effect of notification.

However, he treats assignment and subrogation as largely interchangeable so far as their consequences are concerned and asserts that the receipt could have the effect in Taiwanese law of transferring the right of action and enabling the transferee to sue in its own name.

Now, while I accept that the evidence is not particularly satisfactory — and I think that that applies to both telexes — I would not, for myself, have thought it right, as the learned Judge appears to have done, to decide the application on the basis of what he considered, without further investigation or cross-examination, to be the preferable view. He was of course perfectly right to say that there was no point whatever in giving leave to amend if the claim as amended must fail, but this was a striking out application and, whichever might appear to be the view more likely to be accepted at a trial, the telexes appear to me clearly to raise a triable issue which could not be, and ought not

to have been, decided then and there. For my part, I am persuaded by the plaintiffs' evidence, not that the receipt *was* an effective assignment in Taiwanese law, but at least that it arguably was.

If that is right, can there then be any objection to an amendment of the proceedings so as to bring that issue before the Court?

Mr. Irvin argues that there can be and that there is, for two reasons. First, he says that the amendment necessarily involves joining the 28 buyers as plaintiffs because this is, on any analysis at all, only an equitable assignment and the cause of action cannot be asserted without joining them as plaintiffs. Whatever effect that may have as regards the assignment, it will have the effect, retrospectively to the date of the writ, of joining as plaintiffs those very parties to the proceedings who were necessary for the assertion of the claim based simply on subrogation at law and will thus deprive the defendants of the right which has already accrued to them to resist that claim by reliance upon r. 6 of the Hague Rules. At the moment those proposed plaintiffs cannot assert their rights which have been extinguished; if they are joined as plaintiffs, they will be able to do so. Indeed, their presence as co-plaintiffs claiming the relief claimed will, without more, constitute such an assertion. On ordinary principles, therefore, this amendment ought not to be allowed. Secondly, and regardless of any question of joinder of parties, the amendment to plead an assignment constitutes the assertion of a new and different cause of action and is thus objectionable on the same principle.

I do not, speaking for myself, find Mr. Irvin's first point a persuasive one, although I entirely agree that the learned Judge was right to decline, and I would myself decline, to join the buyers as co-plaintiffs in the manner suggested by the proposed amendments. But, as I understand the practice of the Court, the insistence upon joinder of the assignor under an equitable assignment as a party — the reason and necessity for which I will consider in a moment — is dictated simply by the desirability of having him before the Court and thus bound by the order. It is not because his presence as a plaintiff is essential to the prosecution by the assignee of the cause of action assigned to him. The purpose of joining him is equally well served by his being a defendant and indeed, if he refuses to join as plaintiff, he can and should be made a defendant simply in order to be bound by the result. If therefore it be essential, which Mr. Gruder claims that it is not, to have the buyers before the Court, they cannot quite properly be joined as defendants without that joinder involving the consequences which Mr. Irvin fears.

It is Mr. Irvin's second point that is, to my mind, the critical one: does the pleading of a title by assignment, whether or not accompanied by the joinder of the assignors, constitute the assertion, retrospectively, of some new or different cause of action which, were it not contained in a writ issued prior to the expiry of the limitation period, would otherwise be barred? Mr. Irvin puts his case in this way. The writ in the action was a writ based expressly upon the plaintiffs' right of subrogation. That was the cause of action asserted and that cause of action never was vested in the plaintiffs, so that the writ, although issued timeously, was manifestly demurrable and not a relevant suit for the purposes of r. 6 because it was commenced by the wrong plaintiff. To permit, therefore, an amendment which will convert, after the time bar period has expired, a cause of action not vested in the plaintiff into a cause of action which *is* vested in the plaintiff will be to transgress the rule of practice which inhibits the granting of amendments which destroy a vested right to rely upon a defence of limitation. A limitation defence is always unattractive, but I confess that, at first, I found Mr. Irvin's argument an attractive one. I think, however, that it requires some analysis and that upon analysis it ceases to carry conviction. It rests upon two propositions, neither of which in my judgment will stand the test of close examination. First, it is said that the framework of the general indorsement on the writ dictates once and for all the way in which the claim could be put in the future. Secondly, and in any event it is said that the absence of essential parties at the date of the writ precludes any assertion that the claim now sought to be asserted by amendment is a claim which at the date of the writ it was open to the plaintiffs to assert. These two propositions are in fact separate facets of what is essentially the same point, namely, that a cargo claim vested in the plaintiffs is not the subject-matter of a suit commenced within the time permitted by r. 6.

