2 A.C.

A

[HOUSE OF LORDS]

DEPOSIT PROTECTION BOARD AND ANOTHER    .      . RESPONDENTS

AND

BARCLAYS BANK PLC .     .      .      .      .      .      . APPELLANTS

B

[On appeal from DEPOSIT PROTECTION BOARD v. DALIA]

1993   March 23, 24, 25;                Russell and Simon Brown L.JJ.
       May 6                                    and Sir Michael Fox
1993   Dec. 8, 9;              Lord Keith of Kinkel, Lord Goff of Chieveley,
1994   May 19                        Lord Browne-Wilkinson, Lord Mustill and
                                                 Lord Lloyd of Berwick

C

*Banking—Deposits—Deposit taking business—Fund to compensate
depositors in insolvent bank—Original depositors assigning sums to
third parties after presentation of petition to wind up bank—
Whether assignee of part of original deposit "depositor"—Banking
Act 1987 (c. 22), s. 58(1)—Banking Act 1987 (Meaning of
Deposit) Order 1991 (S.I. 1991 No. 1776), art. 2(1)*

D      The Banking Acts 1979 and 1987 respectively established and
continued the Deposit Protection Board and the Deposit
Protection Fund, from which the board was obliged to pay a
depositor in an authorised bank which became insolvent an
amount equal to three-quarters of the amount of his deposit, in
accordance with section 58(1) of the Act of 1987,[1] limited to a
maximum deposit of £20,000. There was no definition of
"depositor" in the Acts of 1979 or 1987. By section 59(1)(*a*) of
E      the Act of 1987 the event upon which a bank was deemed to have
become insolvent for the purpose of compensation becoming
payable was the making of the winding up order rather than the
presentation of the petition. On 5 July 1991 the Bank of England
presented a petition for an order that an authorised bank be
wound up on the ground that it was insolvent. Some depositors,
in order to maximise recovery from the fund, assigned sums of
F      £20,000 to friends and relations. On 30 July 1991 the Banking
Act 1987 (Meaning of Deposit) Order 1991 was made, which
provided that the definition of "deposit" in section 5 of that Act
excluded a sum to which a person became entitled, otherwise than
by operation of law, after presentation of a winding up petition
or, where a petition had already been presented, after 30 July
1991. On a summons brought by the board, the judge held that
assignees of deposits under assignments made between 5 and 30
G      July were depositors within section 58(1) entitled to compensation
from the fund. On appeal by the second defendant, a contributory
institution, the Court of Appeal upheld the judge's order.
       On appeal by the second defendant:—
       *Held*, allowing the appeal, that prima facie a "depositor" in
section 58(1) of the Banking Act 1987 was the person who made
the original deposit to the institution; that there was nothing in
H      the provisions of the Act which was inconsistent with that
meaning; and that, accordingly a person entitled to a debt by
reason of the assignment of part of a debt was not a depositor

[1] Banking Act 1987, s. 58(1): see post, p. 394E.

holding a protected deposit entitled to compensation under the    A
Act (post, pp. 391c–d, 396c–d, 401a–c).

    Decision of Court of Appeal, post, pp. 373h et seq.; [1994]
2 W.L.R. 732; [1994] 1 All E.R. 539 reversed.


The following case is referred to in the opinion of Lord Browne-Wilkinson:

*Hanlon v. The Law Society* [1981] A.C. 124; [1980] 2 W.L.R. 756; [1980] 2 All
    E.R. 199, H.L.(E.)                                              B


The following additional cases were referred to in argument in the House of
Lords:

*Brice v. Bannister* (1878) 3 Q.B.D. 569, C.A.
*Central Insurance Co. Ltd. v. Seacalf Shipping Corporation* [1983] 2 Lloyd's
    Rep. 25, C.A.
*Commissioners for Special Purposes of the Income Tax v. Pemsel* [1891] A.C.    C
    531, H.L.(E.)
*Forster v. Baker* [1910] 2 K.B. 636, Bray J. and C.A.
*Heydon's Case* (1584) 3 Co.Rep. 7a
*Jones v. Farrell* (1857) 1 De G. & J. 208
*Jones v. Wrotham Park Settled Estates* [1980] A.C. 74; [1979] 2 W.L.R. 132;
    [1979] 1 All E.R. 286, H.L.(E.)
*Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* [1924]    D
    A.C. 1, H.L.(E.)
*Remon v. City of London Real Property Co. Ltd.* [1921] 1 K.B. 49, C.A.
*Steel Wing Co. Ltd., In re* [1921] 1 Ch. 349
*Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd.* [1955] 2 Q.B. 584; [1955]
    2 W.L.R. 919; [1955] 1 All E.R. 843, C.A.
*Weddell v. J. A. Pearce & Major* [1988] Ch. 26; [1987] 3 W.L.R. 592; [1987]
    3 All E.R. 624
                                                                    ·    E


The following cases are referred to in the judgments in the Court of Appeal:

*Brandt's (William) Sons & Co. v. Dunlop Rubber Co. Ltd.* [1905] A.C. 454,
    H.L.(E.)
*Brice v. Bannister* (1878) 3 Q.B.D. 569, C.A.
*Britt v. Buckinghamshire County Council* [1964] 1 Q.B. 77; [1963] 2 W.L.R.
    722; [1963] 2 All E.R. 175, C.A.                               F
*Forster v. Baker* [1910] 2 K.B. 636, Bray J. and C.A.
*Hanlon v. The Law Society* [1981] A.C. 124; [1980] 2 W.L.R. 756; [1980] 2 All
    E.R. 199, H.L.(E.)
*Jones v. Farrell* (1857) 1 De G. & J. 208
*Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* [1924]
    A.C. 1, H.L.(E.)
*Steel Wing Co. Ltd., In re* [1921] 1 Ch. 349
*Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd.* [1955] 2 Q.B. 584; [1955]    G
    2 W.L.R. 919; [1955] 1 All E.R. 843, C.A.
*Warner Bros. Records Inc. v. Rollgreen Ltd.* [1976] Q.B. 430; [1975] 2 W.L.R.
    816; [1975] 2 All E.R. 105, Willis J. and C.A.
*Weddell v. J. A. Pearce & Major* [1988] Ch. 26; [1987] 3 W.L.R. 592; [1987]
    3 All E.R. 624


The following additional cases were cited in argument in the Court of Appeal:    H

*Becke v. Smith* (1836) 2 M. & W. 191
*Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg A.G.*
    [1975] A.C. 591; [1975] 2 W.L.R. 513; [1975] 1 All E.R. 810, H.L.(E.)

A     *Commercial Bank of Australia Ltd., In re* (1893) 19 V.L.R. 333
    *Copeland, Ex parte; In re Copeland* (1852) 22 L.J. Bank. 17
    *Courtauld v. Legh* (1869) L.R. 4 Ex. 126
    *Durham Bros. v. Robertson* [1898] 1 Q.B. 765, C.A.
    *Harrison v. Hammersmith and Fulham London Borough Council* [1981]
       1 W.L.R. 650; [1981] 2 All E.R. 588, C.A.
    *Heydon's Case* (1584) 3 Co.Rep. 7a

B     *Jones v. Wrotham Park Settled Estates* [1980] A.C. 74; [1978] 3 W.L.R. 585;
       [1978] 3 All E.R. 527, C.A. -
    *Kirkness v. John Hudson & Co. Ltd.* [1955] A.C. 696; [1955] 2 W.L.R. 1135;
       [1955] 2 All E.R. 345, H.L.(E.)
    *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709, P.C.
    *McGreavy (orse. McGreavey), In re; Ex parte McGreavey v. Benfleet Urban
       District Council* [1950] Ch. 269; [1950] 1 All E.R. 442, C.A.
    *Macmanaway, In re* [1951] A.C. 161, P.C.

C     *Pepper v. Hart* [1993] A.C. 593; [1992] 3 W.L.R. 1032; [1993] I.C.R. 291;
       [1993] 1 All E.R. 42, H.L.(E.)
    *Portsmouth Corporation v. Smith* (1885) 10 App.Cas. 364, H.L.(E.)
    *Remon v. City of London Real Property Co. Ltd.* [1921] 1 K.B. 49, C.A.
    *Scarf v. Jardine* (1882) 7 App.Cas. 345, H.L.(E.)
    *Schroeder v. The Central Bank of London Ltd.* (1876) 34 L.T. 735
    *Stephens v. Cuckfield Rural District Council* [1960] 2 Q.B. 373; [1960] 3 W.L.R.

D        248; [1960] 2 All E.R. 716, C.A.
    *Walker v. Bradford Old Bank Ltd.* (1884) 12 Q.B.D. 511, D.C.
    *Williams v. Atlantic Assurance Co. Ltd.* [1933] 1 K.B. 81, C.A.

    APPEALS from Sir Donald Nicholls V.-C.
    By notice of appeal dated 11 August 1992 in proceedings commenced

E by originating summons dated 15 April 1992 between the plaintiffs, the
Deposit Protection Board, and the defendants, Mrs. Varsha Dalia and
Barclays Bank Plc., the second defendant appealed against the judgment
of Sir Donald Nicholls V.-C. [1993] Ch. 243 given on 3 July 1992. The
grounds of appeal were that (1) having rightly found, at p. 248E–F, that
the natural meaning of the word "depositor" was "the person who made
the deposit in question" the Vice-Chancellor had wrongly given undue

F weight, in concluding that the natural meaning should nevertheless give
way to a wider meaning for the purposes of the Banking Act 1987, to
(a) the provisions relating to trusts and other accounts specified in section
61 of the Act of 1987 (which provisions did not apply to assignments) and
(b) the provisions of the Banking Act 1987 (Meaning of Deposit) Order
1991 and (2) having rightly found, at p. 247A, that "Parliament never
intended that the limit on the amount of compensation payable to

G individual depositors could be side-stepped by dispositions made after
formal steps had been taken to initiate the winding up process" under the
Act, the Vice-Chancellor had wrongly given no weight or insufficient
weight to (a) the purpose of the Act, namely the protection of vulnerable
and small depositors who had banking relationships with insolvent
institutions; (b) the express provisions of section 60(1)(2) and (6) of the

H Act; (c) the fact that assignment of balances held in the bank accounts,
particularly current accounts, were, save for assignments by way of
security, very unusual (as the Vice-Chancellor recognised) and were not
intended by Parliament to qualify for protection under the Act; (d) the

fact that section 61 of the Act was intended to define exhaustively the    A
exceptions to the natural meaning of the word "depositor" for the
purposes of the Act and the assignments in question did not come within
those specific exceptions, and (e) the fact that the assignments in question
were equitable assignments, such that the assignees did not acquire any
interests distinct and separate from those of their assignors.