Looking first at the indorsement, what is said is that the statement that the claim was "in respect of rights of subrogation under contracts of insurance" conclusively shows (a) that the only way in which the plaintiffs can claim title to sue is by reliance upon their right of subrogation in law and (b) that that demonstrates that what they are purporting to assert is a right not vested in them but in the insured. That, it is said, is supported by par. 5 of the statement of claim. Thus, the argument continues, what was asserted on June 25, 1979, was a cause of action subsisting in someone else, entitling that person to damages together with an unsustainable claim by the plaintiff to be paid those damages. It is not then open to the plaintiff to rely upon a

cause of action subsisting in himself. His writ is and was defective and is incapable of cure, save by an amendment which pleads a new and different cause of action.

I find myself unable to accept this argument for three reasons. In the first place, it seems to me that it attributes altogether too much force to the words "in respect of rights of subrogation". Subrogation is concerned solely with the mutual rights of the parties to a contract of insurance and it confers no right and imposes no liability on any third party (see the analysis of Mr. Justice Diplock (as he then was) in *Yorkshire Insurance Co. Ltd. v. Nisbet Shipping Co. Ltd.*, [1961] 1 Lloyd's Rep. 479; [1962] 2 Q.B. 330). It is not itself and does not create a cause of action against the debtor. To say, therefore, that the plaintiff sues "in respect of rights of subrogation", while it explains why it is that this plaintiff is making a cargo claim at all, is a wholly immaterial averment so far as the defendants' liability is concerned. It in no way alters the nature of the claim made against him. To succeed the plaintiff must prove that he has the right to make the claim, but he does not have to demonstrate that in his writ. It is not, for instance, unknown for the insured, instead of at the behest of the insurer, to implement the insurer's right of subrogation by assigning his right of action (see *King v. Victoria Insurance Co. Ltd.*, [1896] A.C. 250). Nor is the matter carried further by the statement of claim. All that it seems to me that the statement of claim does is to include a similarly immaterial averment and to omit an essential averment showing how the plaintiff is entitled to sue. To put it another way, the reference to subrogation does not of itself show that the right to bring the action is *not* vested in the plaintiff: it merely fails to demonstrate that it *is* so vested.

Secondly, there could not be any doubt at all about what the claim was that was being asserted. It was a claim for short delivery of cargo, full particulars of which had already been delivered and are referred to in the indorsement. That was the breach of contract in respect of which the suit was commenced and the plaintiffs were entitled to put their case for the payment to them of damages in law in any way open to them on the facts that they chose to plead (see *Re Vandervell*, [1974] Ch. 269 at p. 321). What was missing from the statement of claim and what made it demurrable and liable to be struck out was any allegation of fact showing how the cause of action became vested in them.

Thirdly, the absence of any specification of the plaintiffs' title to sue in the writ in no way rendered the writ a nullity. Order 6, r. 2, requires the indorsement to contain "a concise statement of the nature of the claim made". This indorsement was defective no doubt in several respects, although when taken in conjunction with the particulars I do not think that the defendants can have been under any illusion about what was being claimed. This was a cargo claim even if insufficiently specified and the writ would have been good unless and until an application was made to set it aside — an application which had to be made within a reasonable time. The cases of *Hill v. Luton Corporation*, [1951] 2 K.B. 387, and *Pontin v. Wood*, [1962] 1 Q.B. 594, are instructive in this context, for there defective writs were cured by the subsequent delivery of statements of claim even after the limitation period had expired. I am prepared to assume that this writ was in fact defective on its face, but, even as it stood, there was in my judgment nothing whatever to prevent the plaintiffs from serving a statement of claim showing how the right to sue had become vested in him or, if he failed to do that in his statement of claim, to apply to amend to introduce the necessary averments.