By a notice of cross-appeal dated 4 September 1992, the board raised
the additional grounds that (1) the Vice-Chancellor had wrongly given weight    B
to an erroneous construction of section 61 of the Act of 1987 in holding
(a) that the effect of section 61(3) was that a person who fell to be treated
as entitled to a deposit without intervention of a trust under that
subsection should be regarded as a depositor for the purpose of receiving
compensation under section 58 and for the purpose of the definition of
protected interest under section 60; the Vice-Chancellor should have held    C
that section 61(3) was not intended to define who was a depositor for the
purpose of section 58 and that its purpose was to permit beneficiaries
behind a bare trust to claim payment directly from the plaintiff in respect
of a deposit held on trust without increasing the amount of compensation
payable in respect of each trust deposit; (b) that the effect of section 61(6)
was the same as that of section 61(3); the Vice-Chancellor should have    D
held that section 61(6) was only concerned with joint bank accounts where
no trust intervened, that joint accounts were dealt with by way of an
exception to the general rule for entitlement to compensation derived from
the natural meaning of the word "depositor," and that section 61(6)
demonstrated that the material person for the purposes of the protection
scheme was the person "having a deposit" at the onset of insolvency,
namely, the person in whose name a deposit was held at the authorised    E
institution; (c) that the effect of section 61(7) was to treat the person
beneficially entitled to moneys in a client or similar account as the material
person for the purposes of the protection scheme; having rightly observed
that the language of section 61(7) echoed that of section 61(3), the Vice-
Chancellor should have given it the same construction as that contended
for at (a) above, namely that the purpose of section 61(7) was to permit    F
the beneficial owners of moneys in a client account to claim directly from
the plaintiff a proportionate share of a single maximum compensation
payment of £15,000; and (d) that the effect of section 61(8) was to
demonstrate that generally the person beneficially entitled to a deposit was
the material person for the purposes of the protection scheme; the Vice-
Chancellor should have held that section 61(8) was a limited exception to
the general rule for entitlement to compensation derived from the natural    G
meaning of the word "depositor" and that section 61(8) demonstrated that
generally it was persons who had "made a deposit" who were entitled to
compensation, and (2) the Vice-Chancellor had been wrong in law in
holding that the Order of 1991 was a legitimate aid to construction of the
Act of 1987; having rightly observed that the draftsman of the Act may
not have had assignments in mind at all, the Vice-Chancellor should have    H
held that the Order was only a legitimate aid to the construction of the
Act after the date on which the Order came into force, namely 31 July
1991.

A    *Michael Brindle Q.C.* and *Bankim Thanki* for the second defendant.
The judge gave insufficient weight to the ordinary and natural meaning of
"depositor" which should have been applied unless it led to absurdity: see
*Becke v. Smith* (1836) 2 M. & W. 191, 195. As used in sections 60(2)(*a*)
and (6)(*c*) and section 61(8) "depositor" can only mean someone who has
made a deposit.

B    No conclusions can be drawn from the Order of 1991 as to the true
construction of the Act of 1987. Subordinate legislation is often passed ex
abundanti cautela: see *In re Macmanaway* [1951] A.C. 161, 171. It can
sometimes be used to construe the parent Act but that merely overcomes
the general rule that subordinate legislation is inadmissible to construe an
Act of Parliament: see *Stephens v. Cuckfield Rural District Council* [1960]
2 Q.B. 373, 381. *Hanlon v. The Law Society* [1981] A.C. 124 and *Britt v.*
C    *Buckinghamshire County Council* [1964] 1 Q.B. 77 were concerned with
regulations contemporaneous with the parent Act and therefore are
distinguishable.

There is nothing in section 61 of the Act which would justify treating
an assignee as having made a deposit. The better interpretation of the
section is that it defines exhaustively the exceptions to the natural meaning
of "depositor." However, in respect of a particular deposit one bank
D    customer may be substituted for another, the original deposit being
effectively repaid and replaced by a new deposit from the new customer:
*Scarf v. Jardine* (1882) 7 App.Cas. 345, 351. It is also legally possible to
assign the credit balance of a current account (see *Walker v. Bradford Old
Bank* (1884) 12 Q.B.D. 511), although the point was doubted in *Schroeder
v. The Central Bank of London* (1876) 34 L.T. 735.

E    If, however, an assignee can qualify as a depositor, then he can only
do so under an absolute assignment pursuant to section 136 of the Law of
Property Act 1925. An assignee of part of a debt cannot be an assignee
under section 136: *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349 and *Walter
& Sullivan Ltd. v. J. Murphy & Sons* [1955] 2 Q.B. 584. Such an assignee
can sue only in the name of the assignor. This is important protection for
the assignor: see *Forster v. Baker* [1910] 2 K.B. 636, 639 and *Williams v.*
F    *Atlantic Assurance Co. Ltd.* [1933] 1 K.B. 81. *Weddell v. J.A. Pearce &
Major* [1988] Ch. 26 does not support the judge's view that the joinder
requirement is a mere technicality but establishes merely that an action by
an equitable assignee is not a nullity.

The Protection of Depositors Act 1963 cannot assist the construction
of the Acts of 1979 and 1987 because it is not in pari materia with them:
G    see *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709, 711. The definition
of "depositor" in the Act of 1963 does not occur in the later Acts. It is
not therefore to be presumed that Parliament did not intend to change the
law: see *In re McGreavy; Ex parte McGreavey v. Benfleet Urban District
Council* [1950] 1 Ch. 269, 278.

The sections of the Act of 1987 on which the plaintiff relies appear in
parts of the Act unrelated to the deposit protection scheme and ought not
H    to be held to relate to that scheme unless it is clear that they do: see *In re
Commercial Bank of Australia Ltd.* (1893) 19 V.L.R. 333.

Even if "depositor" in the Act of 1987 is wide enough on its literal
construction to include an equitable assignee, the judge failed to give the

Act a purposive construction: see *Heydon's Case* (1584) 3 Co.Rep. 7a, 7b     A
and *Jones v. Wrotham Park Settled Estates* [1980] A.C. 74, 105. It is highly
unlikely that Parliament intended to provide for assignees at all. [Reference
was made to *Remon v. City of London Real Property Co. Ltd.* [1921]
1 K.B. 49 and *Harrison v. Hammersmith and Fulham London Borough
Council* [1981] 1 W.L.R. 650.]

*John Jarvis Q.C.* and *Jonathan Nash* for the board. The ordinary and
natural meaning of "depositor" in the Banking Act 1987 is the person     B
who made the deposit. The Vice-Chancellor erred in concluding, in
reliance upon section 61 of the Act, that the person beneficially entitled to
a deposit was the depositor within the meaning of section 58(1) of the
Act. To determine which persons are entitled to claim compensation it is
necessary to read sections 58(1) and 60(1) of the Act of 1987 together.
Section 61(1) is intended to modify the effect of sections 58 and 60 in     C
specified cases.

The Vice-Chancellor's view that equitable assignments should be
treated in the same way as statutory assignments was wrong. It is not
manifestly absurd that transactions which have different legal effects
should fall to be treated differently under the Act of 1987. An equitable
assignment does not transfer the legal title in the debt to the assignee and
no contractual relationship arises between the debtor and the assignee: see     D
*Warner Bros. Records Inc. v. Rollgreen Ltd.* [1976] 1 Q.B. 430, 443, 445.
An equitable assignee of a cause of action cannot claim damages without
joining the assignor: *Weddell v. J.A. Pearce & Major* [1988] Ch. 26, 40G–
41B. The equitable assignee of a copyright cannot claim an injunction to
protect his rights without joining the assignor: *Performing Right Society v.
London Theatre of Varieties* [1924] A.C. 1, 14, 19, 29. The assignor has     E
not divested himself of the legal title to the debt and it is therefore
necessary to bind him so as to protect the debtor from a further demand
for payment. In the absence of an assignment effective to transfer the legal
title to the debt, i.e. an assignment falling within section 136 of the Law
of Property Act 1925, at the moment of insolvency the institution is not
liable to the equitable assignee within the meaning of section 60(1) of the
Act of 1987. *Jones v. Farrell* (1857) 1 De G. & J. 208 is unsatisfactory     F
because there was no analysis of how the debtor, having paid his legal
creditor, could be liable in equity to the assignee. *Brice v. Bannister* (1878)
3 Q.B.D. 569 is not authority for the proposition that a debtor who has
paid his legal creditor after notice of an equitable assignment will be liable
a second time to the equitable assignee. *Weddell v. J.A. Pearce & Major*
[1988] Ch. 26 was a decision solely on the question of whether an equitable     G
assignee of a cause of action had locus standi to issue a writ without
joining his assignor. To confine the right to claim compensation to
depositors and their statutory assignees only is correct in law and also
achieves a sensible result in the context of the Act of 1987. [Reference was
made to *Durham Brothers v. Robertson* [1898] 1 Q.B. 765.]

The Banking Act 1987 (Meaning of Deposit) Order 1991 is not a
legitimate aid to the construction of the Act in the period before the Order     H
came into force, the Order being subordinate legislation: see *Britt v.
Buckinghamshire County Council* [1964] 1 Q.B. 77, 88, 92–93 and *Hanlon
v. The Law Society* [1981] A.C. 124, 178E. [Reference was also made to

A   *Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg
A.G.* [1975] A.C. 591 and *Pepper v. Hart* [1993] A.C. 593.]

   *Lord Irvine of Lairg Q.C.* and *Philip Sales* for the first defendant.
A bank is liable to an equitable assignee of a deposit or part of a deposit
made at the bank. There is no textual warrant for limiting the words
"total liability . . . to him" in section 60(1) so as to exclude such liability.
The assignee alone can sue the bank to judgment: *Walter & Sullivan Ltd.*

B   *v. J. Murphy & Sons* [1955] 2 Q.B. 584. The bank cannot get a good
discharge from the assignor: *Jones v. Farrell,* 1 De G. & J. 208 and *Brice
v. Bannister,* 3 Q.B.D. 569. After notice has been given of the assignment,
the bank ceases to be liable to the assignor, although he retains the legal
title: see *Trietel on Contract,* 8th ed. (1991), p. 585. The usual requirement
that the assignor be joined in the proceedings is purely procedural:

C   *Weddell v. J.A. Pearce & Major* [1988] Ch. 26, 38–43 and *In re Steel Wing
Co. Ltd.* [1921] 1 Ch. 349. It is irrelevant to the question of construction
that the particular facts before the court arose in the context of a scheme
designed to maximise the compensation payable in respect of the deposit.

   Section 58(1) of the Act of 1987 reproduced the language of section
28(1) of the Banking Act 1979. The presumption is that Parliament
intended "depositor" to bear the same meaning in both: see *Ex parte*

D   *Copeland; In re Copeland* (1852) 22 L.J. Bank. 17, 21; *Lennon v. Gibson
and Howes Ltd.* [1919] A.C. 709, 711–712 and *Portsmouth Corporation v.
Smith* (1885) 10 App.Cas. 364, 371. There is no express definition of
"depositor" in either Act. The definition in section 27(1) of the Protection
of Depositors Act 1963 which would include the assignees of deposits is a
legitimate aid to the construction of the later statutes in pari materia: see

E   *Lennon v. Gibson and Howes Ltd.* [1919] A.C. 709 and *Ex parte Copeland,*
22 L.J. Bank. 17. Further, other sections of the Act of 1979 plainly use
"depositor" in a wide sense. The presumption must be that it is used in
the same sense throughout the statute: see *Courtauld v. Legh* (1869) L.R.
4 Ex. 126. The provisions of section 61 of the Act of 1987 (section 30 of
the Act of 1979) presupposed that "depositor" meant the person currently
entitled to moneys held on deposit (which meaning would include an

F   equitable assignee).

   The Order of 1991 would be otiose if "deposit" bore the board's
meaning. The court may have regard to subordinate legislation in
construing an expression in a statute which is capable of more than one
meaning, especially where the subordinate legislation is made subject to
negative resolution: *Britt v. Buckinghamshire County Council* [1964] 1 Q.B.

G   77; *Hanlon v. The Law Society* [1981] A.C. 124 and *Kirkness v. John
Hudson & Co. Ltd.* [1955] A.C. 696.

   *Jarvis Q.C.* and *Brindle Q.C.* replied.

   *Cur. adv. vult.*

H   6 May 1993.  The following judgments were handed down.

   SIMON BROWN L.J.  This is an appeal by the second defendant,
Barclays Bank Plc. ("Barclays"), and a cross-appeal by the plaintiffs, the
Deposit Protection Board ("the board"), against the judgment of

Sir Donald Nicholls V.-C. [1993] Ch. 243 given on 3 July 1992 whereby    A
he made a declaration in favour of the first defendant, the claimant, upon
a point of law raised by all three parties with regard to the proper
construction and application of the Deposit Protection Scheme, a scheme
of compensation originally created by the Banking Act 1979 and now
contained in Part II of the Banking Act 1987.