This brings me to Mr. Irvin's second point which, if I understand it aright, is merely another way of saying that what the plaintiffs were asserting by their writ was not their own cause of action but somebody else's. The argument runs thus: an equitable assignee *can* only assert his cause of action in a suit to which his assignor is a party. The plaintiffs did not make the buyers party to the action. Therefore they were not asserting a cause of action vested in them, but a cause of action vested in someone else, and the suit was not a relevant suit for the purposes of r. 6. Thus to allow the plaintiffs now to assert a right vested in them would deprive the defendants of a time bar which has already operated in their favour.

Whether or not the conclusion follows from the middle term, I have found myself unable to accept the major premise. That there is a long-standing practice that, before giving judgment in an action at the suit of an equitable assignee, the Court will normally require him to bring his assignor before the Court is beyond doubt. But it does not follow from that that there is no cause of action vested in the assignee and capable of being asserted by him alone or, indeed, that the assignor has in all cases, and necessarily, to be a party. The reason for the requirement is not that the assignee has no right which he can assert independently, but that the debtor ought to be protected from the possibility of any further claim by the assignor who should therefore be bound by the judgment. A further reason given by Lord Justice Chitty in *Durham Brothers v. Robertson*, [1898] 1 Q.B. 765, is that the assignor ought to be given the opportunity to challenge the assignment if he wishes, though

this probably comes to the same thing. The concept behind the rule is that the debtor should not be put in double jeopardy.

Mr. Gruder has referred us to a number of authorities for the proposition that the presence of the assignor is not universally necessary and can be dispensed with by the Court. To begin with there are numerous cases in which an equitable assignee has been permitted to proceed on his own to protect his interest interlocutorily, even though he may subsequently be required to amend by bringing his assignor before the Court. (See *Sweet* v. *Cater*, (1841) 11 Simon's Rep. 572, *Actien-Gesellschaft für Cartonnagen Industrie A.G.* v. *Temler*, (1899) 16 R.P.C. 447, *Bowden's Patents Syndicate Ltd.* v. *Herbert Smith & Co.*, [1904] 2 Ch. 86, per Mr. Justice Warrington at p. 91.) These cases by themselves demonstrate the subsistence of a cause of action in the assignee, but in fact the authorities go further. In *William Brandt's Son & Co. Ltd.* v. *Dunlop Rubber Co. Ltd.*, [1905] A.C. 454, judgment was given for the assignee although the assignor was not made party to the action. The case was, it is true, an exceptional one, for the debtor had in fact settled with the assignor and disclaimed any desire to have him there. Nevertheless, it demonstrates that the requirement is a procedural and not a substantive one upon which the assignee's cause of action depends. Similarly, in *Wilson* v. *Ragosine & Co. Lim.*, (1915) 84 L.J.K.B. 2185, judgment was given in favour of an equitable assignee on the Courts being satisfied that he had in fact got the sole beneficial interest in the chose in action assigned and that it was not practically possible to join the assignor. (See also *Re Steel Wing Co.*, [1921] 1 Ch. 349, per Mr. Justice P. O. Lawrence at pp. 356-357.) The existence of the power of the Court to dispense with the presence of the assignor in exceptional circumstances was in fact recognized by the House of Lords in *Performing Right Society* v. *London Theatre of Varieties*, [1924] 1 A.C. 1, see pp. 13, 19 and 30.

As I have already mentioned, Mr. Gruder submits that the instant case is an exceptional one where the presence of the assignors could properly be dispensed with, for, having regard to the fact that their claims have been discharged, their undertakings to assist in the proceedings in any way possible and the lapse of time, they can have no possible interest in the rights assigned nor any ability to sue the debtor on their own account, so that there is no possible question of double jeopardy. Were the documents upon which he relies undoubted assignments governed by English law, I would for my part have much sympathy with that submission, but, in a case in which there is a dispute between the parties as to whether the documents relied on constitute assignments at all, the ordinary requirement that

the assignors should be before the Court is not one which I feel could be dispensed with and they should in my judgment be before the Court as defendants, even though no relief is claimed against them, save possibly a declaration as to the effect of the documents. The necessity of their joinder does not, however, affect the validity of Mr. Gruder's point that the amended claim does no more than assert the position existing at the date of the writ.