Put shortly, the scheme is designed to alleviate hardship when a bank
becomes insolvent. It provides for a fund to be raised, held, managed and    B
applied by the board. The board raises the fund by levying contributions
from relevant institutions, notably banks. There are at present 500
contributing institutions of which Barclays are one, sued here in a
representative capacity. The obligation to make payment out of the fund
is to be found in section 58(1) of the Act of 1987, so far as material in
these terms:                                                                 C

> "if at any time an institution becomes insolvent . . . the board shall
> as soon as practicable pay out of the fund to each depositor who has
> a protected deposit with that institution an amount equal to three-
> quarters of his protected deposit."

Section 59(1)(a) provides that an institution becomes insolvent on the
making of a winding up order against it.                                      D

By section 60(1) it is provided that:

> "Subject to the provisions of this section, in relation to an
> institution in respect of which a payment falls to be made under
> section 58(1) above any reference in this Act to a depositor's protected
> deposit is a reference to the total liability of the institution to him
> immediately before the time when it becomes insolvent, limited to a    E
> maximum of £20,000 . . ."

Thus the maximum sum payable to a depositor under the scheme is
£15,000 (three-quarters of £20,000).

Whilst, however, "deposit" is defined in section 5 of the Act of 1987,
and "protected deposit" is defined in section 61, the Act contains no
definition of "depositor" and it is this which has given rise to the present    F
difficulty. More particularly the question raised here is whether the
assignee of part of a bank customer's deposit is, within the meaning of
section 58(1), a "depositor" who, with respect to the assigned part of the
account, has himself "a protected deposit with that institution." The Vice-
Chancellor held that an equitable assignee is such a depositor. Barclays
and the board both submit that he is not.

The particular circumstances in which the point presently arises for    G
decision I gratefully take from the following (re-ordered) passages in the
Vice-Chancellor's judgment [1993] Ch. 243, 246, 247–248, 247, 248:

> "The Bank of Credit and Commerce International S.A., usually
> known simply as 'B.C.C.I.,' was an authorised institution under the
> Act of 1987. On 5 July 1991 the Bank of England presented a petition
> to the court for an order that B.C.C.I. be wound up. One of the    H
> grounds relied on was that the company was insolvent. Provisional
> liquidators were appointed and B.C.C.I. ceased trading in England.
> Depositors ceased to be able to withdraw their money. Fearing the

A

worst, some depositors took steps to maximise the amount of the payments from the deposit protection fund. An enterprising firm of accountants, having taken expert legal advice, wrote around to B.C.C.I. depositors telling them of a scheme the accountants had prepared. The scheme was that a depositor should formally transfer and assign part of his or her deposit to family members or close friends 'who can be trusted.' For instance, a depositor with a deposit

B

of £100,000 would transfer £20,000 to each of five relations or friends"—or, I would add, to each of four relations or friends, retaining £20,000 for himself—"Instead of the compensation payable to him being limited to £15,000 as the maximum amount of compensation payable to any one depositor, each of his five assignees could look to the fund for payment of £15,000 in respect of the £20,000 share of the deposit assigned to him. By this means the total

C

compensation payable by the fund would be increased to £75,000. Depositors were urged to hurry, 'for you only have until Monday evening 29 July.' This was because the winding up petition was due to come before the court again on 30 July."

"The assignments were on a printed form of deed. The document recited the 'vendor's' deposit in a specified account with B.C.C.I. The

D

operative part provided that in consideration of £1 'the vendor by this deed sells, assigns and transfers the sum of [£20,000] of the deposit to the purchaser.' The depositor also signed a letter addressed to B.C.C.I., whereby B.C.C.I. was given notice of the 'absolute' assignment in question. The bank was instructed that the sum of £20,000 from the deposit account was now held by the assignee, who

E

was described as 'the purchaser,' and that he should now be identified by the bank 'as a depositor.' The letter added: 'If, for administrative reasons, you are unable to arrange for the completion of formalities to designate a separate deposit account in the name of the purchaser, I/we confirm that I/we hold the above-mentioned sum on trust for the purchaser.' . . . it was common ground that the assignments were not statutory assignments in conformity with section 136 of the Law of

F

Property Act 1925, but that they were effective as equitable assignments."

"Some 50 or so depositors, possibly more, signed transfers in July 1991 in respect of sums totalling several million pounds. There were over 200 assignees. One depositor alone, whose deposits exceeded half a million pounds, executed 26 assignments of £20,000 each. The

G

scheme was quickly stopped in its tracks. Parliament never intended that the limit on the amount of compensation payable to individual depositors could be side-stepped by dispositions made after formal steps had been taken to initiate the winding up process. On 30 July 1991 the Banking Act 1987 (Meaning of Deposit) Order 1991 was made. It provided that in future the definition of 'deposit' in the Act excluded a sum to which a person became entitled, otherwise than by

H

operation of law, after presentation of a winding up petition. In the case of B.C.C.I., where a winding up petition had already been presented, the changed definition took effect from 31 July. So the loophole, if such it was, was closed although subsequently some

months elapsed before a winding up order was eventually made on
14 January 1992. . . . The first defendant is an assignee joined in the
proceedings to represent all assignees."

"The overall sum required to meet the payments due under the
scheme to B.C.C.I. depositors is in the region of £78m. The sum in
issue [in these proceedings] is about £3·7m."

A

The Vice-Chancellor emphasised, as do I in turn, that the
question raised—whether these assignments had their intended effect for
compensation purposes—is one of law, to be answered on the assumption
that the assignments were genuine and valid transactions and that there
was no arrangement or understanding that an assignee would hold for the
assignor any compensation received by him from the fund. The board
have expressly reserved the right to pursue such matters should that
become necessary.

B

C

Similarly the Vice-Chancellor emphasised that the answer given to the
question before the court will be of general application. Its effect will not
be confined to assignments made in circumstances similar to those which
existed regarding B.C.C.I. in July 1991. Even in regard to the future, the
Banking Act 1987 (Meaning of Deposit) Order 1991 leaves untouched any
assignments made before the presentation of a winding up petition.

D

The issue before the court is accordingly whether arrangements of this
nature, assuming always that they are not a sham, are effective to bring
the equitable assignees thereby created within the protection scheme so
that, upon a winding up, each will qualify in his own right for a payment
out of the fund up to the maximum sum of £15,000.

All three parties agree that to qualify for such payment a depositor
must at least be someone to whom the bank is liable immediately before
the winding up order is made: so much is clear from section 60(1)—
although it is altogether less clear what precisely is meant in this context
by "liability," the question upon which most of the argument before us
centred and to which I shall shortly return. Whereas, however, the
claimant contends that such "liability" (whatever precisely that may be
held to encompass) is of itself sufficient to constitute that person a
depositor, Barclays argue that more is required, in particular that the
person to whom the bank is liable must also be the person who made the
deposit in the first place. This appears to have been the main argument
advanced against the claimant below, and much of the criticism directed
against the Vice-Chancellor's judgment has focused upon his reasons for
rejecting it, notably his reliance, first, upon section 61 of the Act, and
secondly, upon the Order of 1991. Before us, however, the emphasis of
the submissions shifted away from this argument and towards the
"liability" issue. Not least this was because Barclays came to recognise the
clearly unsatisfactory consequences flowing from the "deposit maker"
construction, above all: (a) the exclusion from the scheme in the case of
statutory assignments of anyone at all in a position to claim as depositor—
the assignor because the bank no longer remains liable to him, the assignee
because he was not the original deposit maker, and (b) the difficulty—
indeed, despite Mr. Brindle's submissions to the contrary, what I conclude
to be the impossibility—of compensating under the scheme the trustee in

E

F

G

H

A   bankruptcy of an insolvent account holder and the executors or personal representatives of a deceased account holder.

In the event this was not a part of the case upon which we found it necessary to call upon Lord Irvine and I propose to deal with it comparatively shortly.

The argument in support of the "deposit maker" construction is based in part upon what is contended to be the natural meaning of the word B   "depositor," and in part upon various provisions of the Act of 1987, two of which in particular appear to assume that a depositor is the person who will himself have made the deposit in question. The following are the two provisions particularly relied upon (in each case with emphasis added). Section 60(2):

C   "in relation to an institution in respect of which a payment falls to be made under section 58(2) above"—that is a provision comparable to section 58(1) but applicable when an administration order is made under the Insolvency Act 1986—"any reference in this Act to a depositor's protected deposit is a reference to the liability of the institution to him in respect of—(a) the principal amount of each sterling deposit which was *made by him* with a United Kingdom office D   of the institution before the making of the administration order . . ."

Section 60(6):

"In determining the total liability of an institution to a depositor for the purposes of subsection (1) above, or the liability or total liability of an institution to a depositor for the purposes of subsection E   (2) above, no account shall be taken of any liability in respect of a deposit if . . . (c) the institution is a former authorised institution and the deposit was made after it ceased to be an authorised institution or a recognised bank or licensed institution under the Banking Act 1979 unless, *at the time the deposit was made*, the depositor did not know and could not reasonably be expected to have known that it F   had ceased to be an authorised institution, recognised bank or licensed institution."

As to the natural meaning of "depositor," Mr. Brindle not surprisingly relies upon the Vice-Chancellor's own stated view [1993] Ch. 243, 248E–F that: "In this context that word would, I believe, naturally be read as meaning the person who made the deposit in question." In the event, G   however, the Vice-Chancellor decided that that natural meaning had to give way to the extent necessary to enable the underlying purpose of the Act to be achieved. That purpose, discerned in particular from section 61, was, he concluded, to compensate those beneficially entitled to a deposit as at the date payment fell to be made under the scheme.

The Vice-Chancellor in addition expressed himself confirmed in that H   conclusion by the terms of the Order of 1991 which he said, at p. 254B: "proceeded on the basis that 'depositor' does embrace a person who did not make the deposit but subsequently became entitled to it, by operation of law or otherwise." I take each of those reasons in turn.

*Section 61*

A

Section 61(1) provides: "In the cases to which this section applies sections 58 and 60 above shall have effect with the following modifications." There then follow several subsections dealing with a number of disparate situations, some of which, it has to be said, contain their own acute difficulties of construction. For present purposes it is sufficient to cite only the following. Subsection (3):

B

"Where a deposit is held for any person or for two or more persons jointly by a bare trustee, that person or, as the case may be, those persons jointly shall be treated as entitled to the deposit without the intervention of any trust."

"Bare trustee" is defined by section 106(1) of the Act to mean, in relation to a deposit:

C

"a person holding the deposit on trust for another person who has the exclusive right to direct how it shall be dealt with subject only to satisfying any outstanding charge, lien or other right of the trustee to resort to it for the payment of duty, taxes, costs or other outgoings; . . ."

D

Section 61(6):

"where two or more persons are jointly entitled to a deposit . . . each of them shall be treated as having a separate deposit of an amount produced by dividing the amount of the deposit to which they are jointly entitled by the number of persons who are so entitled."

E

By subsection (10), "jointly entitled" is defined to mean "beneficially entitled as joint tenants, tenants in common or coparceners."

Mr. Brindle makes two main submissions with regard to section 61. First, that its effect is expressly by way of modification to sections 58 and 60. Given, as all agree, that assignees are not included within its provisions, they therefore fall to be considered under sections 58 and 60 in their unmodified form. That clearly is right; indeed it can hardly be supposed that the Vice-Chancellor thought otherwise. It does not follow, however, that section 61 can throw no light upon the correct approach to the earlier provisions. On the contrary—and this is surely what the Vice-Chancellor had in mind—it is implicit in, for instance, subsections (3) and (6) that the beneficiaries—those to be treated respectively as "entitled to the deposit without the intervention of any trust" and as "having a separate deposit"—shall on that basis be entitled to compensation under the scheme even though themselves not the original deposit makers and, indeed, irrespective of whether their trust (in a subsection (3) case) or their joint entitlement (in a subsection (6) case) existed at the time the deposit was made. In short it appears plain from section 61, that once a person is treated as entitled to a deposit, that of itself qualifies him for payment under the scheme. Thus entitlement to a deposit under section 61 is seen to be precisely correlative to the institution's liability to the depositor under section 60(1).