The joinder is a purely procedural requirement and, on the assumption that the receipts were effective assignments, the cause of action thus vested in the plaintiffs was effectively asserted by the writ. No question of depriving the defendants of any vested right to rely on the time bar therefore arises, the suit having been properly begun within the period permitted by the rule.

The only other point is whether, having regard to the unexplained lapse of time, amendment to plead an assignment should be refused as a matter of discretion. This is not a case in which the defendants have been in any way misled as to the nature of the claim made, nor has any evidence been adduced to suggest that they have been prejudiced by the delay in any way which cannot be compensated in costs. In these circumstances I would think it appropriate therefore that the discretion of the Court should be exercised in favour of allowing the proceedings to be amended so that the real issue between the parties can be determined. Subject therefore to Mr. Gruder bringing in revised amendments to the writ and statement of claim to plead the assignment only and to join the buyers as defendants, I would allow this appeal.

**Lord Justice ACKNER:** I have had the advantage of reading the judgment of my Lord in draft. I agree with his conclusions and the reasons which he has given for those conclusions. There is nothing that I would wish to add.

[*Order: Appeal allowed; costs reserved to trial Judge; case to be transferred to the Commercial Court and tried by a Judge other than Mr. Justice Sheen; application for leave to appeal to the House of Lords refused.*]

———

# Exhibit C

TRUSTS, WILLS AND PROBATE LIBRARY

# SNELL'S EQUITY

## THIRTY-FIRST EDITION

### General Editor

### JOHN MCGHEE, Q.C.
*M.A. (Oxon.)*
*of Lincoln's Inn, Barrister*

### Contributors

MATTHEW CONAGLEN

TIMOTHY DUTTON

DAVID FOX

TIMOTHY HARRY

EDWIN JOHNSON

THOMAS LEECH

ADAM SMITH

THOMSON
＊
SWEET & MAXWELL

AUSTRALIA
Law Book Co.
Sydney

CANADA AND USA
Carswell
Toronto

HONG KONG
Sweet & Maxwell Asia

NEW ZEALAND
Brookers
Wellington

SINGAPORE AND MALAYSIA
Sweet & Maxwell Asia
Singapore and Kuala Lumpur

ISBN 0-421-85260-7

9 780421 852600

(a) *Whole interest assigned.* Where the chose is merely equitable and the whole interest in it has been vested in the assignee, equity has always permitted him to sue in his own name without joining the original creditor;[9] for the chose existed only in equity, and so equity was free to hold that the assignee was the sole owner and that no interest remained in the original creditor.[10] As has been seen, there is a similar result on a statutory assignment, which is necessarily of the whole chose.[11]

(b) *Some interest outstanding.* The rule is otherwise if the assignment leaves some interest outstanding. This occurs where there is an equitable assignment of part of the chose, or an equitable assignment of a legal chose; for in the latter case, even if the whole chose is assigned, the original creditor still owns the chose in law,[12] holding it in trust for the assignee.[13] In such cases, neither the assignee[14] nor the original creditor[15] can sue for the chose without joining the other, as claimant if he consents and as defendant if he does not.[16] The court must have before it all parties interested in the chose so that there may be a final adjudication binding them all.[17]

This requirement is only procedural however and proceedings will not be treated as a nullity where the assignor and assignee are not both joined.[18] The court may at any stage remedy the defect by ordering that a person be added as a party.[19] In special circumstances (e.g. where it is clear that the assignor has no further interest in the matter[20]) the court may even dispense with the requirement that both assignor and assignee are joined.[21]

Further, an equitable assignee of a legal chose in action cannot exercise contractual rights such as an option conferred on the original creditor.[22] Nor

---

[9] See, e.g. *Cator v Croydon Canal Co* (1843) 4 Y. & C.Ex. 593; *Fulham v M'Carthy* (1848) 1 H.L.C. 703; *Donaldson v Donaldson* (1854) Kay 711.

[10] See *McMurchie v Thompson* (1906) 8 O.L.R. 637 at 639.