F

G

H

Case 1:08-cv-00356-WDQ   Document 60-3   Filed 04/07/09   Page 13 of 35

2 A.C.          Deposit Protection Board v. Dalia (C.A.)        Simon Brown L.J.

A    Mr. Brindle's second main argument with regard to section 61 is that so far from there being, as the Vice-Chancellor concluded [1993] Ch. 243, 251:

> "one thread running through [it] . . . that where A is the person who made the deposit but B is the person beneficially entitled to the deposit, B is the material person for the purposes of the protection scheme,"

B

the section contains a heterogeneous group of provisions disclosing no clear pattern of entitlement. In the case of an ordinary family trust, for instance, or a partnership (subsection (5)), compensation is to be paid only in respect of one protected deposit and it is by no means all beneficiaries who themselves can advance a direct claim for payment. So

C    be it. This does not in my judgment undermine the central conclusion to be drawn from section 61 which is, as stated, that it looks to compensate those who are treated as being entitled to a deposit at the moment when the question of compensation arises.

*The Order of 1991*

D    Article 2(1) of the Order reads:

> "For the purposes of sections 60, 61 and 62 of the Banking Act 1987 the definition of deposit in section 5 of that Act shall be treated as excluding any sum to which a person becomes entitled (otherwise than by operation of law), or comes to be treated as entitled for the purposes of sections 58 and 60 of that Act, after a petition is presented for the winding up of the institution, or, in the case of an

E

> institution in respect of which such a petition has been presented before the date on which this Order comes into force, 30 July 1991."

It was made pursuant to section 7 of the Banking Act 1987 which permits the Treasury by order to amend the meaning of "deposit." Mr. Brindle submits that the Vice-Chancellor erred in regarding the Order as an aid to construction of the Act itself. This is not, he points out, a

F    case like *Britt v. Buckinghamshire County Council* [1964] 1 Q.B. 77 and *Hanlon v. The Law Society* [1981] A.C. 124 where the regulations relied upon were contemporary with the parent Act and, as Lord Lowry put it in *Hanlon*, at p. 193H, constituted a contemporanea expositio, providing a legitimate aid to construction on that basis. Here the Act was passed four years before the Order.

G    In any event, Mr. Brindle submits, all that the Order does is amend the Act of 1987; it does not illuminate its meaning before such amendment. True, it implicitly recognises that, unamended, the Act arguably fell to be construed as including within the word "depositor" those who become entitled to the deposit after the deposit was made. But that is not to say that the Order accepts that to be its true construction.

H    I acknowledge the force of these submissions and recognise too that subordinate legislation may well be passed, as Mr. Brindle submits this was, ex abundanti cautela. But all that said, it seems perhaps more likely that those responsible for the Order were intent on preserving, rather than merely leaving open to future argument, (a) the rights of those whose

entitlement arises by operation of law (ex hypothesi not the deposit A
makers), and (b) the rights of those who become entitled (otherwise than
by operation of law) before a winding up petition is presented—"pre-
petition assignees" as the Vice-Chancellor called them.

In rejecting the "deposit maker" construction, however, I put aside the
Order of 1991 and summarise my reasons as follows. First, it seems
singularly improbable that Parliament intended to exclude from protection
under the scheme three particular categories of non-deposit makers: B
personal representatives of deceased account holders, trustees in
bankruptcy, and legal assignees (those entitled to money on deposit
following a statutory assignment under section 136 of the Law of Property
Act 1925). Clearly the bank is liable to each of these for moneys in the
relevant account and, unless they are protected under the scheme, then
(for these accounts) no one is. Whatever at first blush may be thought the C
most obvious meaning of the word "depositor" under the Act, I certainly
see nothing unnatural in using it to encompass these particular categories
of claimant.

Secondly, as the Vice-Chancellor pointed out, whichever construction
one adopts there is bound to be some untidiness in the Act. True,
subsections (2) and (6) of section 60 appear to assume that the claimant
will have been the original deposit maker—Mr. Jarvis's submission to the D
contrary, advanced in a quasi-amicus capacity, I found difficult to follow.
But, as stated, section 61 appears clearly to recognise that in certain
circumstances that will not be so. Bearing in mind that section 60(2), the
most problematic of these two provisions, did not appear at all in the Act
of 1979—an Act which all agree is in pari materia with the Act of 1987—
it would be remarkable were it necessary on that account to give a E
narrower meaning to "depositor" now than would earlier have been
appropriate. It would, I conclude, be wrong to allow these assumptions to
carry the day.

I turn therefore to what appears to me the critical issue in these
proceedings: given that the claimant need not be the original deposit
maker, what must be the nature of his entitlement against the bank to
make him a "depositor" qualifying for protection under the scheme? F

Lord Irvine contends that a depositor is anyone directly entitled in law
or equity as against the bank to moneys standing on deposit. That, of
course, would include equitable assignees—at any rate those for whom
Lord Irvine is concerned, namely those entitled following an assignment
of which notice has been given and to which the bank has no equitable
defence. The board and Barclays contend on the contrary that depositors G
are only those to whom the bank owes a legal liability, a construction that
would clearly exclude all equitable assignees.

In resolving this issue it is convenient to begin by considering what are
the essential characteristics of equitable assignments and, not least, what
distinguishes them from legal assignments. During the course of the
hearing we were taken to a large number of authorities in this field. To
none of them do I think it necessary to refer in detail. They support, I H
believe, the following basic propositions.

1. An assignment of part of a debt cannot be an "absolute assignment"
within the meaning of section 16 of the Law of Property Act 1925 and

A thus it takes effect solely as an equitable assignment: *Forster v. Baker* [1910] 2 K.B. 636; *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349.

2. A statutory assignee acquires exclusive rights in the debt assigned and can give a good discharge for it or sue the debtor to judgment without involving the assignor in any way.

3. In the case of an equitable assignment, the assignor remains the legal owner of the relevant chose (here the part of the debt assigned) B whilst the assignee becomes entitled to the equitable interest in it—the "creditor in equity" as P. O. Lawrence J. put it in *In re Steel Wing Co. Ltd.*, at p. 357.

4. Once notice of an equitable assignment is given to the debtor, he cannot thereafter deal inconsistently with the assigned interest, for instance by making payment to the assignor: *Jones v. Farrell* (1857) 1 De G. & J. C 208; *Brice v. Bannister* (1878) 3 Q.B.D. 569.

5. In the case of an equitable assignment consisting of the assignment of part of a debt—we are not here concerned with assignments which are equitable rather than statutory only because of a failure to give due notice to the debtor—the assignee cannot give a good discharge in respect of the assigned part of the debt nor can he sue the debtor to judgment without first joining the assignor as a party to the proceedings—as co-plaintiff if D he co-operates, co-defendant if he does not: *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349; *Warner Bros. Records Inc. v. Rollgreen Ltd.* [1976] Q.B. 430; *Performing Right Society Ltd. v. London Theatre of Varieties Ltd.* [1924] A.C. 1.

6. Conversely in such cases, the assignor likewise cannot give a good discharge even in respect of the non-assigned part of the debt and he, too, E must join the assignee in any proceedings brought against the debtor: *Walter & Sullivan Ltd. v. J. Murphy & Sons Ltd.* [1955] 2 Q.B. 584.

7. The underlying rationale for all this is that there remains but one single debt: it would be oppressive for the debtor to have to defend more than one action arising out of the same transaction. He might, for instance dispute the existence of the debt or claim an equitable set-off in respect of it. Why should he have to do this more than once? Equally, as Scott J. F points out in his valuable review of the authorities in *Weddell v. J. A. Pearce & Major* [1988] Ch. 26, 41:

"if the legal owner of the chose were not a party to the action, the defendant might, notwithstanding he had paid the successful plaintiff, the equitable assignee, nevertheless remain liable to the legal owner. The legal owner, after all, might dispute the validity of the equitable G assignment, or might disclose a prior equitable interest in some third party."

8. Once that rationale is understood, cases like *William Brandt's Sons & Co. v. Dunlop Rubber Co. Ltd.* [1905] A.C. 454—where the House of Lords held it unnecessary to have sued the assignors too since the debtor, by paying them, had already obtained discharge of any further liability to H them—and, indeed, *Weddell v. J. A. Pearce & Major* [1988] Ch. 26 itself— where Scott J. held that an action commenced by an equitable assignee was not a nullity even though it could not have proceeded to judgment without first either joining the assignor or, as was there possible and in

the event done, giving notice so as to turn the equitable assignment into    A
an absolute statutory assignment—are readily explicable.

Against that background I turn to consider the rival arguments.

Lord Irvine's argument at its most extreme is that once notice is given
of an equitable assignment the debtor ceases to be liable to the assignor—
his only liability from that time on is to the assignee. This submission is
based principally upon the following passage from *Treitel, The Law of*
*Contract,* 8th ed. (1991), p. 585:                                           B

> "Where the assignment is statutory, the debtor ceases, as soon as
> notice has been given, to be liable to the assignor and becomes liable
> to the assignee. It is submitted that the same is true where the
> assignment is equitable; for it has been held that if the debtor in such
> a case ignores the notice and pays the assignor he is not discharged
> and will have to make a second payment to the assignee."              C

This argument I reject: as Mr. Brindle points out, the authorities
footnoted to that passage support only the comment following the semi-
colon—they do not make good Professor Treitel's submission that the
debtor ceases to be liable to the assignor. Rather there remains a legal
liability to the assignor albeit, true, one which the debtor meets only at
his peril.                                                                    D

At the other end of the spectrum, Mr. Jarvis for the board argues that,
even after notice, the bank remains liable solely to the assignor; the
assignee, he submits, has merely an equitable interest in the assigned part
of the debt in respect of which equity will give him relief. He has,
Mr. Jarvis accepted, a remedy; but that, he submits, is by no means the
same as saying that he has any entitlement against the bank or that the      E
bank has any liability to him.

This argument, too, I reject. The word "liability" in my judgment is
plainly apt to embrace the nature of the bank's obligations to an equitable
assignee after notice is given.

I conclude, therefore, that both the assignor and the assignee are
persons to whom the bank may properly be said to be liable in respect of
an assigned part of a debt. Given, however, as must be plain, that in       F
respect of that sum there can be only one "depositor" for the purposes of
the Act of 1987, the vital question becomes: which is it, the assignor or
the assignee? Which liability—or, conversely, whose entitlement—is the
Act concerned with?

Mr. Brindle, whose second line of argument expressly recognises that
an equitable assignee may indeed be someone to whom the bank is liable,      G
addressed this issue directly. He submits that although liability is a
necessary ingredient of a successful claim under the Act, it should not of
itself be regarded as sufficient basis for such a claim. To say that because
X is someone to whom the bank is liable, therefore X is a depositor, is a
non sequitur—after all, section 60(1) is concerned rather with identifying
what is to be regarded as a protected deposit than with defining a
depositor. Therefore one must look at the scheme of the legislation as a     H
whole to determine what characteristics apart from an entitlement against
the bank a person must have to qualify for protection as a depositor. As
to this Barclays and the board make these further submissions.

A    First, it is one thing to recognise as a depositor a legal assignee of a whole deposit, able to sue and give a good discharge in his own name; quite another to regard similarly an equitable assignee who, to perfect and enforce his rights, has to join the assignor in any proceedings he brings and who cannot alone give a good discharge. To describe him as a "depositor" is to depart from any natural meaning of that word.