[11] Above, paras 3–07, 3–10.

[12] *Cator v Croydon Canal Co* (1843) 4 Y. & C.Ex. 593 at 594.

[13] *Fulham v M'Carthy* (1848) 1 H.L.C. 703 at 722; and see *DiGiulio v Boland* [1958] O.R. 384 at 397.

[14] *Performing Right Society Ltd v London Theatre of Varieties Ltd* [1924] A.C. 1.

[15] *Walter & Sullivan Ltd v J. Murphy & Sons Ltd* [1955] 2 Q.B. 584.

[16] See *Holt v Heatherfield Trust Ltd* [1942] 2 K.B. 1 at 5, citing the substance of this with approval; *Deposit Protection Board v Dalia* [1994] A.C. 367.

[17] *Re Steel Wing Co Ltd* [1921] 1 Ch. 349 at 357; *Deposit Protection Board v Dalia* [1994] A.C. 367 at 381 *per* Simon Brown LJ.

[18] *Weddell v Pearce & Major* [1988] Ch. 26.

[19] CPR, Pt.19.

[20] e.g. *William Brandt's Sons & Co v Dunlop Rubber Co Ltd* [1905] A.C. 454 at 462 *per* Lord Macnaghten.

[21] *Performing Rights Society v London Theatre of Varieties* [1924] A.C.1 at 19, 30; *The Aiolos* [1983] 2 Lloyd's 25; *Weddell v Pearce & Major* [1988] Ch. 26 at 43; *Three Rivers DC v Bank of England* [1996] Q.B. 292.

[22] *Warner Bros Records Inc v Rollgreen Ltd* [1976] Q.B. 430. For criticism of this decision see *The Kloss* (1975) 39 Conv. (N.S.) 261; *Chitty on Contracts* (28th ed.), para 20–005; *Tsettel*, (*The* assignment of contract) (1979) 42 MLR 21. See also *Three Rivers DC v Bank of England* [1996] Q.B.

---

CHAPTER 3—ASSIGNMENT OF CHOSES IN ACTION

is given to the debtor. "And as a trustee in bankruptcy takes subject to all equities affecting the property in the hands of the bankrupt, the assignment will prevail against the subsequent title of the assignor's trustee in bankruptcy, even though the notice required to perfect the assignment as against third parties is not given until after the trustee in bankruptcy has given notice to the debtor of his claim to the debt.[2] The same principle applies to a judgment creditor of the assignor; he can only make the debt available for payment of the judgment subject to all equities affecting it. Accordingly, if he attaches the debt after the assignment has been made, and the debtor pays the money to him despite receiving notice of the assignment, the assignee can compel the debtor to pay again.[3]

Notice of the assignment should, however, always be given to the debtor or trustee for four reasons:

(i) The debtor or trustee will be under no liability to the assignee if, before receiving notice of the assignment, he pays or settles with the original creditor[4] or gives him a negotiable instrument; e.g. a cheque or promissory note;[5] but if he disregards the notice he must pay again.[6]

(ii) Notice to the debtor or trustee prevents him from setting up against the assignee any new and independent equities which may arise between the debtor and the assignor.[7]

(iii) Notice in writing is necessary to preserve the assignee's priority against subsequent assignees under the rule in *Dearle v Hall*.[8]

(iv) Notice, if in writing, may convert the assignment into a statutory assignment, giving the assignee the status of a person entitled to the debt at law, and not merely in equity.

## 3. Effect of equitable assignment

3–20   The effect of an equitable assignment depends upon whether or not the whole interest in the chose has been vested in the assignee.

---

[1] *Donaldson v Donaldson* (1854) Kay 711; *Gorringe v Irwell India Rubber and Gutta Percha Works* (1886) 34 Ch.D. 128; *Ward and Pemberton v Duncombe* [1893] A.C. 369 at 392.

[2] *Re Wallis, Ex p. Jenks* [1902] 1 K.B. 719; *Re Anderson* [1911] 1 K.B. 896.

[3] *Yates v Terry* [1902] 1 K.B. 527.