B    Secondly, the liability of the bank to the equitable assignee—although in a real sense a liability—is not a liability independent of that owed by the bank to the assignor, nor such as to create the assignee a separate depositor in respect of a separate protected deposit. The very reason why there was not a legal assignment in the first place was because this was a single debt; that equally is the reason why claims by equitable assignees are subject to various procedural constraints. The inescapable consequence of this must be that there remains but a single deposit, the assignor and

C    assignee having different interests in that same debt.

    Thirdly, the right approach is therefore to regard only the assignor, the owner of the legal interest in the debt, as the depositor in respect of the single continuing debt. He, of course, can (as a statutory assignor cannot) recover on behalf of the equitable assignee as well as himself up to the limit of protection afforded by the scheme and can account to the

D    assignee, as appropriate, in respect of moneys recovered.

    Fourthly, there is at the very least room for doubt as to the meaning of the word "depositor" in this context and as to whether it is apt to embrace an equitable assignee. In these circumstances it is permissible to adopt a purposive construction to the statute. Such an approach would admit of only one answer. Parliament's intention is plain that even those

E    holding very substantial deposits shall recover no more than a maximum of £15,000. It is equally clear that no one would be likely to assign part of a bank account credit balance except, as here, for the specific purpose of escaping just such a limitation. As Barclays and the board point out, not merely have no claims been made upon the board by equitable assignees other than those who have sought to exploit this particular accountant's scheme, but in the real world it could never be a sensible arrangement.

F    Quite apart from involving a liability both for stamp duty and legal fees, it achieves nothing that could not better be achieved either by a cheque (which would meet almost every case), or just possibly by a charge or trust (in circumstances which, although rare, one can just about envisage). Lord Irvine's examples of situations where it might make sense to assign part of an account prove on close examination to be unreal, fanciful and far-fetched. True, *Paget's Law of Banking*, 10th ed. (1989), expressly

G    mentions the possible assignment of a credit balance where the sum to be assigned is on "time" or "notice" deposit, but this is contemplated specifically by way of statutory rather than equitable assignment; it does not appear to envisage part only of such balance being assigned. And, indeed, all this was appreciated by the Vice-Chancellor himself. He thought it quite possible and understandable that the draftsman had no

H    thought whatever of assignments. As he said [1993] Ch. 243, 252:

        "Assignments of money in a bank account, except by way of charge, are not everyday transactions. The absence of express provision in the section means that the court, treading circumspectly, must look at the

underlying purpose of the legislation and construe the draftsman's        A
language with that purpose in mind."

What Barclays and the board quarrel with, however, is the Vice-
Chancellor's subsequent holding that the compensation of assignees (or at
any rate equitable assignees) comes within that underlying purpose. The
Vice-Chancellor so held with regard to legal assignees for the reasons
already indicated, and with regard to equitable assignees because he took        B
the view that they cannot sensibly be treated differently. But, Barclays and
the board submit, this overlooks amongst other things the virtual certainty
that no equitable assignment will ever be made otherwise than with the
specific object of circumventing the £15,000 ceiling upon the sum
recoverable by each deposit holder, and thus ignores that evident purpose
of the legislation.
                                                                                  C
These are formidable arguments. How does Lord Irvine meet them?

First and foremost he submits that under the Act of 1987 there can be
no logical distinction between statutory assignees on the one hand—a
category we have already indicated we regard as entitled to compensation—
and equitable assignees on the other. True, as indicated, statutory
assignments and equitable assignments have different legal consequences.
But, submits Lord Irvine, relying upon a passage in the Vice-Chancellor's        D
judgment [1993] Ch. 243, 253, central to his decision in the case, "These
differences are not material for present purposes." Only the assignee is
entitled to actual payment of the sum assigned to him. If he has to sue, he
does so to vindicate his own, not the assignor's rights. The assignor is
joined only to guard against or resolve in a single action any dispute as to
the validity or extent of the equitable assignment.
                                                                                  E
With regard to the court adopting a purposive construction of the
statute, Lord Irvine submits first that the language of sections 58 and 60,
properly understood, unambiguously supports his contention. Difficult the
point of construction may be, but that is not to say that the Act is
ambiguous. Even, however, if that be wrong—or if, as Mr. Jarvis argues,
the court is in any event entitled to adopt a purposive approach to
construction—Lord Irvine submits that to admit equitable assignees        F
amongst the categories of those entitled to protection is not in any event
contrary to the intention of the scheme. In the first place, he submits, the
Vice-Chancellor was correct in holding that the protection of assignees is
within the underlying purpose of the legislation. And if that be right, then
to suggest that such transactions thwart Parliament's intention to limit
claims to a maximum of £15,000 is to beg the question. Secondly, he
submits that there was here in any event an opportunity for those        G
concerned in these assignments to have achieved the self-same consequence
of multiple recovery by setting up a bare trust and invoking the provisions
of subsections (3) and (6) of section 61. This, too, appears to have been
part of the Vice-Chancellor's reasoning as appears from the following
passage in his judgment, at p. 253:

"The trust provisions in section 61 draw no distinction of consequence        H
between a declaration of trust relating to the whole deposit and one
relating to a defined part of a deposit. That is not surprising. In the
present case the assignors declared themselves to be trustees of the

A    assigned parts of the deposits if B.C.C.I. was unable to designate separate deposit accounts in the assignees' names. I am unable to see why equitable assignments, with this fall-back declaration of trust, ought to be treated in any way differently for compensation purposes than if in place of assignments there had been simple declarations of trust. Had there been, there could have been no room for doubt."

B    With regard to this last point I respectfully doubt whether in fact the assignors here could have achieved multiple recovery by way of simple declarations of bare trust. Certainly the beneficiaries would have had to be "jointly entitled" within the meaning of section 61(10) and to have the exclusive right to direct the trustee how to deal with the whole deposit (section 106(1)). But be that as it may, it is not suggested here that the
C    assignors' fall-back declarations of trust achieved any such entitlement, and I cannot accept that the possibility of having been able to achieve such a result by other means, even had it existed, can logically avail the claimant in the present circumstances.

As to Lord Irvine's other submissions, I acknowledge their force, in particular regarding the apparent narrowness of the differences between statutory and equitable assignments and the difficulty of distinguishing
D    between them, the foundation of the Vice-Chancellor's decision in the matter.

I do not pretend to have found this by any means an easy case to decide. Having set out the competing arguments at some length, I propose to state my conclusions quite shortly. They are these.

I have come to the view that the differences between legal assignments
E    and equitable assignments, even though in one sense narrow, are in the present context real and in the end decisive. These differences I would summarise as follows. First, whereas after a legal assignment only one person, the assignee, can be said to have any entitlement against the bank, in the case of an equitable assignment, for the reasons given, the bank remains in different ways liable to both assignor and assignee. And this is not merely a technical distinction—its consequence is that whereas to
F    exclude legal assignees from the scheme would leave no one entitled to protection in respect of the assigned account, in the case of equitable assignments, the assignor can still claim.

Secondly, even after the assignment of part of a credit balance, there remains, as stated, but one single debt owed by the bank. That is why the transaction could not be by way of statutory assignment in the first place.
G    In my judgment, it is altogether easier to describe as a "depositor" under the scheme the new owner of an entire credit balance (a legal assignee) than the new equitable creditor of part only of that balance. After all, so to describe the equitable assignees means that in respect of one single debt there will be two or more quite distinct "depositors" under the Act of 1987, two or more people to whom the bank will in varying ways and in different sums be liable. To the extent that section 61 expressly provides
H    for such a situation, so be it. It does not follow that it can otherwise arise under the Act.

Thirdly, whereas I envisage at least the possibility that the whole credit balance of a bank account may be legally assigned for good reason, it

seems to me well nigh inconceivable that anyone would assign part of   A
such a balance for any reason other than that which so plainly prompted
the assignments in the present case, namely the hope of circumventing the
limitation on recovery under the statutory scheme. To assume, as I must
and do, that these assignments were genuine in the sense that they were
legally effective as between the parties to them, does not require me to
assume also that in the real world they would ever be used otherwise than
as a device. To the extent, therefore, that it is necessary to construe the   B
Act of 1987 purposively to achieve the conclusion to which I come, I do
so with this consideration in mind.

    For these reasons I have reached the view that only those to whom the
bank is legally liable are depositors within the scheme and that it is the
sum of a depositor's legal (rather than equitable) claims against the bank
which delimits the size of his protected deposit under section 60(1).   C
Accordingly I for my part would have proposed to allow these appeals,
set aside the declaration made by the Vice-Chancellor, and declare instead
that an assignee of part of a deposit is not to be treated as a depositor
with a protected deposit for the purposes of Part II of the Banking Act
1987. Since, however, I understand Russell L.J. and Sir Michael Fox to
take a different view upon the determining question concerning equitable
assignments, it follows that these appeals will be dismissed.   D


    RUSSELL L.J.   I have had the advantage of reading in draft the
judgment of Simon Brown L.J. I need not repeat the facts and I gratefully
adopt all that he says as to the background of the appeal and his rehearsal
of the competing arguments.   E

    In agreement with Simon Brown L.J. I also am satisfied that protection
under the scheme extends beyond the original depositor, and for the
reasons which he gives I too would reject the "deposit maker" construction
advanced by Mr. Brindle. I part company from Simon Brown L.J.,
however, when he deals with the liability of the board to equitable
assignees, although like him I have not found the resolution of this appeal
an easy task.   F

    In my judgment, whilst I recognise that the differences between a legal
assignee and an equitable assignee are real, they do not, in the context of
this case, justify a fundamental distinction being drawn so that the board
is liable to the one and not liable to the other.

    Had there been no insolvency, each and every equitable assignee could
have sued the bank to judgment if the bank, on demand, had declined to   G
pay out whatever sum had been assigned to the individual assignee. The
equitable assignment having been made by the original depositor pursuant
to a transaction which we are expressly enjoined not to regard as a sham,
there could have been no impediment to the assignee suing the bank to
judgment. The bank would have had no defence to the assignee's claim.
In reality the need to join the assignor in the proceedings would have been
no more than a procedural technicality for no objection to the judgment   H
could have been properly raised by the assignor. If the bank had paid the
assignor any part of the sum assigned without the authority of the
assignee, the latter would still have had an unanswerable claim. This, of

A   course, is on the basis that the bank had had notice of the assignment as it did in all the cases now under review.

In my judgment the scheme of the Banking Act 1987 is that the board, as compensating authority, should stand in the shoes of the defaulting bank, and I can see no reason why, subject to the financial limit, it should be in any better position vis-à-vis equitable assignees than the bank would have been but for the insolvency. If the bank would have been liable to

B   the equitable assignee by due process of law, and, absent any good cause demonstrated by the assignor, no longer liable to the assignor for the moneys assigned, then in my judgment the board must acknowledge the claim of the equitable assignee.

I am, of course, very conscious of the fact that what was done was plainly a device, but I emphasise that no argument was addressed to us

C   that because the assignments amounted to a device they did not, on that account, attract protection. The reservation of the board's position as to the true nature of the transactions may or may not lead to a different result from that which I have reached. I take the view that the Vice-Chancellor was right to make the declaration that he did and I would dismiss these appeals.

D

SIR MICHAEL FOX.   I agree with the judgment of Russell L.J. and would dismiss this appeal accordingly.

Basically, two arguments were advanced against the claims of the assignees to be entitled to protection, namely: (1) that a claimant is not entitled to protection under the Act of 1987 unless he was the original depositor, and (2) that, in any event, the rights of an equitable assignee

E   are not sufficient to make him a depositor qualifying for protection under the Act.

As to the first of those arguments, we did not call upon Lord Irvine. The reasons for that are set forth in the judgment of Simon Brown L.J.

The second argument is the central issue in the case. In order to deal with it, it is necessary to be clear as to the rights of an equitable assignee.

F   I should add that the assignments in the present case were equitable because, being assignments of part only of the debts, they were not absolute assignments for the purposes of section 136 of the Law of Property Act 1925.