[4] *Stocks v Dobson* (1853) 4 De G.M. & G. 11; *Donaldson v Donaldson* (1854) Kay 711; *Re Lord Southampton's Estate* (1880) 16 Ch.D. 178 at 186; *Herkules Piling v Tilbury Construction* (1992) 61 B.L.R. 107.

[5] *Bence v Shearman* [1898] 2 Ch. 582.

[6] *Brice v Bannister* (1878) 3 Q.B.D. 569 (where the assignment was equitable despite references to the statute; see *Durham Bros. v Robertson* [1898] 1 Q.B. 765 at 773–774); *Yates v Terry*, above; *Walter & Sullivan Ltd v J. Murphy & Sons Ltd* [1955] 2 Q.B. 584 at 588. "Deposit Protection Board v Dalia* [1994] 2 A.C. 367 at 361 *per* Simon Brown LJ, took the view that even after notice Russell LJ. See above at 382 where Simon Brown LJ had been content the debtor was to be regarded as liable to the assignor.

[7] 

[8]

can be to an effective discharge to the debtor unless authorised to do so by
the assignor.

## 3—EFFECT OF ASSIGNMENT ON EQUITIES

### 1. The rule

3-22   Whether the assignment is legal[24] or equitable,[25] the assignee takes subject to
equities having priority over the right of the assignee.[26] The assignee of a
chose in action cannot acquire a better right than the assignor had, and the
assignee takes the chose in action subject to all the equities affecting it in the
hands of the assignor which are in existence before notice is received by the
debtor.[27] Notice of the assignment thus fixes the rights of the parties;
thereafter the assignor cannot alter them. It is this date, and not that of the
assignment,[28] that is decisive.

### 2. Debtor's rights to set aside the transaction

3-23   If the contract under which the debt arose is voidable[29] by reason of the
assignor's fraud,[30] misrepresentation,[31] or non-disclosure[32] the debtor may
set up the plea in answer to an action brought by the assignee, even though
the assignee gave value for the assignment. However, it has been held that
the debtor cannot rely on the fraud of the assignor if he does not seek to set
aside the transaction he was induced to enter with the assignee but merely to
claim damages since the damages claim is personal to the assignor.[31]

The debtor has the same rights of set-off against the assignee as against the
original creditor. Thus in Re Knapman[32] certain legatees, who were also the
testator's next-of-kin, brought an action in the Probate Division against the
executor claiming revocation of the probate, and pending the action the
executor assigned their rights under the will or intestacy. When, subsequently, the
action was dismissed with costs, the court held that the executor had a right
to set off the costs against the legacies, and that the assignees took subject to
this right and could not recover more than the assignor. Some care is needed
if the set-off arises directly out of or is closely connected with the same
contract or transaction as the subject-matter of the assignment, the defen-
dant may set up against the assignee whether it accrued to him before or
after notice of the assignment.[33] But if a claim arises out of a contract which
is independent of that in which the assigned debt arose (as where it is liable
to.[?] on a bond, and T owes L arrears of rent), he can set off that claim
against the assignee only if the claim arose before notice of the assignment
whether or not it is payable before that date.[34]

A claim by the debtor against the assignee may be the subject of a set-off
even though it would not have been available as a set-off against the
assignor.[35] There is authority that in the case of successive assignments the
debtor cannot set off a claim which he had against the intermediate
assignee.[36] However, this exception has been criticised and it has been sug-
gested that a set-off should be available in such circumstances where it arose
after the first assignment.[36]

### 4. Amount of claim by assignee

An assignee generally cannot recover more from the debtor than the
assignor could have recovered had there been no assignment.[37] But where
the owner of a building sells it together with the benefit of the owner's claims

23 Durham Bros v Robertson [1898] 1 Q.B. 765 at 770; and see Jones v Farrell (1857) 1 De G. & J.
208 at 218.

24 LPA 1925, s.136; E. Pfeiffer Weinkellerei-Weineinkauf GmbH & Co v Arbuthnot Factors Ltd
[1988] 1 W.L.R. 150.

25 Mangles v Dixon (1852) 3 H.L.C. 702, 731; Phipps v Lovegrove (1873) L.R. 16 Eq. 80, 88.

26 Quaere whether this includes equitable tracing rights: see D. W. McLauchlan (1980) 96
L.Q.R. 90. For tracing see below, paras 28–35 et seq.