An equitable assignee of a debt or part of a debt who has given proper notice of the assignment to the debtor, can recover the assigned amount from the debtor by an ordinary action in the courts. He must however

G   join the assignor as a party; that is merely for the protection of the assignor in case there are defences which he can raise to the validity of the assignment. The position of a legal assignee is different in that he can sue the debtor without joining the assignor as a party.

It is accepted that a legal assignment of a bank deposit would be sufficient to enable the assignee to obtain whatever benefit the Act of 1979 conferred in relation to that debt. The rights conferred by the general law

H   upon an equitable assignee are not in my judgment sufficiently different from those of a legal assignee to justify the conclusion that an equitable assignee is not entitled to the protection of the Act of 1979. In both cases the assignee is (subject to giving notice) entitled to recover the amount of

the assigned debt from the debtor. The equitable assignee must, of course,   A
join the assignor as a party. If the assignment is a valid assignment the
assignee will get judgment against the debtor for payment of the assigned
amount. If it is not a valid assignment, he will not get judgment but on
that assumption he had no claim anyway. In the present case, it is assumed
for the purposes of this appeal that the assignment was a genuine and
valid assignment which takes effect accordingly to its tenor. We must
assume, therefore, that there would be no defence to the assignees' claims.   B

I appreciate, of course, that a legal assignment would not have served
the purpose of the assignors in the present case. But what is important is
that a legal assignment would plainly be effective to secure the protection
of the Act of 1979 and that the rights conferred by an equitable assignment
are not sufficiently different to those of a legal assignee to justify any
significant practical distinction between legal and equitable assignees for   C
the purposes of this case. The crucial matter to any assignee is whether he
can recover the debt. The practical position is that, provided he gives
notice (which the legal assignee also has to do) the equitable assignee will
get his money if it was an unimpeachable assignment. He has to join the
assignor in the action but that, in such cases (including the present),
would be a formality.

Looking at the matter from the point of view of liability therefore, it   D
seems to me that an equitable assignee under a valid assignment must
realistically be regarded as entitled to the debt or part of the debt which
has been assigned to him. The courts will enforce payment.

Accordingly, I think that the Vice-Chancellor was right. I would
dismiss the appeals.

                                                                              E

                                                *Appeals dismissed.*

*Solicitors: Lovell White Durrant; Clifford Chance; Ashurst Morris
Crisp.*

                    [Reported by JOHN SPENCER, Barrister]                     F

The second defendant appealed.

*Michael Brindle Q.C.* and *Bankim Thanki* for the second defendant.
The issue is: who is a "depositor" within the meaning of section 58(1) of
the Banking Act 1987? The Act should be construed so as to further its   G
purpose and not to retard it: see *Jones v. Wrotham Park Settled Estates*
[1980] A.C. 74, 105, *per* Lord Diplock echoing the classic statements in
*Heydon's Case* (1584) 3 Co.Rep. 7a, 7b; see also *Remon v. City of London
Real Property Co. Ltd.* [1921] 1 K.B. 49.

The Act requires both that the claimant be a "depositor" and that the
institution be liable to him immediately prior to the winding up. Personal
representatives stand in the shoes of the original depositor, and trustees in   H
bankruptcy or statutory assignees inherit all the rights of the original
depositor to the exclusion of that person and can sue in their own name.
Thus, there is no difficulty in extending "depositor" to include those

A persons who supplant or replace the original depositor in respect of claims against the institution.

Although an equitable assignee of part of a deposit is in a sense entitled as against the institution in question, he does not supplant or replace the assignor and the liability of the institution to him is not a liability independent of that owed by a bank to the assignor, nor such as to create the assignee a separate depositor in respect of a separate

B protected deposit.

An assignment of part of a debt cannot be an "absolute assignment" within the meaning of section 136 of the Law of Property Act 1925 and thus can take effect only as an equitable assignment: see *Forster v. Baker* [1910] 2 K.B. 636 and *In re Steel Wing Co. Ltd.* [1921] 1 Ch. 349. Whilst

C a statutory assignee acquires exclusive rights in the debt assigned to him, in the case of an equitable assignment the assignor remains the legal owner of the chose in action and is not removed from the picture vis-à-vis the debtor. The equitable assignee cannot give a good discharge to the debtor in respect of the assigned debt and cannot sue the debtor to judgment without joining the assignor as a party: *In re Steel Wing Co. Ltd.* and *Performing Right Society Ltd. v. London Theatre of Varieties Ltd.*

D [1924] A.C. 1. Further, the assignor cannot give a good discharge even in respect of the part of the debt which he has not assigned and must join all equitable assignees of other parts of the total debt in any proceedings brought against the debtor: *Walter & Sullivan Ltd. v. J. Murphy and Sons Ltd.* [1955] 2 Q.B. 584. Since there is at all material times one single debt arising out of a single transaction with a single counterparty it would be oppressive for the debtor to defend more than one action: see *Weddell v.*

E *J.A. Pearce & Major* [1988] Ch. 26, 41A. Thus, the first defendant and those like her did not obtain any title independent of that of the relevant assignor. The "depositor" remained at all material times the assignor for the purposes of Part II of the Act of 1987, being the original depositor, the institution's customer, and also remaining entitled at law (although not in equity) to part of the deposit assigned.

F Alternatively, a "depositor" is to be regarded as the person who made the deposit. This construction accords with the natural meaning of the word and fits the wording of the Act: see sections 5, 60(2)(a)(6)(c), 61(8). However, that construction creates possible anomalies in respect of three categories of non-deposit makers, namely, personal representatives of deceased account holders, trustees in bankruptcy and statutory assignees becoming entitled pursuant to section 136 of the Law of Property Act

G 1925. The first construction removes these anomalies.

*John Jarvis Q.C.* and *Jonathan Nash* for the board, having adopted the submissions of the second defendant. The method chosen for limiting compensation indicates that Parliament had in contemplation that only one person would be entitled in respect of each deposit. Section 61 of the Act of 1987 was intended to modify the effect of sections 58 and 60.

H Drawing the line between legal and equitable assignees prevents the evasion of the limitation on compensation, achieves the purposes of the Act, does not violate the language of the statute and is most unlikely to produce unfairness or anomalies.

*Patrick Elias Q.C.* and *Philip Sales* for the first defendant. "Depositor"   A
in sections 58(1) and 60(1) of the Act of 1987 means a person who,
whether or not he made the deposit initially, is entitled in equity, at law
or pursuant to statute to payment by the institution of moneys held on
deposit by it. He is the person to whom the bank is liable. Thus, the first
defendant as equitable assignee of part of the credit balance of a deposit
is a depositor. There is no reason why the draftsman should have made a
distinction between creditors at law and in equity. The key to   B
understanding the Act is liability or entitlement. The board stands in the
shoes of the defaulting bank and if the bank was under a liability to pay,
so is the board: see, *per* Russell L.J., ante, p. 387A–B. [Reference was also
made to sections 60(2)(6)(*c*) and 61(3)(6)(7).]

The amount of compensation payable to a depositor is 75 per cent. of
his protected deposit, which is defined in section 60(1) as "the total   C
liability of the institution to him." If the deposit maker construction were
correct an anomaly would arise. An original depositor (in the payment
sense) who was also an assignee of a deposit could count the value of the
assigned deposit in calculating the amount of his protected deposit, and
hence could claim compensation in respect of the assigned deposit under
section 58(1). But an assignee of a deposit who had not himself made an   D
original deposit as well would get no compensation. There is no sound
basis for supposing that Parliament intended some assigned deposits to
attract compensation but not others. Further, by the operation of section
61(3) a beneficiary under a bare trust is intended to have the benefit of
the claim for compensation in respect of that deposit under section 58(1).
It would also be anomalous for the Act of 1987, by the regime for bare
trusts, to compensate such beneficiaries but not to compensate assignees   E
of deposits: see [1993] Ch. 243, 251F–252F, 253C–D, *per* Sir Donald
Nicholls V.-C.

Parliament must be assumed to have used the phrase "the total liability
of the institution" in section 60 in its natural meaning and as referring to
liability both at law and in equity: see *In re Steel Wing Co. Ltd.* [1921]
1 Ch. 349. "Liability" means liability to make payment to someone. Once   F
the assignment has taken place and notice has been given to the debtor,
he can resist any claim for payment by the assignor, who, for his part,
cannot give good discharge to the debtor. The assignee then has an
independent entitlement to enforce his claim. Once the debtor has paid
the assignee, he has a defence to any subsequent action: see *Jones v.
Farrell* (1857) 1 De G. & J. 208 and *Brice v. Bannister* (1878) 3 Q.B.D.
569. Thus in no sense can one talk of a continuing liability to the assignor.   G
The procedure whereby the assignee may have to join the assignor in
order to sue does not affect the assignee's substantive rights: see *Central
Insurance Co. Ltd. v. Seacalf Shipping Corporation* [1983] 2 Lloyd's Rep.
25. If the assignor sues in respect of part of the fund retained by himself,
he, too, must join the assignee: *Walter & Sullivan Ltd. v. J. Murphy and
Sons Ltd.* [1955] 2 Q.B. 584. No one has suggested that the assignor does   H
not have an entitlement to sue in such circumstances.

If "depositor" is limited to those with legal title, there would be a
serious anomaly between the laws of England and Scotland in relation to

A part assignments. Scots law does not make the distinction between law and equity.

*Brindle Q.C.* in reply. It is probable that the Act of 1987 was drafted primarily with English law in mind: see *Commissioners for Special Purposes of the Income Tax v. Pemsel* [1891] A.C. 531, 579. The Act may therefore have a different result under Scots law to that under English law. Although Scots law does not use the law/equity distinction, it does not follow that Scots law treats an assignment of part of a deposit as legally identical to an assignment of the whole.

It would be dangerous to use the Banking Act 1987 (Meaning of Deposit) Order 1991 as an aid to the construction of the Act. There is no material to suggest that the draftsman of the Order had any relevant intention one way or the other as to the meaning of "depositor." All the Order does is to amend the Act. It was made some four years after the parent Act, so "contemporanea expositio" cannot be prayed in aid.

Their Lordships took time for consideration.

19 May 1994. LORD KEITH OF KINKEL. My Lords, for the reasons set out in the speech to be delivered by my noble and learned friend, Lord Browne-Wilkinson, which I have read in draft and with which I agree, I would allow this appeal and make the declaration which he proposes.

LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

LORD BROWNE-WILKINSON. My Lords, the Deposit Protection Fund, established under Part II of the Banking Act 1987, is designed to provide compensation to depositors on the insolvency of an institution authorised to accept deposits under that Act. On the insolvency of the institution, a depositor is entitled to be paid three-quarters of the amount of his deposit, but limited to a maximum deposit of £20,000. Thus a depositor owed £20,000 can obtain compensation of £15,000. A depositor owed £100,000 is also entitled to compensation, but his claim, too, is limited to the same maximum of £15,000.

*The facts*

On 5 July 1991 the Bank of England presented a petition for the winding up of the Bank of Credit and Commerce International S.A. ("B.C.C.I."). Provisional liquidators were appointed and depositors ceased to be able to withdraw their money. It was therefore clear that there was a substantial risk that depositors with B.C.C.I. would not recover the amount of their deposits and would have to look to the Deposit Protection Fund. A firm of accountants devised a scheme whereby a depositor would assign a part of his deposit to "family members or close friends who can be trusted." For example, in the case of a deposit of £100,000 the depositor would assign £20,000 out of it to each of four friends. In consequence, if the scheme is effective, instead of the compensation payable in respect of the deposit of £100,000 being limited

to £15,000, the original depositor and each of the four assignees could          A
claim compensation of £15,000 in respect of the £20,000 part of the
deposit which belonged or had been assigned to him. In consequence,
instead of £15,000 being the maximum compensation payable in respect
of the original deposit of £100,000, the compensation payable would be
increased to £75,000.