27 Roxburghe v Cox (1881) 17 Ch.D. 520.

28 Turton v Benson (1718) 1 P.Wms. 496.

29 Graham v Johnson (1869) L.R. 8 Eq. 36; Bristol v Birch, Crisp & Co [1913] 2 Ch. 325 at 379.

30 William Pickersgill & Sons Ltd v London & Provincial Marine and General Insurance Co Ltd
[1912] 3 K.B. 614.

31 Stoddart v Union Trust Ltd [1912] 1 K.B. 181 (criticised in Treitel, Law of Contract (10th ed.,
1999), p.636 but followed in Provident Finance Corp v Hammond [1978] V.R. 312). See also
Banco Santander S.A. v Bayfern Ltd [2000] 1 All E.R. (Comm) 776 at 780–784; [1?...295

32 (1881) 18 Ch.D. 300; and see Re Jones, Christmas v Jones [1897] 2 Ch. 190; but cf. Re Pain
[1919] 1 Ch. 38 where Re Knapman was distinguished where the action was commenced after
the assignment had taken place and been notified to the trustees.

33 Young v Kitchin (1878) 3 Ex.D. 127; Government of Newfoundland v Newfoundland Ry (1888)
13 App.Cas. 199; Lawrence v Hayes [1927] 2 K.B. 111; Business Computers Ltd v Anglo-
African Leasing Ltd [1977] 1 W.L.R. 578 at 585; The Raven [1980] 2 Lloyd's 266; Muscat v
Smith [2003] EWCA Civ 962.

34 Watson v Mid-Wales Ry (1867) L.R. 2 C.P. 593.

35 Watson v Mid-Wales Ry (1867) L.R. 2 C.P. 593; Christie v Taunton, Delmard, Lane & Co
[1893] 2 Ch. 175; Re Pain [1919] 1 Ch. 38; Re Pinto Leite [1929] 1 Ch. 221; Biggerstaff v
Rowan's Wharf Ltd [1896] 2 Ch. 93; Business Computers Ltd v Anglo-African Leasing Ltd
[1977] 1 W.L.R. 578, 585; Rother Iron Works Ltd v Canterbury Precision Engineering Ltd
[1974] Q.B. 1; The Kiam Captain (No.2) [1986] 1 Lloyd's 429; Marathon Electrical v Mash-
reqbank [1997] 2 B.C.L.C. 460.

36 The Raven [1980] 2 Lloyd's 266.

37 The Raven [1980] 2 Lloyd's 266 at 273; Re Milan Railways Co (1884) 25 Ch.D. 587 at 593;
Treitel, Law of Contract (10th ed., 1999), p.637; Derham Set Off (2nd ed., 1996), p.589 et seq.

38 Dawson v Great Northern & City Ry Co [1905] 1 K.B. 260.

**19-12**

It has been argued that resulting trusts arise to reverse unjust enrichment in the situations where a recipient of money is liable to make a personal restitutionary claim in respect of money had and received for unjust enrichment, such as mistake. The situations where the payer lacks an intention to pass his beneficial interest in the money to the recipient. It is said therefore that a resulting trust should arise in those situations.[50] This argument has not yet been accepted in the decided cases.[51] Accordingly, it is not relied upon in arranging the classification of trusts in this book.

### 3. Private and public

Trusts may also be divided, according to their purpose, into private and public. A trust is private if it is for the benefit of an individual or class with standing to enforce the trustee's duties, irrespective of any benefit which may incidentally be conferred on the public at large. The only public trusts which are valid are those which are charitable, according to the legal definition of charity. It must also promote the public welfare, even if incidentally it confers a benefit on an individual or class. A charitable trust is enforced by the Attorney-General or the Charity Commissioners.