The accountants wrote to depositors in B.C.C.I. suggesting this scheme.
A substantial number of depositors adopted the scheme. Before 30 July          B
1991, each depositor executed a deed of assignment which was in the
standard form prepared by, or for, the accountants. It described the
original depositor as "the vendor" and the assignee as "the purchaser."
After reciting the vendor's deposit with B.C.C.I. (which was identified by
its number) the deed provided: "in consideration of the sum of £1 . . . the
vendor by this deed sells, assigns and transfers the sum of £———— of the          C
deposit to the purchaser." At the same time, the original depositor gave
notice of the assignment to B.C.C.I. and instructed B.C.C.I.:

> "that the above-mentioned sum is now held by the purchaser and that
> the purchaser should now be identified by you as a depositor. If, for
> administrative reasons, you are unable to arrange for the completion
> of formalities to designate a separate deposit account in the name of          D
> the purchaser, I/we confirm that I/we hold the above mentioned sum
> on trust for the purchaser."

It is common ground that such assignments were not statutory
assignments of the debts owed by B.C.C.I. to the original depositors
within the meaning of section 136 of the Law of Property Act 1925, since
only part of the debt was assigned. However it is also agreed that they          E
took effect as equitable assignments under which in equity, but not at law,
B.C.C.I. became liable to pay each assignee the part of the debt assigned
to him.

Whilst it is accepted by all parties that the scheme devised by the
accountants was a device designed solely to increase the amount of
compensation recoverable, it is for the purposes of these proceedings          F
accepted that the assignments were genuine and that there was no
arrangement that the assignee would hold any compensation received by
him for the benefit of the assignor. However, the Deposit Protection
Board has reserved the right in future proceedings to challenge the validity
of the assignments if necessary.

These proceedings are designed to establish whether or not the scheme          G
devised by the accountants is effective. Any future resort to such a
scheme has now been counteracted by the Banking Act 1987 (Meaning of
Deposit) Order 1991 in such a way that any assignment of deposits made
after 30 July 1991 and after a winding up petition has been presented will
not qualify for compensation. But the Order does not affect this scheme
which, if effective, will give rise to an additional £3·7m. of compensation
being payable out of the fund in respect of deposits with B.C.C.I. The          H
first defendant is an assignee of part of the debt owed to a Mrs. Dalia
prior to the assignment: she is joined to represent all such assignees. The
second defendant is Barclays Bank Plc. which is joined to represent all the

A   authorised institutions which, under the Act of 1987, are responsible for providing the funds necessary to meet the compensation payments.

*The issues*

   The question in this case is one of pure statutory construction. Under section 58(1), upon an authorised institution becoming insolvent
B   compensation is payable "to each depositor who has a protected deposit with that institution." The question is whether an assignee of part of the deposit is a "depositor." No argument was advanced before the House based on the final words of the notice to B.C.C.I. referring to a declaration of trust.

   The Act contains no relevant definition of the word "depositor." Broadly stated three possible constructions of "depositor" have been put
C   forward, viz.:

   (1) The deposit maker construction, i.e. the word "depositor" means only the person who originally paid the sum to the insolvent institution. On this construction, no assignee of a deposit (other than a limited class of deposits under certificates of deposit) is a "depositor."

   (2) The entitled-at-law construction, i.e. the person entitled in law (as opposed to equity) to the sum deposited. On this construction legal
D   assignees of a deposit who acquire the whole legal and equitable right to the debts are "depositors" but equitable assignees such as the present claimants are not.

   (3) The entitlement construction, i.e. any person entitled to the deposit as against the institution whether or not he was the person who originally paid the sum to the institution. On this construction the present claimants
E   and all other legal and equitable assignees are "depositors."

   Sir Donald Nicholls V.-C. [1993] Ch. 243 rejected the deposit maker construction as did, unanimously, the Court of Appeal, ante, pp. 373H et seq. The entitled-at-law construction was not fully advanced before the Vice-Chancellor and was rejected by the majority of the Court of Appeal (Russell L.J. and Sir Michael Fox, Simon Brown L.J. dissenting).
F   Accordingly, the Vice-Chancellor and the majority of the Court of Appeal held in favour of the claimants. Barclays Bank appeal that decision to your Lordships' House.

   Although the question raised is a simple one, the answer is far from simple and involves the very complicated interaction of a number of sections in the Act, not all of which were brought to the attention of the courts below.

G

*The Act*

   Although the Act of 1987 contains no definition of "depositor" it does contain a definition of "deposit" to which I attach considerable importance:

   "5(1) Subject to the provisions of this section, in this Act 'deposit'
H   means a sum of money paid on terms—(*a*) under which it will be repaid, with or without interest or a premium, and either on demand or at a time or in circumstances agreed by or on behalf of the person making the payment and the person receiving it; and (*b*) which are not referable to the provision of property or services or the giving of

security; and references in this Act to money deposited and to the   A
making of a deposit shall be construed accordingly. . . . (3) Except
so far as any provision of this Act otherwise provides, in this Act
'deposit' does not include—(a) a sum paid by the bank or an
authorised institution; (b) a sum paid by a person for the time being
specified in Schedule 2 to this Act; (c) a sum paid by a person, other
than a person within paragraph (a) or (b) above, in the course of
carrying on a business consisting wholly or mainly of lending money;   B
(d) a sum which is paid by one company to another at the time when
one is a subsidiary of the other or both are subsidiaries of another
company or the same individual is a majority or principal shareholder
controller of both of them; or (e) a sum which is paid by a person
who, at the time when it is paid, is a close relative of the person
receiving it or who is, or is a close relative of, a director, controller   C
or manager of that person."

That definition applies for all the purposes of the Act but, for the purposes
of Part II, certain amendments are made by section 60(9).

Part II of the Act provides for the payment of compensation on the
insolvency of an authorised institution. Such payment is made out of a
fund constituted under Part II. Section 58(1) provides for compensation   D
to be payable in the event of an authorised institution becoming insolvent
which, by section 59(1) is defined as the date of the winding up order.
Section 58(2) provides for the payment of compensation in the event of
an administration order being made under section 8 of the Insolvency Act
1986. They provide:

"58(1) Subject to the provisions of this section, if at any time an   E
institution becomes insolvent and at that time—(a) it is an authorised
institution; or (b) it is a former authorised institution . . . the board
shall as soon as practicable pay out of the fund to each depositor
who has a protected deposit with that institution an amount equal to
three-quarters of his protected deposit. (2) Subject to the provisions
of this section, if at any time an administration order is made under   F
section 8 of the Insolvency Act 1986 in relation to an institution and
at that time it is such an institution as is mentioned in subsection (1)
above the board shall pay out of the fund to each depositor who has
a protected deposit with that institution an amount equal to three
quarters of his protected deposit; . . . "

These two subsections therefore require one to discover what is "a   G
protected deposit," a phrase defined by section 60:

"(1) Subject to the provisions of this section, in relation to an
institution in respect of which a payment falls to be made under
section 58(1) above any reference in this Act to a depositor's protected
deposit is a reference to the total liability of the institution to him
immediately before the time when it becomes insolvent, limited to a   H
maximum of £20,000, in respect of the principal amounts of and
accrued interest on sterling deposits made with the United Kingdom
offices of the institution. (2) Subject to the provisions of this section,

A
in relation to an institution in respect of which a payment falls to be made under section 58(2) above any reference in this Act to a depositor's protected deposit is a reference to the liability of the institution to him in respect of—(a) the principal amount of each sterling deposit which was made by him with the United Kingdom office of the institution before the making of the administration order and which under the terms on which it was made is or becomes due

B
or payable while the order is in force; and (b) accrued interest on any such deposit up to the time when it is or becomes due and payable as aforesaid; but so that the total liability of the institution to him in respect of such deposits does not exceed £20,000. . . . (6) In determining the total liability of an institution to a depositor for the purposes of subsection (1) above, or liability or total liability of an

C
institution to a depositor for the purposes of subsection (2) above, no account shall be taken of any liability in respect of a deposit if . . . (c) the institution is a former authorised institution and the deposit was made after it ceased to be an authorised institution or a recognised bank or licensed institution under the Banking Act 1979 unless, at the time the deposit was made, the depositor did not know and could not reasonably be expected to have known that it had

D
ceased to be an authorised institution, recognised bank or licensed institution. . . . (9) For the purposes of this section and sections 61 and 62 below the definition of deposit in section 5 above—(a) shall be treated as including—(i) any sum that would otherwise be excluded by paragraph (a), (d) or (e) of subsection (3) of that section if the sum is paid as trustee for a person not falling within any of those

E
paragraphs; (ii) any sum that would otherwise be excluded by paragraph (b) or (c) of that subsection; (b) subject to subsections (10) and (11) below, shall be treated as excluding any sum paid by a trustee for a person falling within paragraph (e) of subsection (3) of that section; and (c) shall be treated as including any sum the right to repayment of which is evidenced by a transferable certificate of deposit or other transferable instrument and which would be a deposit

F
within the meaning of section 5 as extended by paragraph (a) and restricted by paragraph (b) above if it had been paid by the person who is entitled to it at the time when the institution in question becomes insolvent."

Section 61 has a sidenote "Trustee deposits, joint deposits etc." It provides, so far as relevant:

G
"(1) In the cases to which this section applies sections 58 and 60 above shall have effect with the following modifications. (2) Subject to the provisions of this section, where any persons are entitled to a deposit as trustees they shall be treated as a single and continuing body of persons distinct from the persons who may from time to time be the trustees, and if the same persons are entitled as trustees to different deposits under different trusts they shall be treated as a

H
separate and distinct body with respect to each of those trusts. (3) Where a deposit is held for any person or for two or more persons jointly by a bare trustee, that person or, as the case may be, those

persons jointly shall be treated as entitled to the deposit without the   A
intervention of any trust. (4) Subsection (3) above does not extend
to Scotland and, in Scotland, where a deposit is held by a person as
nominee for another person or for two or more other persons jointly,
that other person or, as the case may be, those other persons jointly
shall be treated as entitled to the deposit. (5) A deposit to which two
or more persons are entitled as members of a partnership (whether or
not in equal shares) shall be treated as a single deposit. (6) Subject   B
to subsection (5) above, where two or more persons are jointly
entitled to a deposit and subsection (2) above does not apply each of
them shall be treated as having a separate deposit of an amount
produced by dividing the amount of the deposit to which they are
jointly entitled by the number of persons who are so entitled."

  C

I will deal first with the deposit maker argument since, if this is correct,
no assignee can be a "depositor" for the purposes of section 58.

*The prima facie meaning of "depositor"*

Both Sir Donald Nicholls V.-C. and (to a lesser extent) the Court of
Appeal considered that prima facie "depositor" means a person who   D
makes the deposit. This view was challenged by Mr. Elias for the
claimants but, in the context of this Act, I agree with the courts below.

My view is strengthened by the definition of "deposit" in section 5.
To my mind, a depositor within the meaning of the Act must at least be
entitled to a "deposit" as defined in the Act. Section 5(3) excludes from
the definition of "deposit" certain sums "paid" to the institution, such
exclusions being formulated by reference to the personal characteristics of   E
the payer. Thus, a sum paid to an institution by a person who at the time
when it is paid is, for example, a close relative of a director (whom I will
call a "close relative") is not included in the definition of a deposit. One
would assume therefore that the word "depositor" prima facie means the
person whose characteristics at the time he paid the sum to the institution
determined whether or not the sum so paid is a "deposit" within the
meaning of the Act.   F

As the courts below appreciated, this prima facie meaning of depositor
as being the deposit maker is much supported by subsections (2) and
(6)(*c*) of section 60. Subsection (2) deals with the meaning of a
"depositor's protected deposit" in the event of an administration order
being made. It is defined as the liability "to him" (i.e. to "the depositor")
in respect of a sterling deposit "which was made by him." It is therefore   G
clear that, in the context of administration orders, a "depositor" for the
purposes of Part II means the person who originally made the deposit.
Nobody has been able to suggest any reason why, in this respect,
Parliament should have intended to treat compensation payable on the
insolvency of a company differently from compensation in the event of an
administration order being made in relation to a company.