**19-13**

### 5. Perfect and imperfect obligation

The distinction here is between a trust which is enforceable by or on behalf of a beneficiary or object, and one which has no person with standing to enforce the trustee's duties. In English law, it is taken that a trust must generally have human beneficiaries with standing to enforce the trustee's account for his trusteeship.[59] Trusts which are not enforceable by a person are therefore known as trusts of imperfect obligation.[60]

In some anomalous cases, the courts have upheld testamentary trusts limited in duration to the perpetuity period, for the maintenance of individual animals,[62] or a tomb.[63] In all such trusts the obligations of the trustee is imperfect, since there is no human beneficiary to enforce them, unless perhaps a residuary beneficiary.[64] They may not be saved by being construed as a power to carry out the specified purpose, subject to a resulting trust in favour of the settlor's residuary legatee or next-of-kin.[65]

Charitable trusts are not trusts of imperfect obligation as they are enforceable by the Attorney-General.[66] The same is true of those purpose trusts recognised in other jurisdictions which have a 'nominated enforcer' with standing to enforce the trustee's duties.[67]

**19-11**

### 3. Bare and special

A bare (or simple)[52] trust is one in which property is vested in one person as trustee for another, the nature of the trust imposing no active duty or powers of management on the trustee. An example is where property is transferred to T 'on trust for B absolutely'. In such a case, T's sole duty is to B, or only to obey any direction he may give as to how the property should be disposed of.

Many constructive trusts arising in response to a person's wrong conduct are bare trusts. The effect of imposing a bare trust on the wrongdoer is that the claimant may compel the trustee to restore the proceeds of his wrong to the claimant.[53]

If B in turn becomes a bare trustee of his equitable interest for C, T will hold directly in trust for C,[54] whereas if B holds for C on a special trust in which the legal estate is requisite, B can call for the legal estate from T. 'dummy' for the managing trustees or for the beneficiaries.[55]

A special trust, on the other hand, is one where the trust instrument imposes active management on the trustees, e.g. a trust for sale or a trust for a life tenant and remainderman. The great majority of express trusts are thus 'special'. Such trusts may be either fixed or discretionary. In a fixed trust the settlor defines, in the instrument, the entitlement of the beneficiaries; in a discretionary trust, the settlor defines a discretion to select which the objects of the trust but allows the trustee a discretion to select which should receive property from the trust.

50 See R. Chambers, *Resulting Trusts* (1997); Millett (1998) 114 L.Q.R. 399 at 408–411.
51 *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 708–709 per Browne-Wilkinson.
52 See *Re Cunningham and Frayling* [1891] 2 Ch.567 at 572; *Tomlinson v Glyns Executor Trustee Co* [1970] Ch.112 at 125, 126.
53 See Ch.24.
54 *Head v Lord Teynham* (1783) 1 Cox Eq. 57.
55 *Angier v Stannard* (1834) 3 My. & K. 566; *Poole v Pass* (1839) 1 Beav. 600; *Onslow v Wallis* (1849) 1 Mac. & G. 506; and see *Grey v IRC* [1958] Ch.375 at 382 (in CA at 690; in HL [1960] A.C. 1) where this distinction does not appear to have been taken.
56 Trustee Act 2000, s.17.

58 *Morice v Bishop of Durham* (1804) 9 Ves. 399; affd. (1805) 10 Ves. 522; *Re Denley's Trust Deed* [1969] 1 Ch.373.
59 *Re Dean* (1889) 41 Ch.D. 552; *Pettingall v Pettingall* (1842) 11 L.J.Ch.176.
60 *Mussett v Bingle* [1876] W.N. 170; £300 to be applied in erecting a monument... and a husband and wife held good though gift of £200 to maintain the monument was admittedly bad; and so too *Re Hooper* [1932] 1 Ch.38.
... *Public Trustee v Lloyd* [1934] Ch.342.
64 *Re Wood, Barton's Cottages Trust* [1955] Ch.20 at 36; *Re Endacott* above, at 246. The overuling of *Re Broadway Cottages Trust* by *McPhail v Doulton* [1971] A.C. 424 (below, ...) does not affect this dictum: purpose trusts were not there under consideration.
For restrictions which might allow the creation of a mere power which would serve the same purposes as trust. See Matthews, above, at p.7.
See *Dawson v Small* (1874) L.R. 18 Eq. 114.
67 See Underhill and Hayton's *Law of Trusts and Trustees* (16th ed.) at pp.114–116.