Section 60(6)(*c*) points in the same direction. It deals with a case   H
where a sum is deposited with an institution which was formerly authorised
but at the date of deposit had ceased to be authorised. Such a person is
entitled to compensation under section 58(2). The effect of subsection

A  (6)(c) of section 60 is to exclude compensation unless, *at the time the deposit was made*, the depositor did not have notice that the institution had ceased to be authorised. Thus "the depositor" in this provision must be the person who originally paid the sums to the institution. If, as the claimants submit, "depositor" includes an assignee, in the case of a claim made by an assignee either the state of knowledge of the original payer would have to be investigated or an assignee of the debt would be entitled

B  to compensation even though he at all times (including the date of assignment) knew that the institution had ceased to be authorised. It seems improbable that Parliament intended either of these results.

*Is the prima facie meaning displaced?*

C      What, then, persuaded the courts below that an assignee of the debt was a depositor for the purposes of Part II of the Act? In broad terms there were three reasons, viz.: (1) That since the provisions of section 61 confer a right to compensation on beneficiaries under bare trusts, it was inconceivable that statutory assignees should be treated less favourably. (2) The Order of 1991, being a legitimate aid to construction, only operates to negate assignments made after a winding up petition is

D  presented; therefore, by inference, assignments made before such presentation entitle the assignee to compensation. (3) That it would be surprising if statutory assignees of a debt were not entitled to compensation.

       I can deal with the second of those reasons quite shortly. Although there are occasions on which regulations can be used as an aid to construction of the Act under which they are made (*Hanlon v. The Law*

E  *Society* [1981] A.C. 124) that is only where the regulations are roughly contemporaneous with the Act being construed. In my judgment regulations made by a government department and rushed through in order to counteract an identified mischief (viz. the accountants' device which is the subject matter of this appeal) throw little if any light on the meaning of an Act passed by Parliament four years previously.

F      I turn then to the first reason urged, viz. the provisions of section 61 relating to deposits held on trust. I fear that the proper construction of section 61 depends upon a complicated interaction between section 5, section 60(9) and section 61. The courts below proceeded throughout on the basis that compensation is payable to a person who (a) is a "depositor" and (b) is entitled to a sum deposited with an institution. On that basis,

G  they treated it as being clear that since section 61(3) and (4) require one to treat the beneficial owner of deposits made by bare trustees or nominees as being "entitled to the deposit" such person must be a "depositor" for the purposes of Part II. In their view, this was the result whether the nominee originally paid the sum as nominee or, after making the payment to the institution, subsequently declared himself to be a bare trustee or nominee. Therefore, they considered, it must have been the underlying

H  purpose of the Act to provide compensation for a person who is beneficially entitled to the sum deposited. In particular, Parliament could not have intended to draw any distinction between a statutory assignee and a beneficiary entitled under a bare trust.

I cannot agree with this conclusion for the reasons which in outline   A
can be stated as follows. 1. The right of a beneficiary to compensation
under section 61 depends on his entitlement to a "deposit" within the
meaning of Part II of the Act: if there is no relevant "deposit" he cannot
be the "depositor." It is therefore impossible to draw any firm conclusion
as to the rights of an assignee by comparison with those of a beneficiary
absolutely entitled under a bare trust without considering the provisions
of section 60(9) which vary the meaning of "deposit" for the purposes,   B
inter alia, of section 61. 2. Section 60(9)(c) expressly modifies the
definition of "deposit" in relation to one type of assignment (those
evidenced by a transferable instrument) but is significantly silent as to
other assignments.

I will consider each of these reasons in turn.

C

*1. The meaning of "deposit"*

It is, in my view, clear that no one can be a "depositor" unless he is
entitled or deemed to be entitled to a "deposit" within the statutory
definition. Under section 5(3) sums paid by someone who falls within the
classes excluded by paragraphs (a) to (e) of section 5(3) are not deposits
within the meaning of the Act. Therefore, apart from the modifications   D
introduced by section 60(9), in the case of a sum paid to the institution
by a trustee, its status as a "deposit" under section 5(3) depends upon the
personal characteristics of the payer (the trustee) not the beneficiary.
Thus, if A (who is a close relative of a director of the institution) pays a
sum to an institution as bare trustee for B (who is not a close relative)
under section 5(3)(e) the sum is not a deposit, since it was "paid by" A,
a close relative, and sums so paid are excluded from the definition of   E
"deposit." The characteristics of B, the beneficiary, are irrelevant for the
purposes of section 5(3).

When Parliament determined that compensation should be payable to
certain beneficiaries under trusts, this necessarily required a modification
of the definition of "deposit" so as to determine whether or not a debt
owed by an institution is a "deposit" by reference to the characteristics of
the beneficiary, B. This variation was effected by section 60(9)(a) and (b)   F
under which the status of the sum as a "deposit" is made to depend on
the characteristics of the beneficiary, not those of the trustee. Thus, in the
example given above, for the purposes of sections 60 and 61 of the Act, a
sum which would have been excluded by section 5(3)(e) from being a
"deposit" falls to be treated as a deposit since it was paid by A, as trustee,
for B who, not being a close relative, was not an excluded person under   G
section 5(3)(e).

It follows that the provisions of section 61(3) which say that the
nominee "shall be treated as entitled to the deposit" do not, as the courts
below considered, lead to the conclusion that he is a "depositor." A
claimant who is a beneficiary under a bare trust also has to show that,
within the definition in section 5(3) as amended by section 60(9), the sum
falls to be treated as a "deposit:" unless it is a deposit he will not be the   H
depositor.

Once the importance of the definition of "deposit" is apparent, the
analogy between the rights to compensation of a beneficiary under a bare

A  trust and the right of an assignee to such compensation becomes very strained. A (a close relative) pays a sum to the institution as trustee for B (not a close relative): B is entitled to compensation since the sum is to be treated as a deposit (section 60(9)(*a*)). Compare the case where A (a close relative) assigns an existing deposit to B (not a close relative). B is not entitled to compensation: the sum is not a "deposit" since its status falls to be determined according to the characteristics of A at the date of
B  payment under section 5(3), there being nothing to modify that definition for the purposes of Part II of the Act. Therefore the rights of an assignee to compensation would not be the same as a beneficiary under a bare trust.

Take another case. A (not a close relative) pays the sum to the institution as trustee for B (a close relative). The sum is not a "deposit"
C  (section 60(9)(*b*)): therefore no compensation is payable. Contrast the case where A, instead of declaring himself trustee, assigns the debt to B (a close relative). If assignees are to be treated as "depositors," B would be entitled to compensation since there is nothing to link the definition of "deposit" to the status of the assignee as opposed to that of the person who made the original payment. One would therefore have the remarkable
D  result that close relatives who obtained assignments of debts would be entitled to compensation where, if they had made the original deposit themselves or were beneficiaries under a bare trust, they would have been expressly excluded.

For these reasons, in my judgment section 60 provides no clear guidance as to the meaning of the word "depositor."

E
*2. "Negotiable deposits"*

In the courts below it was thought that the draftsman of the Act had probably overlooked the position of assignees. However, section 60(9)(*c*) deals specifically with one type of assignment, viz. deposits evidenced by transferable certificates of deposit or other transferable instruments
F  ("C.D.s"). Therefore the rights of assignees of at least one kind were in the mind of the draftsman.

It is interesting to see how Parliament dealt with the definition of "deposit" in the context of C.D.s. The subject matter of a C.D. is to be included in the definition of "deposit" "if it had been paid by the person who is entitled to it at the time when the institution in question becomes insolvent." There are two points to be noted. First, the assignee is to be
G  deemed to have made the initial payment, i.e. he is deemed to be the deposit maker. This strongly suggests that Parliament was, throughout, considering a depositor to be the original payer and therefore had to deem an assignee to have paid the deposit. Second, unlike the personal characteristics of beneficiaries under a trust which are ascertained at the date of the original payment, it is the personal characteristics of the
H  assignee at the date of insolvency which determines the status of the C.D. As one would expect in the case of compensation for assignees, the entitlement to compensation is not made to depend on the personal characteristics of the original depositor.

However, the most significant feature of section 60(9)(*c*) is that it deals    A
only with one type of assignment, viz. assignments of sums deposited
under C.D.s. If "depositor" includes all assignees, this would lead to
extraordinary results. If A (not a close relative) makes a C.D. deposit
and then transfers it to B (a close relative), B is not entitled to
compensation since the sum is not a deposit by virtue of section 60(9)(*c*).
If, on the other hand, A were to make an ordinary deposit (not a C.D.)
and then assign it to X (a close relative), X is entitled to compensation    B
since there is nothing to exclude the debt from the definition of deposit.
I find it impossible to accept that Parliament, having been to such lengths
to exclude from compensation a close relative who was either the original
depositor, or a beneficiary under a trust, or the holder of a C.D., intended
an assignee who is a close relative at the date of insolvency to receive
compensation.                                                                   C
    For these reasons I can find nothing in the provisions of section 61
which clearly indicate that an assignee is to be treated as a depositor and
indications in section 60 that he is not to be so treated.

*No compensation for assignees*

    There remains the final reason relied upon by the courts below for    D
rejecting the prima facie meaning of the word depositor, viz. that it would
be odd if Parliament had not provided compensation for a statutory
assignee: in the case of an assigned debt, the result would be that neither
the original deposit maker nor the assignee would be entitled to
compensation.
    The Court of Appeal, but not Sir Donald Nicholls V.-C., considered
that unless assignees were "depositors" neither the personal representatives    E
nor the trustee in bankruptcy of the original deposit maker would be
entitled to compensation. In my judgment this is not correct. Personal
representatives and trustees in bankruptcy are, by operation of law,
universal successors to those whom they represent. Therefore on any
footing they are entitled to the compensation to which the persons they
represent would have been entitled had they survived or not become
insolvent.                                                                      F
    That leaves the undoubted fact that, on the deposit maker construction,
a legal assignee of the debt (apart from deposits under C.D.s) will not be
entitled to compensation. Although I agree that it is difficult to see the
reason for such exclusion, it may well be that the rarity of assignments of
deposits provides an explanation. In the ordinary way, deposits with
banks and other financial institutions are not assigned. The transfer of    G
cash on deposit is normally achieved by drawing a cheque in favour of the
transferee or drawing cash and paying it to the transferee. We were told
that, apart from C.D.s and the assignments the subject matter of this
action, the Deposit Protection Board had no experience of any statutory
assignments and knew of only one equitable assignment where trustees
attempted to assign the deposit to themselves. The view may well have    H
been taken that, apart from C.D.s, in the real world such assignments do
not occur.

A   *Conclusion*

I therefore find nothing in the other provisions of the Act which is inconsistent with the prima facie meaning of "depositor" as being the person who makes the deposit. I would therefore allow the appeal on this ground and declare that a person entitled to a debt by reason of the assignment of part of a debt is not a depositor holding a protected deposit

B   entitled to compensation pursuant to section 58(1) of the Act. In the circumstances it is unnecessary for me to deal with the other arguments advanced. It is agreed that there will be no order as to costs.

LORD MUSTILL.   My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

C

LORD LLOYD OF BERWICK.   My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson. For the reasons he gives I, too, would allow the appeal.

D                                        *Appeal allowed.*
                                         *No order as to costs.*

*Solicitors: Lovell White Durrant; Clifford Chance; Ashurst Morris Crisp.*

                                                      C. T. B.

E

F

G

H